**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **AMERICAN SIGNATURE, INC.,** | : | |
| **AND SEI, INC.,** | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 2:09 cv 878** |
| | : | |
| **vs.** | : | **Judge Frost** |
| | : | |
| **MOODY'S INVESTORS** | : | |
| **SERVICES, INC.,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **THE MCGRAW HILL** | : | |
| **COMPANIES, INC.** | : | |
| | : | |
| **and** | : | |
| | : | |
| **STANDARD & POOR'S FINANCIAL** | : | |
| **SERVICES, LLC,** | : | |
| | : | |
| **Defendants.** | : | |

**FIRST AMENDED COMPLAINT**

**(JURY DEMAND ENDORSED HEREON)**

Plaintiffs American Signature, Inc. ("ASI") and SEI, Inc. ("SEI"), for their first amended complaint against Defendants Moody's Investors Services, Inc. ("Moody's"), The McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services, LLC, d/b/a "Standard & Poor's Rating Services" ("S&P") (together, the "Rating Agencies" or "Defendants"), allege as follows:

**PRELIMINARY STATEMENT**

1.     This action arises from the Ratings Agencies' egregious fraud in convincing Plaintiffs and other investors to rely, in making their investment decisions, upon the Rating

Agencies' ratings of the creditworthiness of securities – ratings that that the Agencies falsely represented were objective, independent, and derived from valid methodologies.

2.      In fact, the Ratings Agencies fraudulently concealed the truth that certain complex derivative auction rate securities ("ARS") were undeserving of the misleadingly high ratings the Ratings Agencies had assigned to them because those ratings did not reflect any review of the ARS but, rather, were, upon information and belief, derived from the Rating Agencies' own ratings on subprime mortgage-related derivatives and/or entities whose ratings were knowingly and improperly inflated due to their dependence on the underlying and improperly rated subprime securities.  The ARS ratings, as well as the underlying ratings from which they were derived, were, thus, over inflated and utterly baseless because the Ratings Agencies:  i) competed to deliver to the issuers of the underlying subprime derivatives highly and unjustifiably favorable ratings in order to convince the issuers to retain them; ii)  participated in structuring those very securities that they were supposed to be rating objectively; and iii) used ratings methodologies that they knew to be outdated, inappropriate and inapplicable.

3.      As a result of Defendants' fraud, they assigned egregiously misleading high "investment grade" ratings to ARS, including those purchased by Plaintiffs.  Defendants thereby garnered lucrative fees from the issuers and/or other entities with a direct interest in the securities they rated, and Plaintiffs became the owners of now worthless ARS and have suffered tens of millions of dollars in losses.

4.      ASI, a furniture retailer, and its affiliate, SEI, became the victims of Defendants' fraud because they had established conservative investment policies for their cash management accounts that relied explicitly upon Defendants' ratings schemes.  Intending to permit investment of their cash in only safe and liquid "cash equivalent" securities, Plaintiffs expressly restricted

2

their former investment advisor, Lehman Brothers, Inc. ("Lehman"), to purchasing only securities that carried high "investment grade" ratings from one or more of the major nationally recognized statistical rating organizations ("NRSROs"), including Defendants Moody's and S&P.  In doing so, Plaintiffs relied upon Moody's and S&P's representations that their ratings were the product of current, unbiased, objective analyses and reflected Moody's and S&P's independent and good faith conclusions as to the creditworthiness of the rated securities.

5.     However, as Moody's and S&P knew, but concealed from Plaintiffs and the investment community, the ratings that Moody's and S&P assigned to the complex ARS purchased for Plaintiffs' accounts had no basis in fact because the ratings the Agencies applied to the subprime mortgage-related securities upon which the ARS ratings were ultimately derived and/or dependent were utterly meaningless.  Moody's and S&P, for example, had developed new statistical methodologies to rate these complex securities, but refused to implement these new methodologies because doing so would have cut into profits.  Accordingly, Moody's and S&P instead rated the complex new securities using their preexisting, outdated and inapplicable methodologies for rating much less complex, ordinary corporate bonds, and otherwise knowingly relaxed their standards – even though Moody's and S&P knew that this would result in ratings that were fallacious and unreliable.  The Agencies then rated the ARS based on ratings derived from and/or otherwise dependent on their meaningless ratings of other subprime securities, inflicting the harm from their fraud on conservative, short-term investors, including Plaintiffs.

6.     While Moody's and S&P repeatedly represented to investors, including Plaintiffs, that their opinions were independent and their methodologies objective, the opposite was true. Moody's and S&P concealed from Plaintiffs and many other members of the investing public that, far from being neutral reviewers of the complex new securities, Moody's and S&P had

strong incentives from their compensation structure to deliver highly favorable investment grade ratings – incentives that effectively negated whatever independence Moody's and S&P might otherwise have had.  Most of the compensation issuers paid to the Rating Agencies for rating complex structured products (unlike for rating corporate bonds) was paid once the Rating Agency was selected by the issuer (or its investment bank) to rate the product based on the Agency's preliminary risk evaluation of the product.  Consequently, Moody's and S&P were under strong competitive and financial pressures to deliver favorable evaluations of the ARS to win the issuer's business and capture lucrative fees.

7.     These competitive pressures led Moody's and S&P not only to inflate the preliminary and final ratings they assigned to complex new securities and, ultimately, to the ARS, but also to work directly with the issuers in structuring the complex securities on which those ARS ultimately depended so Moody's and S&P could try to justify the investment grade ratings necessary to induce investors such as Plaintiffs to purchase the securities.  By working directly with the investment banks and the issuers, Moody's and S&P made it possible to market such securities and, in return, earned hundreds of millions of dollars in fees, giving them profits that were vast multiples of what they had reaped in the past.

8.     In reliance upon the unjustified investment grade ratings Moody's and S&P applied to ARS that were tied to subprime mortgage-related derivatives and/or to other securities dependent thereupon, Lehman purchased on Plaintiffs' behalf hundreds of millions of dollars worth of those ARS.  Now that the true risks of those securities have been revealed by the exploding subprime mortgage crisis, Plaintiffs are holding millions of dollars worth of securities that are essentially worthless.

## THE PARTIES

9.      ASI is a privately-held corporation formed under the laws of the State of Ohio, with its principal place of business at 4300 East Fifth Avenue, Columbus, Ohio 43219.

10.     SEI is a privately-held corporation formed under the laws of the State of Nevada, with its principal place of business at 4300 East Fifth Avenue, Columbus, Ohio 43219.

11.     Defendant Moody's is a Delaware corporation with its principal place of business in New York.  Moody's is an NRSRO that holds approximately a 40% share of the world's credit ratings market.

12.     Upon information and belief, Defendant The McGraw Hill Companies is a Delaware corporation with its principal place of business in New York.

13.     Upon information and belief, Defendant Standard & Poor's Financial Services, LLC is a Delaware limited liability company with its principal place of business in New York.  It is also a subsidiary of The McGraw Hill Companies.

14.     Upon information and belief, Standard & Poor's Ratings Service ("S&P") is a unit of The McGraw Hill Companies and/or its subsidiary[ies].  S&P is an NRSRO that holds approximately a 40% share of the world's credit ratings market.

15.     Upon information and belief, both Moody's and S&P regularly conduct business in Ohio, including within the Southern District of Ohio, Eastern Division.  Moreover, both Moody's and S&P have previously been subject to litigation in this forum, and they are currently defendants in a separate action brought against them by the state of Ohio.

## STATEMENT OF FACTS

16.     Plaintiffs are retail businesses that maintain substantial amounts of their assets in cash or other highly-liquid investments to meet various business contingencies – such as paying

vendors and service providers, satisfying tax obligations, meeting compensation commitments, and investing in new business opportunities.  To protect their cash, Plaintiffs had always placed it in traditional short- and/or intermediate term cash management instruments that were liquid and safe, such as commercial paper, U.S. government obligations, variable rate demand notes, repurchase agreements, or money market instruments.

17.     To ensure safety, Plaintiffs limited their investments to those carrying high ratings from the three principal NRSROs:  Moody's, S&P and/or Fitch IBCA.  Plaintiffs' conservative investment policy was to invest only in those short-term securities that had received a rating of "A2"[1] or higher from Moody's or of "A"[2] or higher from S&P ("High Investment Grade Rating").  As an additional protection, Plaintiffs stipulated that at least 80% of the securities purchased for their cash management accounts had to have ratings superior to "A/A" – *i.e.*, they had to be designated "Aa" or higher from Moody's and "AA" or higher from S&P.

18.     The current world-wide financial crisis was precipitated at least in part by widespread defaults on subprime mortgages – loans at higher interest rates made to borrowers with riskier credit histories.

19.     The impact of these defaults on the world's financial system was enormously magnified because the subprime mortgages were packaged together and securitized as complex structured debt securities, such as residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs").  RMBS and CDOs related to them were sold to

---

[1]     Moody's adds the numerical modifiers 1, 2, and 3 to the letter-grade ratings from "Aa" through "Caa" – a "1" to indicate that the security ranks in the higher end of its letter category; a "2" to indicate that it ranks in the mid-range of its letter category; and a "3" to indicate that it ranks in the lower end of its letter category.

[2]     S&P assigns modifiers letter-grade ratings from "AA" to "CCC," with the addition of a plus (+) or minus (-) sign to show relative standing within a letter category.

investors on a massive scale and spread the substantial risk of default on those subprime mortgages to virtually every corner of the globe.

20.     While RMBS and CDO securities were typically long-term securities purchased by investors seeking higher yields, the damage caused by these risky and volatile securities was spread to conservative, short term investors such as Plaintiffs through the creation of Structured Product ARS.  These securities were marketed to investors such as Plaintiffs as safe, "cash equivalent" investments on the basis that they were highly rated and highly liquid, because they could be sold at auctions held as frequently as every seven days.  However, because Structured Product ARS were typically sold by specially created trusts or companies for the purpose of raising money that could be used to cover losses on investments in RMBS and CDOs, purchasers of the ARS were unwittingly taking on the risk of subprime mortgages.  Indeed, the more RMBS and CDO defaults that occurred, the more likely the ARS investors would lose their money.

21.     The RMBS, CDOs and Structured Product ARS never could have been marketed widely without the substantial participation of the Rating Agencies.  The issuance of and widespread distribution of such high risk debt securities depended upon their having received High Investment Grade Ratings from the NRSROs, including the Rating Agencies, for which issuers and investment banks were prepared to pay substantial fees.  The Rating Agencies cast aside the objectivity that had been the hallmark of their business, participated in the very creation of these RMBSs, CDOs, and Structured Product ARS, and applied High Investment Grade Ratings to those securities without any basis for doing so.  In the case of the Structured Product ARS, the Rating Agencies ensured that unsuspecting investors such as Plaintiffs' corporate treasury departments would purchase these investments believing them to be safe, highly-liquid "cash equivalents."

22.     Plaintiffs – each of which had distinctly conservative investment profiles – never had any intention of investing in risky subprime mortgage debt or in any securities derived from or otherwise dependent on it.  Indeed, Plaintiffs – relying upon commonly-held understandings as to the meaning of High Investment Grade Ratings – believed that, by having restricted their cash investments to short- and/or intermediate-term highly liquid securities bearing only High Investment Grade Ratings, they had protected their cash from anything approaching the high risk of subprime mortgage debt.  As set forth below, however, the Rating Agencies' profit-motivated and irresponsible application of High Investment Grade Ratings led directly to Plaintiffs' purchase of hundreds of millions of dollars of Structured Product ARS.  Plaintiffs now find themselves the unwitting victims of the subprime mortgage meltdown, stranded with millions of dollars in virtually worthless Structured Product ARS.

**A.     Moody's and S&P Actively and Knowingly Induced Investor Reliance on Their Ratings of RMBS, CDOs and Structured Product ARS.**

23.     The Rating Agencies were essential players in the marketing of RMBS, CDOs and Structured Product ARS.  Based or dependent as they were upon risky subprime debt, these esoteric securities could never have been marketed broadly without ratings from the Rating Agencies that purported to provide independent, objective, reliable and unbiased assessments of the risk presented by such investments.  According to the 2002 SEC statement of Raymond W. McDaniel ("McDaniel"), the former President and current Chief Executive Officer and Chairman of Moody's: "[T]he main and proper role of credit ratings is to enhance transparency and efficiency in debt capital markets by reducing the information asymmetry between borrowers and lenders."  [11/21/02 Statement of Raymond W. McDaniel Before United States Securities and Exchange Commission, at 2, ("McDaniel SEC Stmt.").]

24.     Indeed, the Rating Agencies have publicly admitted that these types of securities could not have been proposed, issued or sold without the Rating Agencies' ratings.  Frank Raiter ("Raiter"), S&P's former Managing Director and Head of Residential Mortgage-Backed Securities Ratings, acknowledged in 2008 that:  "By regulation, institutional investment policy, and tradition, the sale of associated mortgage backed securities generally required ratings from two of the [Rating Agencies]."  Therefore, "if [the Rating Agencies] had stood up and said we're not going to [rate complex structured finance transactions], then the other players would have been forced to cut back.  But everyone was having too good a time."  According to Raiter, "the rating agencies were the oilers who kept the wheels of the train greased."  As Richard Gugliada, S&P's former head of CDO ratings, stated, without ratings, the transactions simply "can't be done."  [10/22/08 Statement of Frank L. Raiter on Credit Rating Agencies and the Financial Crisis Before the U.S. House of Representatives Committee on Oversight and Government Reform, at 2, Exh. B ("Raiter Stmt."); Transcript of 12/26/08 "Credit and Credibility" Television Program, Exh. C ("Credit and Credibility").]

25.     According to Ohio's former attorney general Marc Dann, who investigated the Rating Agencies for mortgage fraud, "[the Rating Agencies] made the market.  Nobody would have been able to sell these bonds without the ratings."  [Quoted in "Overrated," Portfolio.com (Aug. 13, 2007, Exh. D ("Overrated").]

26.     Moreover, investors relied upon the ratings of structured finance products more than they did for ratings of other securities, because of the relative opacity of the structured finance markets.  As Jerome Fons ("Fons"), a former Moody's Managing Director in charge of Credit Policy, has noted, the "details of the underlying asset pool and often the structure of the transaction are not publicly available for external scrutiny."  This lack of publicly available

information made "[t]he role of rating agencies . . . particularly important to the structured finance process.  Investors rely on agency ratings when making purchase decisions because of the opacity [in the structured finance market]."  [Fons, White Paper on Rating Competition and Structured Finance (Jan. 10, 2008), Exh. E ("Fons White Paper").]

27.     Fons explained investor reliance on structured product ratings as follows:

> Market participants relied heavily on the rating agencies when purchasing subprime related assets for at least three reasons.  First, subprime RMBS and their offshoots offer little transparency around the composition and characteristics of the underlying loan collateral.  Potential investors are not privy to the information that would allow them to understand clearly the quality of the loan pool.  Loan-by-loan data, the highest level of detail, is generally not available to investors.  Second, the complexity of the securitization process requires extremely sophisticated systems and technical competence to properly assess risk at the tranche level.  Third, rating agencies had a reputation, earned over nearly one century, of being honest arbiters of risk.

> [10/22/08 Testimony of Jerome S. Fons Before the U.S. House of Representatives Committee on Oversight and Government Reform, Exh. F ("Fons Committee Test.").]

28.     Moody's and S&P actively cultivated investor reliance by portraying their ratings as independent, objective and substantially accurate.  For example, in a statement to the SEC on November 21, 2002, McDaniel, Moody's former President and current Chief Executive Officer, portrayed Moody's as an independent provider of unbiased, trustworthy ratings derived from a rigorous and judicious process:

- Objectivity and independence.  Moody's internal policies and procedures have mitigated the latent conflict of interest that is inherent in the rating agency business model.  As such, our rating opinions are the product of analysis that is unbiased and trustworthy.

- Predictive content.  The predictive content of our ratings has been consistently mapped and measured.  Moody's and unrelated academics have published studies on the relationship between our ratings and credit defaults.  Research has shown a strong relationship between Moody's ratings and actual default experience.  Put

10

simply, corporate bonds that have received higher default from Moody's default less frequently on average than lower rated bonds.

▪ Judicious ratings process.  Our ratings are arrived at through a rigorous and judicious process that tends not to react to transitory conditions in favor of longer-term considerations and ratings stability.

[McDaniel SEC Stmt., at 4.]

29.    S&P has made similar representations.   Deven Sharma, President of S&P, testified before Congress on October 22, 2008 that "[S&P's] core mission is to provide the markets with quality, independent analysis" and "independence is a core principle of our business."  [10/22/08 Testimony of Deven Sharma Before U.S. House of Representatives Committee on Oversight and Government Reform ("Sharma Committee Test.").]  S&P's former Vice President Vickie A. Tillman ("Tillman") declared in a letter to the editor of the Wall Street Journal that "[o]ur credit ratings provide objective, impartial opinions on the credit quality of bonds."  ["How S&P Protects Integrity of Credit Ratings," Wall Street Journal (Sept. 17, 2007), Exh. G ("Tillman WSJ").]

30.    In particular, Moody's and S&P induced investor reliance on the ratings of new complex structured securities, such as the RMBS, CDOs, and their offshoot Structured Product ARS, by emphasizing their comparability to the well-familiar ratings of conventional corporate debt.

31.    Moody's made repeated public statements – later revealed to be false – about the comparability of its ratings models for structured finance products and corporate bonds.  For example, Moody's Report on the Code of Professional Conduct (April 12, 2006) proclaimed that "Structured Finance Credit Ratings use the same symbol system and are intended to convey comparable information with respect to the relative risk of expected credit loss."  Likewise, in *Moody's: Rating Symbols and Definitions* (March 2007), Moody's represented the following:

> It is Moody's intention that the expected loss rate associated with a given rating symbol and time horizon be the same across obligations and issuers rated on the Global Scale. Moody's rating methodologies, rating practices and performance monitoring systems are each designed to ensure a consistency of meaning.
> . . .
>
> Moody's structured finance ratings are engineered to replicate the expected loss content of Moody's Global Scale.

[Exh. H.]

Then, in his September 27, 2007 testimony before the U.S. Congress, Michael Kanef, the former head of Moody's Asset-Backed Finance Rating Group responsible for RMBS, testified that:

> Moody's rating accuracy on mortgage-backed securities has been similar to its rating accuracy on other structured finance products, and, over long time horizons, comparable to the accuracy of Moody's corporate bond ratings.
> . . .
> [Moody's ratings] indicate[d] a high degree of consistency between structured finance and corporate ratings.
>
> > [9/27/07 Testimony of Michael Kanef Before U.S. House of Representatives Subcommittee on Capital Market, Insurance, and Government Sponsored Enterprises.]

32.    S&P also proclaimed in a special report dated June 13, 2001, that its "approach, in both policy and practice, is intended to provide a *consistent* framework for risk assessment that builds reasonable ratings *consistency* within and across sectors and geographies" (emphasis supplied). In the same report, S&P defined those "sectors" to include, among others, the "six different sectors of the corporate market, [and] the three major sectors of the structured market (asset-backed, commercial mortgage-backed, and residential mortgage-backed securities)." S&P Executive Vice President Tillman also reaffirmed S&P's commitment to consistent standards in her September 2007 letter to the editor of the Wall Street Journal, in which she explained that

12

"we rate [structured] deals based on our criteria – criteria that are publicly available, non-negotiable and *consistently applied* ...." [Tillman WSJ (emphasis added).]

33.    Not only did the Rating Agencies knowingly induce investor reliance on their ratings of RMBS, CDOs and Structured Product ARS, but they did so knowing that such reliance would operate to the investors' detriment.  As expressed in a prophetic internal December 15, 2006 e-mail from Christopher Meyer, an Associate Director in S&P's Global CDO Group: "Rating Agencies continue to create and [sic] even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters.  :o)."  [Quoted in "Rating McGraw-Hill," Fortune Magazine (April 23, 2009), Exh. I.]

34.    The Ratings Agencies' efforts to induce investor reliance worked to perfection.  As was the case with Plaintiffs' investment policies, the Defendants' ratings were routinely embedded, or "hard-coded" into financial contracts and policies of banks, pension funds, insurance companies, investment funds and corporate investors, each of which defined risk tolerance in terms of those ratings.  The Ratings Agencies were well aware of this fact.  As Moody's McDaniel explained: "Ratings facilitate [the broad marketability of bonds] . . . because many [large U.S. investors] have prudential investment guidelines that rely in part upon ratings as a measure of desired portfolio quality."  To "promote the objectives of market efficiency and investor protection," ratings were even incorporated into "various legislative and regulatory frameworks ...."    [2/8/05 Testimony of Raymond W. McDaniel Before U.S. Senate Subcommittee on Banking, Housing and Urban Affairs.]

**B.      The Rating Agencies Materially Misrepresented Their Independence and Objectivity, While Concealing Their Conflicts of Interest in Rating Structured Finance Products.**

35.      While Moody's and S&P induced investor reliance by touting their reputations for independence and objectivity in evaluating rated securities, they concealed from various segments of the investing public – including Plaintiffs – the truth about their conflicts of interest when rating RMBS, CDOs and Structured Product ARS.

36.      In June 2005, Moody's adopted and published a Code of Professional Conduct in which it represented that:

> In the rating process, Moody's maintains independence in its relationship with Issuers and other interested entities. . . . As a matter of policy, and in keeping with its role as an independent and objective publisher of opinions, Moody's retains complete editorial control over the content of its Credit Ratings . . . .

In that Code, Moody's reiterated its "commitment to maintaining the quality and integrity of the rating process" and adopting "policies and controls to ensure that we maintain our independence and properly manage potential conflicts of interest . . . ."  [Id.]

37.      S&P made similar representations about its independence and objectivity.   In testimony before Congress on March 20, 2002, Ronald M. Barone, a former Standard & Poor's Managing Director, stated:

> Standard & Poor's is – and has always been – independent of any investment banking firm, bank or similar organization. . . . Standard & Poor's is committed to objective ratings by independent rating committees comprised of analysts with credit experience in their areas.
> . . .
>
> Standard & Poor's credit ratings have gained respect and authority throughout the investment community because they are widely understood to be based on independent, objective and credible analysis.
> . . .

> Standard & Poor's Commitment to Objectivity
> [Our] Guidelines and Code stress the overriding importance of objectivity in our ratings process.
> . . .
>
> Indeed, independence, credibility and integrity are the foundations of the Standard & Poor's ratings business and they are what ultimately provide value to the marketplace.
> Our rating opinions are based on an objective and independent process that we consistently disclose and describe to the marketplace.
>
> > [3/20/02 Testimony of Ronald M. Barone Before U.S. Senate Committee on Governmental Affairs.]

38.     In January 2002, S&P published a paper entitled, "Understanding Credit Ratings," in which it represented:

> A Standard & Poor's rating is based on principles of independence, integrity and disclosure – the same standards that underlie market confidence and acceptance of our ratings by investors worldwide. The rating process is open and clear at Standard & Poor's.  The process remains consistent across different types of ratings and different markets.

## 1.     The Compensation Scheme for Rating RMBS, CDOs and Structured Product ARS Undermined the Integrity of Defendants' Ratings.

39.     Notwithstanding the Defendants' professions of independence, their ratings process was, in fact, rife with conflicts of interest.  For example, the Defendants would not receive any substantial revenue for rating a structured finance product until after they won the business to rate the product.  Investment banks would decide which NRSRO to hire based upon the NRSROs' preliminary evaluations of the structured products, for which the NRSRO would be paid only a nominal fee.  These preliminary evaluations might consist of a simple approval or disapproval as to whether the proposed capital structure of the deal might justify the desired

rating or might predict the "expected loss" associated with the portfolio.  If the NRSRO could not reach the desired rating under the proposed structure, negotiation would typically ensue.

40.     Once selected to rate the structured product, the NRSRO would then undertake a purportedly more comprehensive evaluation, and it was only after this phase was completed and the rating published that the NRSRO would receive the most substantial portion of their revenues.   Hence, the NRSROs, including Defendants, had incentives to issue favorable evaluations early on to win the coveted business in the first instance, and then to remain pliable throughout the process to ensure a substantial payment at the end.

41.     This pre-evaluation process gave investment banks enormous opportunities for "ratings shopping" – where an underwriter would bring its proposed structured product deal to multiple NRSROs to determine which would impose the least demanding requirements.  Since marketing a structured product deal typically required ratings from only two of the three major NRSROs, competitive pressures induced the NRSROs to relax their parameters in order to make their requirements as permissive as possible.

42.     This debasement of standards significantly impaired the accuracy of the Rating Agencies' credit risk evaluations.  The ratings process rapidly degenerated into a "race to the bottom" in terms of quality – where, as one former Moody's executive described, "[s]upport levels migrate[d] to the lowest possible values as agencies maneuver[ed] to maintain market shares."  [Fons White Paper, at 7.]

43.     Contrary to their denials, the Rating Agencies were willfully complicit in this ratings shopping process.  As former Moody's Managing Director Fons testified before Congress on October 22, 2008:  "A drive to maintain or expand market share made the rating agencies

willing participants in this shopping spree."  Succumbing to competitive pressures, Defendants were, in effect, selling their ratings instead of their work.  [Fons Committee Test., at 3.]

44.     In fact, the Defendants would sometimes sell their proprietary models to the investment banks, so the banks could themselves manipulate the structure of their deals in an attempt to justify the highest possible rating.  By selling their analytical tools on the one hand, and advising banks on asset composition and security structuring on the other, the Rating Agencies were "playing both coach and referee" (Wall Street Journal, *Conflicts and the Credit Crunch*, September 7, 2007) – in direct contravention of the independence, objectivity and integrity that the Rating Agencies so ardently professed in their public statements.  [Exh. J.]

45.     Competitive pressures on NRSROs were only heightened by the relative concentration of issuers and banks in the structured finance space.  As compared with the corporate bond market, which comprises thousands of issuers, the investment banks that specialized in creating structured products were few in number.  Consequently, the loss of one deal could represent the loss of millions of dollars in revenues to an NRSRO from that issuing bank.  As Professor John C. Coffee of Columbia University explained in his Congressional testimony on September 26, 2007, the NRSROs had been "destabilized" by the "small number" of "large repeat clients" that controlled access to structured finance deals:

> The major change that destabilized rating agencies appears to have been the rise of structured finance. . .  [T]he rating agency is no longer facing an atomized market of clients who each come to it only intermittently (and thus lack market power), but instead large repeat clients who have the ability to take their business elsewhere. Today, structured finance accounts for a major share of some rating agencies' total revenues; equally important, these amounts are paid by a small number of investment banks that know how to exploit their leverage . . . .

> [9/26/07 Testimony of John C. Coffee, Jr. Before U.S. Senate Banking Committee, Exh. K.]

46.     Pleasing the client thus became the paramount objective within the Rating Agencies' cultures, supplanting ratings integrity as the overriding goal.  As McDaniel conceded to the company's board of directors in October 2007, Moody's had abandoned its own standards under the influence of banks, issuers, and investors in order to gain market share and reap its share of the subprime mortgage boom.  Indeed, McDaniel stated that Moody's own self-interest had "color(ed)" the firm's purportedly objective ratings, and that its analysts would "drink the kool-aid" in order to keep up the flow of new deals for Moody's to rate.  [Quoted in "Moody's CEO Warned Profit Push Posed Risk to Quality of Ratings," Wall Street Journal (Oct. 23, 2008), Exh. L.]

47.     Gugliada, likewise, told Bloomberg of S&P's involvement in a "market-share war where criteria were relaxed …."  ["Race to Bottom At Moody's, S&P Secured Subprime's Boom, Bust," Bloomberg.com (Sept. 25, 2008), Exh. M.]  Gugliada said of this relaxation of standards in pursuit of profits:  "I knew it was wrong at the time. … It was either that or skip the business.  That wasn't my mandate.  My mandate was to find a way.  Find the way."  [Id.]

48.     In its July 2008 "Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Ratings," the SEC, itself, highlighted the heightened conflict of interest concerns presented by the "issuer-pays" model in the context of mortgage derivative securities.  Specifically, the SEC, which conducted a review of Moody's, S&P and Fitch's noted:

> As the Commission noted in its recent release, some observers have indicated that while conflicts of interest due to the "issuer pays" model exist with respect to all asset classes that receive ratings, the conflicts created from the "issuer pays" model in rating structured finance products, particularly RMBS and related-CDOs, may be exacerbated for a number of reasons.  First, the arranger is often the primary designer of the deal and as such, has more flexibility to adjust the deal structure to obtain a desired credit rating as compared to arrangers of non-structured asset classes.  As

well, arrangers that underwrite RMBS and CDO offerings have substantial influence over the choice of rating agencies hired to rate the deals.

Second, there is a high concentration in the firms conducting the underwriting function. Based on data provided by the three rating agencies examined, the Staff reviewed a sample of 642 deals. While 22 different arrangers underwrote subprime RMBS deals, 12 arrangers accounted for 80% of the deals, in both number and dollar volume. Similarly, for 368 CDOs of RMBS deals, although 26 different arrangers underwrote the CDOs, 11 arrangers accounted for 92% of the deals and 80% of the dollar volume. In addition, 12 of the largest 13 RMBS underwriters were also the 12 largest CDO underwriters, further concentrating the underwriting function, as well as the sources of the rating agencies' revenue stream.

> [United States Securities and Exchange Commission, "Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies" (July 2008), Exh. N.]

**2.     Despite Representations to the Contrary, Defendants Actively Participated in Creating the RMBS, CDOs and Structured Product ARS They Rated.**

49.     Despite their repeated public representations about their objectivity and neutrality, the Rating Agencies, in fact, played an active role in structuring complex securities according to a highly subjective, results-oriented approach.  Indeed, the methodology employed by Defendants to rate structured finance securities was anything but objective.  Far from being passive reviewers, the Rating Agencies were intimately involved in structuring complex financial products – including those underlying Structured Product ARS**,** or upon which the ARS were ultimately dependent – precisely to justify a desired rating.  Thus, rather than conduct an analysis of objective factors to culminate in a rating, the Rating Agencies worked backwards:  they started with the rating they knew would be required to market the complex securities to

investors, and then worked with the investment banks to "structure" those securities in an attempt to justify the rating.

50.     Moody's former President and Chief Operating Officer, Brian Clarkson, has conceded that, in creating a structured finance product: "You start with a rating and build a deal around a rating."  [Quoted in "Overrated".]  According to Moody's, structured finance ratings were an "iterative process, giving feedback" to underwriters seeking to bring new RMBS and CDOs to market.  [Id.]

51.     The extent of the Rating Agencies' implication in the process – and lack of objectivity – has also been noted by several commentators.  In September 2007, Joseph R. Mason, an Associate Professor of Finance at Drexel University and a Senior Fellow at the University of Pennsylvania's Wharton School who studied structured debt products with the Office of the Comptroller of the Currency, told the United States Congress that:

> [NRSROs] do more than opine; they play an active role in structuring RMBS and CDOs.  They also serve as key sources of information about securitization performance and often enumerate measures that issuers must take to maintain ratings in troubled securitizations.
>
> > [9/27/07 Testimony of Joseph R. Mason Before U.S. House of Representatives Subcommittee on Capital Market, Insurance and Government Sponsored Enterprises, Exh. O ("Mason Test.").

52.     In the words of former SEC Chairman Arthur Levitt, Jr., "as complex structured debt products have increased in popularity, the relationship between rater and issue [sic] became even closer—and the line between independent rater and paid advisor became blurred."  [Levitt, Remarks to Dialogue with the OSC 2006, "Strengthening the Gatekeeping:  The Importance of Independence and Accountability to the Capital Markets" (Nov. 27, 2007), Exh. P.]

53.     The process started with the designation by the issuing bank of the target rating it required.  The rating, in effect, became a type of "brand name" under which the structured products would be marketed.  The Ratings Agencies would then work with the issuers on supposed "credit enhancements" – *e.g.*, subordination, collateral cushions, guarantees, amortization features, etc. – that were designed to justify the required rating.  Each of these credit enhancements, however, reduced issuer profit.  Accordingly, investment banks had a strong interest in awarding their business to the NRSROs that assigned the lowest "expected loss" designations, because lower expected losses resulted in higher profits.  The Defendants obliged their clients by keeping expected loss projections artificially low in order to keep ratings – and, with them, profits – artificially high.

54.     Unlike bond ratings for corporate issuers, whose financial statements could not be altered in the short term to "score" better ratings, structured finance products harbored great flexibility.  Consequently, in the words of one former Moody's executive, Paul Stevenson, in the case of structured products, "the rating process became a negotiation."  [Quoted in "As Housing Boomed, Moody's Opened Up," Wall Street Journal (April 11, 2008), Exh. Q.]

55.     Defendants materially misrepresented and failed to disclose to investors such as Plaintiffs the active role they played in structuring complex securities, including the Structured Product ARS, and the inherent conflicts of interest that utterly debased the objectivity of their ratings methodologies.

C.     **To Improve Their Profits, The Rating Agencies Knowingly Rated RMBS, CDOs and Structured Product ARS Using Inapplicable and Out-of-Date Processes.**

56.     In rating the complex RMBS, CDOs and, ultimately, the Structured Product ARS, the Rating Agencies also applied processes and data they knew to be inaccurate, inapplicable and

out-of-date.  Thus, while the Rating Agencies led the investing public to believe that a AAA-rated CDO presented the same risk as a AAA-rated corporate bond, the Rating Agencies, in fact, had no basis for providing that comparison.  The Rating Agencies did all of the foregoing without so informing the investing public – including the Plaintiffs – and thereby misled the public and Plaintiffs into relying upon ratings that had no objective basis.

57.     The Rating Agencies compromised their rating standards for structured products because doing so was immensely profitable.  By 2008, NRSROs could receive between $750,000 and $1 million per issue of a structured finance security.  According to Raiter, S&P's former Managing Director and Head of Residential Mortgage-Backed Securities Ratings, during his ten years with S&P, mortgage securitization grew from a $639 billion business to a $3.3 trillion business.  Notably, subprime mortgage "production" alone grew from $35 billion to $807 billion over that time.  [Raiter Stmt., at 2.]  When asked how profitable CDOs were for S&P, Gugliada answered, "[v]ery profitable . . . [a] typical[] fee would be something like a quarter of a million dollars per deal," and, "in the busiest months, we were doing as many as 20, 25 per month."  From 2002 to 2007, revenues from these transactions put S&P in the top ten of the S&P 500.  [Credit and Credibility.]

58.     Moody's bottom line fared similarly well from the expansion of mortgage-backed securitizations.  By the time Moody's became a public company in 2000, rating structured finance products had become its top source of revenue.  Initially, "Moody's could receive between $200,000 and $250,000 to rate a $350 million mortgage pool, for example, while rating a municipal bond of a similar size might have generated just $50,000 in fees."  ["Debt Watchdogs:  Tames or Caught Napping?"  New York Times (Dec. 7, 2008), Exh. R.]  Between 2000 and 2006, Moody's profits rose 375% and its share price quintupled.  Moody's structured

finance group grew to account for approximately 53% of Moody's revenue by the first quarter of 2007, up from 28% in 1998.  "By 2006, the firm had more revenue from structured finance alone – $881 million – than its entire revenue had been in 2001."  ["As Housing Boomed, Moody's Opened Up," Wall Street Journal (April 11, 2008), Exh. Q.]  From 2002 to 2007, revenues from these transactions made Moody's the third-most profitable company in the S&P 500-stock index – higher than Microsoft and Google.  Misrepresenting the independence, objectivity and integrity of their ratings process proved a lucrative way of doing business for Defendants.  [See, e.g., id.]

59.     In furtherance of the profit objective, the voice of dissent was routinely quashed at Moody's and S&P by reassigning scrupulous analysts and supervisors to other divisions.  As the Wall Street Journal reported, Moody's analysts deemed too "fussy" were reassigned, because "[a]nalysts who raised doubts about a deal could hurt revenues for the rating firm and investment bank."  ["At Request of Bond Issuers or Bankers, Credit-Rating Firms Switch Analysts," Wall Street Journal (May 23, 2008), Exh. S.] Thus, analysts who demonstrated the very objectivity and independence that the Rating Agencies touted as their hallmarks were routinely kept down.

60.     The Ratings Agencies not only generated enormous revenue from rating RMBS, CDOs and Structured Product ARS, but the Rating Agencies also maintained their profits by refusing to incur the costs necessary to rate those securities properly.  Specifically, both Moody's and S&P refused – primarily, if not solely, for profit reasons – to implement new models for rating RMBS, CDOs and Structured Product ARS.

61.     Prior to the advent of complex structured securities like RMBSs and CDOs, the Rating Agencies rated traditional debt securities like corporate bonds.  The Rating Agencies generally employed mathematical "models" to assess the future performance of these debt securities.  These models were mathematical representations of economic and other factors that

were likely to impact an issuer's ability to make such payments, and included such metrics as the issuer's revenues, costs, or currency fluctuations in the markets in which the issuer conducts its business.  By inputting into those models data reflecting various assumptions, the Rating Agencies were able to project the issuer's revenues and, accordingly, its ability to satisfy its obligations on debts as those debts came due.  The quality of the analyst's projections was determined by the metrics in the model and the data input into those metrics.

62.     In stark contrast, RMBS and CDOs were issued by specially created trusts holding pools of new mortgages and other assets, none of which had any prior history. Accordingly, in rating RMBS, CDOs and Structured Product ARS, the Rating Agencies did not have access to the type of historical issuer data upon which they had traditionally relied to provide a rating.

63.     The Rating Agencies knew full well that these traditional models were grossly inadequate for rating RMBS, CDOs and Structured Product ARS, but the Rating Agencies used those traditional models anyway.  Indeed, both Defendants had created new models and processes that would allow them to measure the performance of RMBS and CDOs over time so the Defendants could reassess the applicability of their ratings.  As both Moody's and S&P have admitted, however, each decided not to employ these new models and processes, including the periodic reviews, because: i) doing so would cut into their profits; and ii) they were only paid to rate the securities once – at the time of issuance.

### 1.     S&P Rated Structured Products Even Though It Knew It Had No Workable Model For Doing So.

64.     In a written statement to the U.S. House of Representatives on October 22, 2008, Raiter, S&P's former Managing Director and Head of Residential Mortgage-Backed Securities Ratings, explained that, beginning in the mid-1990s, S&P developed better, statistically-based

models for estimating default risk on individual loans and pools.  As Raiter confirmed, "[i]t was critical to maintain the best models as they were the linchpin of the rating process" and "[e]ach version of the model was better than its predecessor in determining default probabilities." [Raiter Stmt., at 5.]

65.    With the vast expansion of the housing market beginning in 2001, S&P then developed its most comprehensive model for analyzing complex structured debt products to date, one that would "cover[] the full spectrum of new mortgage products, particularly in the Alt-A and fixed/floating payment type categories" – those categories that ultimately wrecked the financial markets.  In Raiter's words, the model was "by far the best yet developed."  [Id.]

66.    Shockingly, however, S&P's state-of-the-art model "was not implemented due to budgetary constraints."  S&P instead continued to employ a model that would not account for new types of mortgages and their risks, because the company quite simply did not want to spend the money.  Raiter stated bluntly that S&P's management failed to implement the new model because "it was expensive to build or acquire the growing data bases, perform the necessary statistical analysis, complete the [information technology] code modifications and implement and distribute new versions of the model," and, "[b]y 2001, the focus at S&P was profits for the parent company, McGraw-Hill – it was not on incurring additional expense."  [Id. at 5-6.]

67.    Raiter also advised Congress that, in his opinion, had S&P implemented the more refined methods for assessing default risk, the severity of the current market crisis might have been mitigated:  "An unfortunate consequence of continuing to use out-dated versions of the rating model was the failure to capture changes in performance of the new non-prime products." [Id. at 6.]

## 2. Moody's Rated Structured Finance Products Even Though it Knew it Had No Workable Model for Doing So.

68. Like S&P, Moody's, at all relevant times, also knew that it did not have a ratings model that could provide a meaningful analysis of RMBS, CDOs and Structured Product ARS.

69. Moody's rated RMBS and CDOs by using a model that had been created to analyze simple corporate bonds. In an April 3, 2007 press release, Moody's conceded that these models were out of date, because they had been created in 2002 and lacked key information necessary to properly assess the attendant risks. According to Moody's, "[s]ince then, the mortgage market has evolved considerably, with the introduction of many new products and an expansion of risks associated with them. . . ." [Quoted in Mason Test., at 8.]

70. Moreover, Moody's knew that applying its outdated and unsuitable corporate bond models to complex structured products was producing ratings that were wildly misleading. According to Moody's own analysis, for example, corporate bonds that Moody's had rated Baa (its lowest investment grade rating) had had an average 2.2% default rate in the period prior to 2005. In contrast, CDOs to which Moody's had ascribed the same Baa grade had default rates of 24%. At no time did Moody's disclose to investors such as Plaintiffs that, for example, a structured finance product, such as the Structured Product ARS, could be ten times riskier than a corporate bond bearing the same Moody's rating.

71. Despite knowing that it did not have an appropriate model for analyzing structured finance products, and that the models it was using were producing wildly misleading ratings, Moody's nevertheless became the largest rater of RMBS, CDOs and Structured Product ARS. By 2006, Moody's rated nine out of every ten dollars of mortgage-related structured finance products. In 2007, Moody's rated about 94% of the $190 billion in mortgage-related and other structured finance CDOs issued, the second busiest year ever.

> ### 3. The Rating Agencies' Failure to Evaluate the Default Risk of Underlying Subprime Mortgages Rendered Their Ratings of The Subject Securities Completely Baseless.

72.     Any credible model for assessing the risk of RMBS, CDOs and Structured Product ARS had to include the likely default rate of the subprime mortgages and other assets ultimately underlying those structured products.

73.     Because the Ratings Agencies elected – for profit reasons – not to implement models that would measure those default rates, it was foreordained that the Ratings Agencies' ratings of RMBS, CDOs and Structured Product ARS would be meaningless.  The Ratings Agencies, however, falsely propped up the reliability of their ratings of RMBS, CDOs and, ultimately, Structured Product ARS by publicly misrepresenting that they analyzed the underlying loan data.

> #### a. Moody's Repeatedly Misrepresented That It Conducted Meaningful Analysis of Original Loan Data in Rating Structured Securities.

74.     Moody's made repeated public statements – later revealed to be false – indicating that it routinely evaluated original loan data as part of its rating methodology for structured finance products.

75.     For example, a Moody's report dated April 1, 2003 that described its model for analyzing mortgage-backed securities contained a chapter entitled, "Originator and Servicer Practices and Loan Programs Continue to be Captured."  In that report, Moody's stated:

> Moody's continues to rely on both quantitative means as well as qualitative reviews to assess originator and servicer quality and their impact on pool performance.  These assessments form an integral part of Moody's Mortgage Metrics credit support calculations.
>
> Moody's considers numerous factors when determining the quality and performance of the originator and services, including:

- Past performance of an originator's loans;
- Underwriting guidelines for the mortgage loans and adherence to them;
- Loan marketing practices;
- Credit checks made on borrowers;
- Appraisal standards;
- Experience in origination of mortgages. . . .

[Moody's Investors Service, "Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools," April 1, 2003, Exh. T.]

76.     In 2007, Moody's made similar representations:

In addition to reported loan characteristics, qualitative elements of the origination and servicing processes influence pool performance. Moody's considers a number of these elements, including mortgage loan underwriting quality, underwriting guidelines, appraisal standards and the quality assurance processes. Underwriting guidelines and exception practices in the sub-prime market can vary substantially across originators, as can servicer quality, with a significant impact on loan quality and performance. . . . Moody's view of the overall quality of origination, and servicing practices, as well as originators' historical performance is applied to assess the pool loss estimates.

[Moody's Investors Service, *Closed-End Seconds: Recent Performance and Update to Methodology*, April 2, 2007.]

77.     These representations were materially false and misleading. As McDaniel, the Chairman and Chief Executive Officer of Moody's parent corporation, admitted in his testimony to Congress on October 22, 2008: "[W]e do not receive or review individual loan files." [10/22/08 Testimony of Raymond W. McDaniel Before U.S. House of Representatives Committee on Oversight and Government Reform.]

> **b.** **S&P Repeatedly Misrepresented That It Conducted Meaningful Analysis of Original Loan Data in Rating Structured Securities.**

78. S&P also made repeated public statements – later revealed to be false – indicating that it routinely evaluated original loan data as part of its rating methodology for structured finance products.

79. S&P's Tillman testified before Congress on September 26, 2007 that "[t]he first step in our analysis is evaluating the overall creditworthiness of a pool of mortgage loans by conducting loan level analysis …. S&P also reviews the practices, polices [sic] and procedures of the originators and servicers. … For an originator, the topics we review include, but are not limited to:  loan production practices; loan underwriting; and quality control practices and findings."  [9/26/07 Testimony of Vickie A. Tillman Before U.S. Senate Committee on Banking, Housing and Urban Affairs.]  Chris Atkins, an S&P spokesman, was later quoted in an October 23, 2008 New York Times article as representing that "[i]t has long been the practice of S&P to review loan level data for new RMBS securities."  ["Credit Rating Agency Heads Grilled By Lawmakers," N.Y. Times (Oct. 23, 2008), Exh. EE.]

80. These representations were materially false and misleading.  Raiter, S&P's former Managing Director and Head of Residential Mortgage Backed Securities Ratings, admitted to Congress that S&P's loan evaluation practices were, in fact, non-existent.  He stated that, although the issue was robustly debated, "[t]he Managing Director of the surveillance area for RMBS did not believe loan level data was necessary and that had the effect of quashing all requests for funds to build in-house data bases" to evaluate such data.  [Raiter Stmt., at 6.]

**D.      Upon Defendants' Misrepresentations and Omissions, Plaintiffs Authorized Their Broker to Purchase ARS Based Upon Their High Investment Grade Ratings.**

81.      In establishing its investment policy and investment limits for Lehman, their investment advisor, each of ASI and SEI relied upon, among other things, the professed objectivity and integrity of the Ratings Agencies and the comparability of their structured products ratings to ratings of conventional corporate debt.  Stated simply, ASI and SEI believed that Structured Product ARS rated AAA bore the same low risk as corporate debt rated AAA.

82.      To ensure safety of their cash, Plaintiffs limited their investments to those carrying High Investment Grade Ratings from Moody's, S&P and/or Fitch IBCA.  Plaintiffs were led to believe that they had minimal, if any, credit risk by restricting their investments to only those securities that were rated at the very top of the Moody's and S&P scales, as indicated by the following chart:

| | **Moody's** | **S&P** | | |
|---|---|---|---|---|
| Highest | Aaa<br>Aa | AAA<br><br>AA | } | At least 80% of Plaintiffs' portfolios were required to possess Aa/AA ratings or higher. |
| | A | A | } | Up to 20% of Plaintiffs' portfolios were allowed to possess A2/A ratings. |
| | Baa | BBB | } | Not eligible for inclusion in Plaintiffs' portfolios. |
| | Ba | BB | | |
| | B | B | | |
| | Caa | CCC | | |
| | Ca | CC | | |
| Lowest | C | SD/D | | |

83.      Starting in 2004, SEI had discussions with Lehman regarding investment of SEI's cash on SEI's behalf.  SEI advised Lehman that SEI was not willing to trade security and liquidity for higher returns, and, as a result, SEI would only grant Lehman discretionary

authority to invest in a manner consistent with SEI's existing conservative risk profile, whose risk tolerance required High Investment Grade Ratings from the Defendants.

84.     On or about January 28, 2005, SEI and Lehman then entered into a Cash Management Brokerage Agreement and Limited Discretionary Authorization (the "SEI Cash Account Agreement"), pursuant to which SEI gave Lehman limited discretion to invest cash that SEI would place in a discretionary account with Lehman (the "SEI Cash Account").  Lehman agreed that all purchases of securities for SEI would be consistent with SEI's conservative risk profile as codified in written investing guidelines (the "SEI Guidelines").  The SEI Guidelines included as "Approved Securities" debt obligations of the U.S. Treasury, corporate debt obligations, certificates of deposit, time deposits, money market funds, and ARS.

85.     SEI agreed to add ARS to its Approved Securities list because SEI reasonably believed that, so long as those ARS carried the High Investment Grade Ratings from Defendants required by SEI's conservative risk profile, the ARS would not subject SEI to any greater risk than other investments carrying the same ratings.  Stated otherwise, SEI reasonably believed that the ratings Defendants applied to ARS indicated a level of credit quality consistent with that of any other debt security to which the Rating Agencies had applied the same rating.

86.     On or about May 24, 2006, ASI also entered into a Cash Management Brokerage Agreement and Limited Discretionary Authorization with Lehman (the "ASI Cash Account Agreement"), which was supposed to govern the operation of ASI's own discretionary brokerage account with Lehman (the "ASI Cash Account").  As with SEI, the ASI Cash Account Agreement also incorporated written investing guidelines (the "ASI Guidelines") derived from and consistent with the SEI Guidelines.  At Lehman's recommendation, the ASI Guidelines

31

included U.S. Treasury bills, corporate bonds, commercial paper, and ARS.  ASI agreed to add ARS to its Approved Securities for the same reason that SEI did so.

87.     In short, Plaintiffs authorized Lehman to purchase ARS for their accounts only to the extent ARS met Plaintiffs' Investment Guidelines.  In granting that authority, Plaintiffs reasonably believed that Defendants' ratings of ARS accurately reflected each Defendant's independent conclusions relative to its published standards.  Plaintiffs relied upon the Rating Agencies' public representations that they were assigning ratings objectively in accordance with their published criteria and standards.  Plaintiffs reasonably believed that the Defendants' assignment of a High Investment Grade Rating meant that the security conformed to the Rating Agencies' risk standards for assigning that rating and was less risky than securities that received lower ratings.

**E.     Defendants' Misrepresentations and Omissions Caused Plaintiffs Harm.**

88.     In reliance upon the Defendants' promises to deliver unbiased, objective ratings predicated upon rigorous analysis, Plaintiffs authorized Lehman to purchase for their accounts ARS that Defendants had rated "A" or higher.  Based upon the Rating Agencies' representations, Plaintiffs justifiably and reasonably believed that that the ratings on those ARS represented a level of creditworthiness consistent with other debt products to which the Defendants had assigned identical ratings.

89.     Throughout the time that Plaintiffs had authorized Lehman to purchase such ARS:

  a.     Plaintiffs reasonably relied upon the Defendants' public representations of their independence, objectivity, consistency and substantial accuracy;

b.    Plaintiffs did not have any understanding, belief, or suspicion that the Rating Agencies were not independent or that the Ratings Agencies had a financial interest in assigning High Investment Grade Ratings to ARS;

c.    Plaintiffs did not have any understanding, belief, or suspicion that the Rating Agencies' ratings models were flawed or inadequate with respect to the ratings ultimately applied to Structured Product ARS, or that the Ratings Agencies had declined to employ models and/or knowingly lowered their standards that would produce more meaningful and reliable results for Structured Product ARS;

d.    Plaintiffs did not have any understanding, belief, or suspicion that the Rating Agencies were not monitoring the relevant risks relating to the Structured Product ARS they had rated and were not updating or correcting their previously issued ratings; and

e.    Plaintiffs were part of the limited class of investors Defendants intended and knew would be relying on their ratings of Structured Product ARS.

90.    Based upon Plaintiffs' authorization, Lehman purchased for each of ASI and SEI hundreds of millions of dollars worth of Structured Product ARS that bore High Investment Grade Ratings.

91.    In or about January 2008, just before it became apparent in February 2008 that the ARS did not possess the credit quality falsely represented by Defendants, Plaintiffs held the ARS identified in the spreadsheets set forth below, and also attached as Exhibit A, which are expressly adopted and incorporated herein:

**SEI AUCTION RATE HOLDINGS IN LEHMAN ACCOUNT JANUARY 2008**

| SECURITY/ISSUER | CUSIP | COST | SETTLE DATE | MOODY'S SETTLE DATE | S&P SETTLE DATE | MOODY'S JAN. 26, 2008 | S&P JAN. 26, 2008 |
|---|---|---|---|---|---|---|---|
| Double Oak Cap Secs 2007 – III (Protective Life) | 25857eaa8 | 4,900,000 | 7/23/07 | Aaa | AAA | Aaa | AAA |
| Potomac Tr Cap Vi 2004 | 73771naa1 | 1,300,000 | 5/26/06 | Aaa | AAA | Aaa | AAA |
| Potomac Tr Cap Vi 2004 | 73771naa1 | 1,100,000 | 4/27/07 | Aaa | AAA | Aaa | AAA |
| River Lake Ins. Co II Surplus Nt Ser C (INC 2004-3) | 76827rac5 | 1,100,000 | 8/11/06 | Aaa | AAA | Aaa | AAA |
| River Lake Ins. Co II Surplus Nt Ser C (INC 2004-3) | 76827rac5 | 2,800,000 | 12/26/06 | Aaa | AAA | Aaa | AAA |
| Grand Central Cap Tr III (FGIC) | 38528c205 | 1,200,000 | 8/24/06 | Aa2 | AA | Aa2 | AA |
| Grand Central Cap Tr III (FGIC) | 38528c205 | 800,000 | 2/8/07 | Aa2 | AA | Aa2 | AA |
| Grand Central Cap Tr Money Market (FGIC) | 38528a209 | 700,000 | 6/15/06 | Aa2 | AA | Aa2 | AA |
| North Castle Mmp IV (MBIA) | 658316203 | 1,000,000 | 5/30/06 | Aa2 | AA | Aa3 | AA- |
| North Castle Mmp IV (MBIA) | 658316203 | 200,000 | 2/6/07 | Aa2 | AA | Aa3 | AA- |
| North Castle Mmp I (MBIA) | 658317102 | 2,300,000 | 12/18/06 | Aa2 | AA | Aa3 | AA- |
| Sutton Cap Tr I (FSA) | 869435206 | 1,100,000 | 1/25/06 | Aa2 | AA | Aa2 | AA |
| Sutton Cap Tr II Money Market (FSA) | 86943v209 | 3,100,000 | 10/11/06 | Aa2 | | Aa2 | AA |
| Blue Water Trust I (RAM Re Ins) | 09608r305 | 1,400,000 | 8/8/05 | A2 | A+ | A2 | A+ |
| Blue Water Trust I (RAM Re Ins) | 09608r305 | 1,800,000 | 2/21/06 | A2 | A+ | A2 | A+ |
| Blue Water Trust I (RAM Re Ins) | 09608r305 | 1,200,000 | 4/27/06 | A2 | A+ | A2 | A+ |
| Dutch Harbor Fin SubTrust II (AMBAC) | 26702h207 | 4,000,000 | 2/2/07 | Aa2 | AA | Aa2 | AA |
| Athilon Cap Corp Sub Deferrable Int. NT. Ser. B | 047468ab9 | 3,100,000 | 8/28/06 | Aa2 | AA | Aa2 | AA |
| Athilon Cap Corp Sub Deferrable Int. NT. Ser. B | 047468ab9 | 1,300,000 | 11/29/06 | Aa2 | AA | Aa2 | AA |
| Lehman Bros. Custodial Rep Primus Fin. Ser. B (Primus) | 52519g802 | 1,300,000 | 2/10/05 | | | A2 | A |

| SECURITY/ISSUER | CUSIP | COST | SETTLE DATE | MOODY'S SETTLE DATE | S&P SETTLE DATE | MOODY'S JAN. 26, 2008 | S&P JAN. 26, 2008 |
|---|---|---|---|---|---|---|---|
| Lehman Bros. Custodial Rep Primus Fin. Ser. B (Primus) | 52519g802 | 1,400,000 | 3/31/05 | | | A2 | A |
| Primus Final Prods Sub Nt Ser B (05) | 74163paf9 | 2,300,000 | 12/19/05 | Aa2 | | Aa2 | AA |

## ASI AUCTION RATE HOLDINGS IN LEHMAN ACCOUNT JANUARY 2008

| SECURITY/ISSUER | CUSIP | COST | SETTLE DATE | MOODY'S SETTLE DATE | S&P SETTLE DATE | MOODY'S JAN. 26, 2008 | S&P JAN. 26, 2008 |
|---|---|---|---|---|---|---|---|
| Grand Central Cap Tr III (FGIC) | 38528c205 | 1,000,000 | 10/19/06 | Aa2 | AA | Aa2 | AA |
| Grand Central Cap Tr III (FGIC) | 38528c205 | 1,000,000 | 3/8/07 | Aa2 | AA | Aa2 | AA |
| Grand Central Cap Tr Money Market (FGIC) | 38528a209 | 1,500,000 | 6/15/06 | Aa2 | AA | Aa2 | AA |
| North Castle Mmp I (MBIA) | 658317102 | 1,600,000 | 10/23/06 | Aa2 | AA | Aa3 | AA- |
| North Castle Mmp I (MBIA) | 658317102 | 1,000,000 | 3/12/07 | Aa2 | AA | Aa3 | AA- |
| Sutton Cap Tr I (FSA) | 869435206 | 1,200,000 | 11/29/06 | Aa2 | AA | Aa2 | AA |
| Blue Water Trust I (RAM Re Ins) | 09608r305 | 3,000,000 | 1/22/07 | A2 | A+ | A2 | A+ |
| Athilon Cap Corp Sub Deferrable Int. NT. Ser. B | 047468ab9 | 900,000 | 8/16/06 | Aa2 | AA | Aa2 | AA |
| Athilon Cap Corp Sub Deferrable Int. NT. Ser. B | 047468ab9 | 2,000,000 | 10/23/06 | Aa2 | AA | Aa2 | AA |
| Athilon Cap Corp Sub Deferrable Int. NT. Ser. B | 047468ab9 | 500,000 | 10/30/06 | Aa2 | AA | Aa2 | AA |
| Lehman Bros. Custodial Rep Primus Fin. Ser. B (Primus) | 52519g802 | 2,000,000 | 5/24/06 | A2 | A | A2 | A |
| Double Oak Cap Secs | 25857caa2 | 3,000,000 | 7/23/07 | Aaa | AAA | Aaa | AAA |
| North Castle V Money Mkt Pfd | 658320205 | 1,000,000 | 5/9/07 | Aa2 | AA | Aa3 | AA- |
| North Castle Mmp | 658321203 | 1,400,000 | 6/19/06 | Aa2 | AA | Aa3 | AA- |
| Primus Finl Prods Lsc Sub Nt | 74163pae2 | 900,000 | 3/9/07 | Aa2 | AA | Aa2 | AA |
| Sutton Cap Tr lv Money Mkt Committed Pfd | 86943x205 | 1,500,000 | 2/21/07 | Aa2 | AA | Aa2 | AA |
| Lehman Bros Custodial Rep Primus Fins Ser A | 52519g208 | 500,000 | 6/28/06 | A2 | A | A2 | A |

| SECURITY/ISSUER | CUSIP | COST | SETTLE DATE | MOODY'S SETTLE DATE | S&P SETTLE DATE | MOODY'S JAN. 26, 2008 | S&P JAN. 26, 2008 |
|---|---|---|---|---|---|---|---|
| Lehman Bros Custodial Rep Primus Fins Ser A | 52519g208 | 800,000 | 7/26/06 | A2 | A | A2 | A |
| Anchorage Fin Sub Trust | 033299207 | 400,000 | 10/18/06 | Aa2 | AA | Aa2 | AA |
| Market Street Custodial Trust | 570601209 | 1,600,000 | 6/29/07 | NR | A | NR | A |
| Insurance Note Capital | 45804eaa0 | 600,000 | 7/31/07 | Aaa | AAA | Aaa | AAA |
| Insurance Note Capital | 45804xaa8 | 2,900,000 | 7/11/07 | Aaa | AAA | Aaa | AAA |
| Insurance Note Capital | 45804qaa3 | 1,000,000 | 5/17/07 | Aaa | AAA | Aaa | AAA |

92.     These specific ARS consistently received high investment-grade ratings from Defendants, as reflected in the spreadsheet, from the settle date through at least as late as January 2008.

93.     As a result of Defendants' misrepresentations, which initially led to Plaintiffs' purchases of these ARS, Plaintiffs have been forced to continue holding, in some form, these impaired and, in some instances, unmarketable investments.

94.     As noted, each of the Structured Product ARS purchased by Plaintiffs were given High Investment Grade Ratings by Defendants.  Defendants, who upon information and belief were paid significant sums by the issuers of and/or other entities with a direct interest in the securities they rated (and the sale thereof), issued such ratings not of their own accord for the purpose of dissemination to the public generally, but specifically for use in marketing and selling the securities to a limited class of investors, including Plaintiffs.

95.     But, as has now been revealed, Defendants' ratings of these securities were not objective and independent, and they did not accurately reflect the creditworthiness of the Structured Product ARS purchased by Plaintiffs. The Ratings Agencies never reviewed the default risk of the Structured Product ARS sold to Plaintiffs.  Instead, upon information and belief, the Agencies simply transferred to the ARS the ratings that they had applied to the issuing

entities, themselves—typically specially created trusts or companies with no credit histories of their own—and/or other entities whose ratings were knowingly and improperly inflated due to their dependence on the underlying and improperly rated subprime securities.

96.     Because the issuers and/or other related entities could use the money Plaintiffs paid for the ARS to pay losses on RMBS and CDOs, the rating applied to the issuer and/or other entities—and, in turn, to the ARS—would necessarily be derived from or dependent on the ratings applied to the RMBS and CDOs.  Accordingly, the High Investment Grade Ratings the Agencies applied to the Structured Product ARS purchased by Plaintiffs suffered from the same egregious and knowing failings as the ratings applied to the RMBS and CDOs, discussed in detail above, and were equally flawed and over inflated.  Defendants knew this, but they nonetheless issued the High Investment Grade Ratings for the Structured Product ARS purchased by Plaintiffs.

97.     Because these Structured Product ARS purchased by Plaintiffs were based or otherwise dependent upon extremely risky subprime mortgage-related derivatives, they never warranted the High Investment Grade Ratings the Defendants gave them, and Defendants knew it.

98.     Beginning in or around 2007, the house of cards that the Rating Agencies helped to build based on subprime and other high-risk mortgages began to collapse.  Holders of such mortgages began to default at increasing rates, and those increasing defaults reverberated throughout the RMBS, CDOs and Structured Product ARS tied to or dependent upon those loans. Billions of dollars worth of structured securities have defaulted and, in many cases, have become worthless.

99.     It has now become clear that Defendants misled Plaintiffs – and other risk averse investors – into purchasing the risky Structured Product ARS by assigning to those ARS grossly inflated and unjustified ratings.   Plaintiffs and other investors were unwittingly duped into holding highly risky investments that far exceeded their risk tolerance parameters.

100.     After the subprime mortgage crisis revealed the true risks of those Structured Product ARS, including those ARS purchased by Plaintiffs, the ARS became illiquid and substantially devalued, and Plaintiffs have been left holding millions of dollars in impaired and, in some instances, unmarketable Structured Product ARS.   The losses sustained by Plaintiffs were a foreseeable consequence of the Defendants' misrepresentations and omissions.

101.     Had Plaintiffs known the facts set forth herein, Plaintiffs would not have permitted Lehman to purchase the Structured Product ARS for their accounts, and would not have suffered the harm they did.

## COUNT I

### (Fraud)

102.     Plaintiffs reallege and incorporate the foregoing paragraphs as if fully rewritten herein.

103.     With the intent of inducing Plaintiffs to purchase Structured Product ARS and to continue holding Structured Product ARS, Defendants knowingly and/or recklessly made false representations of fact.

104.     Defendants, with knowledge of or reckless disregard for the truth, disseminated the false statements specified above, which were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

105.    Defendants' aforementioned misrepresentations and omissions are material factors that reasonable investors, including Plaintiffs, would have considered important in making an investment decision.

106.    Plaintiffs justifiably and reasonably relied upon Defendants' false representations as to the credit quality of the Structured Product ARS in purchasing and holding tens of millions of dollars worth of Structured Product ARS.

107.    Had Plaintiffs known the truth about Structured Product ARS and Defendants' rating of them, Plaintiffs would not have purchased and held such ARS.

108.    Plaintiffs purchased the Structured Product ARS between the time the misrepresentations were made and the time the true credit risks of investing in such securities were revealed.

109.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT II

### (Violations of Section 10(b) of the
### Exchange Act and Rule 10b-5 Promulgated Thereunder)

110.    Plaintiffs reallege and incorporate the foregoing paragraphs as if fully rewritten herein.

111.    Defendants intentionally and/or recklessly: (a) employed a device, scheme and artifice to defraud Plaintiffs with respect to the sale of the Structured Product ARS; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business that operated as a fraud and deceit upon Plaintiffs in connection with the sale and purchase of Plaintiffs' ARS, in violation of Section

10(b), 15 U.S.C. § 78i(b), of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

112. Plaintiffs justifiably and reasonably relied upon Defendants' false representations as to the credit quality of the Structured Product ARS in purchasing and holding tens of millions of dollars worth of Structured Product ARS.

113. Had Plaintiffs known the truth about Structured Product ARS and Defendants' rating of them, Plaintiffs would not have purchased and held such ARS.

114. Defendants' misrepresentations, misleading statements and omissions were not "forward looking" statements because they were statements of current or historical fact. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint.

115. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because: (i) such statements, made intentionally by Defendants, were material; (ii) at the time each of those forward-looking statements was made, Defendants had actual knowledge that the particular forward-looking statement was false or misleading; and/or (iii) such statements were not identified by Defendants as "forward-looking" and lacked meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

116. Defendants' materially misleading statements and omissions were reflected in the primary offering and subsequent market price of the Structured Product ARS.

117. Plaintiffs purchased the Structured Product ARS in reasonable and justifiable reliance upon Defendants' false representations as to the credit quality of the Structured Product

ARS in purchasing and holding tens of millions of dollars worth of Structured Product ARS; the market price, which incorporated Defendants' ratings; and the integrity of the ARS market itself, on which the Structured Product ARS could not have traded absent Defendants' fraudulent and misleading statements and omissions.

118.    Plaintiffs commenced this action within two years of February 2008, when they first became aware that the Structured Product ARS might not have the credit quality falsely represented by Defendants, and within five years of the date they purchased, through Lehman, the relevant ARS.

119.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT III

### (Violation Of Ohio's Blue Sky Laws)

120.    Plaintiffs reallege and incorporate the foregoing paragraphs as if fully rewritten herein.

121.    The Structured Product ARS Plaintiffs, who are based in Ohio, now own were offered for sale pursuant to offering materials that contained false statements, omitted to state material facts necessary in order to make the statements made not misleading, and contained unfounded and unjustified ratings.

122.    Specifically, the offering materials falsely represented that the Structured Product ARS Plaintiffs purchased had a credit quality consistent with Defendants' criteria for High Investment Grade Ratings.

123.    In fact, those Structured Product ARS did not have a credit quality consistent with Defendants' criteria for High Investment Grade Ratings, because, as Defendants well knew,

those ARS were in fact related to and/or otherwise dependent on and subject to the credit risks of highly risky subprime mortgage debt.

124.    Defendants participated in and aided in the sale of the Structured Product ARS purchased by Plaintiffs, including by falsely representing that those ARS were of a credit quality consistent with Defendants' High Investment Grade Ratings, and Defendants did so in violation of Sections 1707.41, 1707.43 and 1707.44 of the Ohio Securities Act.

125.    Plaintiffs justifiably and reasonably relied upon the Defendants' false representations of credit quality in purchasing and holding, through Lehman, the Structured Product ARS.  Had Plaintiffs known the truth about the credit quality of the Structured Product ARS represented by Defendants, Plaintiffs would not have purchased those ARS.

126.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT IV

### (Negligent Misrepresentation)

127.    Plaintiffs reallege and incorporate the foregoing paragraphs as if fully rewritten herein.

128.    Plaintiffs were part of a select and limited class of qualified investors to whom Defendants intended their ratings to be ultimately supplied as part of the offering materials.

129.    Defendants issued ratings of Structured Product ARS to provide guidance to investors such as Plaintiffs in making investment decisions, and Defendants knew that their ratings would be relied upon by Plaintiffs and other members of this class of investors.

130.    Plaintiffs had a reasonable expectation that Defendants were independent, that Defendants' methods were valid and objective, and that Defendants' ratings of Structured Product ARS accurately reflected the credit quality of such instruments.

131.    Defendants knew or should have known that their representations about Structured Product ARS were false and misleading.

132.    Defendants made their material misrepresentations and omissions of fact negligently and carelessly.

133.    But for the Defendants' material misrepresentations and omissions of fact, the Structured Product ARS would have been unmarketable.

134.    Plaintiffs reasonably relied to their detriment upon Defendants' negligent misrepresentations and omissions by purchasing and holding tens of millions of dollars worth of Structured Product ARS that are now illiquid and devalued.

135.    As a direct and proximate consequence of Defendants' negligent misrepresentations, Plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT V

### (Declaratory Relief)

136.    Plaintiffs reallege and incorporate the foregoing paragraphs as if fully rewritten herein.

137.    Defendants have repeatedly asserted that the First Amendment to the United States Constitution bars any claims against them for fraud and/or negligent misrepresentation on the basis of their ratings.

138.    Specifically, Defendants have repeatedly asserted two, primary First Amendment arguments:  (a) that they, as purported members of the "financial press," can be held liable for

misstatements only upon proof of "actual malice"—a standard applicable in certain cases involving public-figure plaintiffs; and (b) that their ratings constitute "opinion," which they contend is non-actionable under the First Amendment.

139.    Defendants' First Amendment arguments, however, represent a misapplication of First Amendment jurisprudence and/or are contrary to substantial precedent which holds, among other things, that:

(a)    the First Amendment is not a defense to fraud and/or securities fraud claims [see Illinois ex rel. Madigan v. Telemarketing Associates, Inc., 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud.")];

(b)    even in the defamation context, the "actual malice" test for _liability_ applies only where the Plaintiff is a "public figure," even if the defendant is a journalist, and that, absent a public figure plaintiff, the mere fact that the matter is one of "public concern" is insufficient to invoke the "actual malice" test for liability [see Gertz v. Robert Welch, Inc., 418 U.S. 323, 343-45, 347-49 (1974) (refusing to apply actual malice standard to private-figure plaintiffs, even where underlying speech involved a matter of public concern)];

(c)    that rating agency defendants do not act as "financial journalists" in providing issuer-paid ratings to be used in the marketing of the issuer's securities to a targeted group of investors, nor do ratings issued in such circumstances constitute matters of "public concern"; and

(d)    even purported "opinions" are actionable, consistent with the First Amendment, where they contain "provably false" and/or objectively

verifiable statements; or where the party offering the opinion does not believe it or it is without basis in fact [see Milkovich v. Lorain Journal, 497 U.S. 1, 19-23 (1990)].

140. As set forth herein, Plaintiffs have alleged that Defendants' fact-based ratings of the Structured Product ARS purchased by Plaintiffs were: (a) based on knowingly and provably false and/or deficient evaluations and/or criteria employed by Defendants; and (b) generated for use and paid for by the issuers thereof in attempting to sell the Structured Product ARS to a limited class of investors, including Plaintiffs—which are privately-held companies.

141. Given the obvious conflict between Defendants' First Amendment-based assertions and the applicable precedent, in light of Plaintiffs' actual allegations, a real, substantial, and immediate controversy is presented regarding the rights, duties and liabilities of the parties. Declaratory relief from this Court will resolve this controversy and limit the uncertainties.

142. Plaintiffs therefore request a declaratory judgment from this Court, pursuant to Rule 57 of the Federal Rules of Civil Procedure, that will resolve the issue of the application of the First Amendment to Plaintiffs' claims in this case. Specifically, Plaintiffs request a declaration, in light of the applicable precedent, that:

(a) the First Amendment has no application to Plaintiffs' fraud and/or federal and state-law securities fraud claims;

(b) that the "actual malice" test for liability that is applied in public-figure *defamation* cases involving speech regarding matters of "public concern" has no application to this case because (i) this test is not applicable outside

of the public figure defamation context, and (ii) it otherwise has no application to the privately-held corporate plaintiffs in this case;

(c)    that, in generating and providing issuer-paid ratings of securities for the purpose of marketing such securities to a targeted group of investors, Defendants do not act as financial publishers, and their ratings do not constitute matters of "public concern"; and

(d)     that Defendants' ratings at issue in this case do not constitute protected "opinion" because such ratings are based on objectively verifiable information, Defendants did not truly believe the accuracy of the ratings and/or such ratings lacked a basis in fact.

**WHEREFORE**, Plaintiffs demand judgment:

(a)    awarding Plaintiffs compensatory damages in amounts to be determined at trial, in excess of $75,000, together with interest, attorneys' fees, costs and disbursements; and

(b)    awarding Plaintiffs punitive and exemplary damages in amounts to be determined at trial; and

(c)    a declaratory judgment as set forth in Count V, above; and

(d)    such other and further relief as is just and proper.

Respectfully submitted,

/s/ John W. Zeiger
John W. Zeiger  (0010707)
ZEIGER, TIGGES & LITTLE LLP
3500 Huntington Center
41 South High Street
Columbus, Ohio  43215
(614) 365-9900
(Fax) (614) 365-7900
zeiger@litohio.com
Trial Attorney for Plaintiffs
American Signature, Inc. and SEI, Inc.

OF COUNSEL:

Marion H. Little, Jr.   (0042679)
Christopher J. Hogan  (0079829)
ZEIGER, TIGGES & LITTLE LLP
3500 Huntington Center
41 South High Street
Columbus, Ohio  43215
Tel: (614) 365-9900
Fax: (614) 365-7900
little@litohio.com
hogan@litohio.com

James E. Arnold  (0037712)
JAMES E. ARNOLD & ASSOCIATES, LPA
115 W. Main Street, 4th Floor
Columbus, Ohio 43215
Tel: (614) 460-1600
Fax: (614) 469-1066
jarnold@arnlaw.com

## Jury Demand

Plaintiffs demand a trial by jury, in the maximum number provided by law, as to all claims and issues properly triable to a jury.

/s/ Marion H. Little, Jr.
Marion H. Little, Jr.   (0042679)

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 4, 2009, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Michael H. Carpenter, Esq.
Jeffrey A. Lipps, Esq.
Carpenter Lipps & Leland LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215

Attorneys for Moody's Investors Services, Inc.

Drew H. Campbell, Esq.
Bricker & Eckler, LLP
100 S. Third Street
Columbus, OH  43215

Attorneys for McGraw-Hill Companies, Inc.

/s/ Marion H. Little, Jr.
Marion H. Little, Jr.   (0042679)

885-001:  197151