UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
AMERICAN SIGNATURE, INC., et al,      :
          :
          Plaintiffs,     :     10-cv-05095 (PGG)
          :
     -against-     :
          :
          :
MOODY'S INVESTORS SERVICES, INC., et al,  :
          :
          Defendants.    :
------------------------------------------------------------x

## FIRST AMENDED AND SUPPLEMENTED COMPLAINT

### (JURY DEMAND ENDORSED HEREON)

Plaintiffs American Signature, Inc. ("ASI") and SEI, Inc. ("SEI"), for their first amended and supplemented complaint against Defendants Moody's Investors Services, Inc. ("Moody's"), and The McGraw-Hill Companies, Inc. ("S&P") (together, the "Rating Agencies" or "Defendants"), allege as follows:

### PRELIMINARY STATEMENT

1.    This action arises from the Ratings Agencies' egregious fraud in convincing Plaintiffs and other investors to rely, in m aking their invest ment decisions, upon the Rating Agencies' ratings of th e creditworthiness of securities – ra tings that th at the Agencies falsely represented were objective, independent, and derived from valid methodologies.

2.    In fact, the Ratings Agencies fraudulently concealed the truth that certain complex derivative auction rate securitie s ("ARS") were undeserving of th e misleadingly high ratings the Ratings Agencies had assigned to them because those ratings did not reflect any review of the ARS but, rather, were, upon inform ation and belie f, derived from the Rating Agencies' own

ratings on subprime mortgage-related derivatives and/or entities whose ratings were knowingly and improperly inflated due to their depe ndence on the underlying and im properly rated subprime securities. The ARS rati ngs, as well as the underlying ratings from which they were derived, were, thus, over inflated and utterly baseless because the Ratings Agencies : i) competed to deliver to the issuers of the underlying subprime derivatives highly and unjustifiably favorable ratings in order to convince the issuers to retain them; ii) participated in structuring those very securities that they were supposed to be rating obj ectively; and iii) used ratings methodologies that they knew to be outdated, inappropriate and inapplicable.

3.      As a result of Defendants' fraud, they assigned egregiously m isleading high "investment grade" ratings to ARS, including those purchased by Pl aintiffs. Defendants thereby garnered lucrative fees from the issuers and/or other entities with a direct interest in the securities they rated, and Plaintiffs becam e the owners of now worthless ARS an d have suffered tens of millions of dollars in losses.

4.      ASI, a furniture retailer, and its af filiate, SEI, became the victims of Defendants' fraud because they had established conservative investment policies for their cash m anagement accounts that relied explicitly upon Defendants' ratings schemes. Intending to permit investment of their cash in only safe and liqu id "cash equivalent" securities, Plaintiffs expressly restricted their former investment advisor, Lehm an Brothers, Inc. ("Lehm an"), to purchasing only securities that carried high "investment grade" ratings from one or m ore of the major nationally recognized statistical rating organizations ("NRSROs"), including Defendants Moody's and S&P. In doing so, Plaintiffs relied upon Moody' s and S&P's representati ons that their ratings were the product of current, unb iased, objective analyses a nd reflected Moody's and S&P's independent and good faith conclusions as to the creditworthiness of the rated securities.

5.      However,  as Moody's and S&P knew, but      concealed  from  Plaintiffs and the investment  community, the ratings that M    oody's  and S&P assigned to the complex ARS purchased for Plaintiffs' accounts had no basis in fact because the ratings the Agencies applied to the  subprime mortgage-related  securities  upon which the ARS rati  ngs  were ultimately derived and/or dependent were utterly meaningless.  Moody's and S&P, for example, had developed new statistical methodologies to rate  these complex  securities, but refused to im plement these new methodologies because doing so would have cut   into profits.  Accordin gly,  Moody's and S&P instead  rated the com  plex  new securities using    their  preexisting, outdat ed  and inapplicable methodologies for rating much less complex, ordinary corporate bonds, and otherwise knowingly relaxed their standards – even  though  Moody's and S&P knew that  this would resu lt  in ratings that were fallacious and  unreliable.  The Agenci es then rated the ARS based on ratings derived from  and/or otherwise dependent on their m    eaningless  ratings of othe r  subprime  securities, inflicting the harm from their fraud on conservative, short-term investors, including Plaintiffs.

6.      While Moody's and S&P repeatedly represented to investors, including Plaintiffs, that  their opinions were independent and thei  r  methodologies  objective, the opposite was true. Moody's  and S&P concealed from Plaintiffs an  d  many  other m embers  of the investing public that,  far from  being neutral review ers  of th e  complex  new securities, Moody's and S&P had strong incentives from their compensation structure to deliver highly favorable investment grade ratings – incentives that effectively negate  d  whatever independence Moody's and S&P m  ight otherwise  have had.  Most of the com  pensation  issuers paid to the Rating Agencies for rating complex  structured products (unlike for rati    ng  corporate bonds) was   paid  once the Rating Agency  was selected by the issuer (or its i    nvestment  bank) to rate the product based on the Agency's  preliminary risk evaluation of the   product.  Consequently , Moody's and S&P were

under strong competitive and financial pressures to deliver favorable evaluations of the ARS to win the issuer's business and capture lucrative fees.

7.     These competitive pressures led Moody's and S&P not only to inflate the preliminary and final ratings they assigned to complex new securities and, ultimately, to the ARS, but also to work directly with the issuers in structuring the complex securities on which those ARS ultimately depended so Moody's and S&P could try to justify the investment grade ratings necessary to induce investors such as Plaintiffs to purchase the securities. By working directly with the investment banks and the issuers, Moody's and S&P made it possible to market such securities and, in return, earned hundreds of millions of dollars in fees, giving them profits that were vast multiples of what they had reaped in the past.

8.     In reliance upon the unjustified investment grade ratings Moody's and S&P applied to ARS that were tied to subprime mortgage-related derivatives and/or to other securities dependent thereupon, Lehman purchased on Plaintiffs' behalf hundreds of millions of dollars worth of those ARS. Now that the true risks of those securities have been revealed by the exploding subprime mortgage crisis, Plaintiffs are holding millions of dollars worth of securities that are essentially worthless.

## THE PARTIES

9.     ASI is a privately-held corporation formed under the laws of the State of Ohio, with its principal place of business at 4300 East Fifth Avenue, Columbus, Ohio 43219.

10.     SEI is a privately-held corporation formed under the laws of the State of Nevada, with its principal place of business at 4300 East Fifth Avenue, Columbus, Ohio 43219.

11.     Defendant Moody's is a Delaware corporation with its principal place of business in New York.  Moody's is an NRSRO that holds approximately a 40% share of the world's credit ratings market.

12.     Upon information and belief, Defendant The McGraw Hill Companies is a Delaware corporation with its principal place of business in New York.

13.     Upon information and belief, Defendant Standard & Poor's Financial Services, LLC is a Delaware limited liability company with its principal place of business in New York.  It is also a subsidiary of The McGraw Hill Companies.

14.     Upon information and belief, Standard & Poor's Ratings Service ("S&P") is a unit of The McGraw Hill Companies and/or its subsidiary[ies].  S&P is an NRSRO that holds approximately a 40% share of the world's credit ratings market.

15.     Upon information and belief, both Moody's and S&P regularly conduct business in Ohio, including within the Southern District of Ohio, Eastern Division.  Moreover, both Moody's and S&P have previously been subject to litigation in this forum, and they are currently defendants in a separate action brought against them by the state of Ohio.

## STATEMENT OF FACTS

16.     Plaintiffs are retail businesses that maintain substantial amounts of their assets in cash or other highly-liquid investments to meet various business contingencies – such as paying vendors and service providers, satisfying tax obligations, meeting compensation commitments, and investing in new business opportunities.  To protect their cash, Plaintiffs had always placed it in traditional short- and/or intermediate term cash management instruments that were liquid and safe, such as commercial paper, U.S. government obligations, variable rate demand notes, repurchase agreements, or money market instruments.

17.     To ensure safety, Plaintiffs limited their investments to those carrying high ratings from the three principal NRSROs :  Moody's, S&P and/or Fitch IBCA.  Plaintiffs' conservative investment policy was to invest on ly in those  short-term securities that had received a rating of "A2"[1] or  higher from  Moody's or of "A"  [2] or  higher from S&P ("High Investm  ent  Grade Rating").  As an additional protec  tion,  Plaintiffs stipulated that   at least 80% of the securities purchased for their cash m anagement accounts had to have ratings superior to "A/A " – *i.e.*, they had to be designated "Aa" or higher from Moody's and "AA" or higher from S&P.

18.     The  current world-wide f  inancial  crisis  was precip itated  at leas t  in  part by widespread defaults on subprim e mortgages – loans at higher interest rates m  ade to borrowers with riskier credit histories.

19.     The  impact  of these defaults on the wo   rld's  financial system  was e normously magnified because the subprim e mortgages were packaged together and  securitized as com plex structured  debt securities, su   ch  as residential m  ortgage-backed  securities ("R MBS")  and collateralized  debt obligations ("C  DOs").   RMBS  and CDOs related to     them  were sold  to investors  on a m  assive  scale and spread the      substantial  risk of default on those subprim    e mortgages to virtually every corner of the globe.

20.     While  RMBS and CDO securities were ty  pically  long-term  securities purchased by investors seeking high er yields, the damage caused by thes e risky and volatile securities was spread to conservative, short term  investors such as Plaintiffs  through the creation of Structured Product  ARS.   These securities were m    arketed  to  investors  such as P laintiffs  as safe, "cash

---

[1]     Moody's adds the numerical modifiers 1, 2, and 3 to the letter-grade ratings from "Aa" through "Caa" – a "1" to indicate  that the security ranks  in the  higher end of its letter categ ory; a "2" t o  indicate that it ranks in t  he mid-range of its letter category; and a "3" to indicate that it ranks in the lower end of its letter category.

[2]     S&P assigns modifiers letter-grade ratings from "AA" to "CCC," with the addition of a plus (+) or minus (-) sign to show relative standing within a letter category.

equivalent" investments on the basis that they were highly rated and highly liquid, because they could be sold at auctions held as frequently as every seven days.  However, because Structured Product ARS were typically sold by specially created trusts or companies for the purpose of raising money that could be used to cover losses on investments in RMBS and CDOs, purchasers of the ARS were unwittingly taking on the risk of subprime mortgages.  Indeed, the more RMBS and CDO defaults that occurred, the more likely the ARS investors would lose their money.

21.     The RMBS, CDOs and Structured Product ARS never could have been marketed widely without the substantial participation of the Rating Agencies.  The issuance of and widespread distribution of such high risk debt securities depended upon their having received High Investment Grade Ratings from the NRSROs, including the Rating Agencies, for which issuers and investment banks were prepared to pay substantial fees.  The Rating Agencies cast aside the objectivity that had been the hallmark of their business, participated in the very creation of these RMBSs, CDOs, and Structured Product ARS, and applied High Investment Grade Ratings to those securities without any basis for doing so.  In the case of the Structured Product ARS, the Rating Agencies ensured that unsuspecting investors such as Plaintiffs' corporate treasury departments would purchase these investments believing them to be safe, highly-liquid "cash equivalents."

22.     Plaintiffs – each of which had distinctly conservative investment profiles – never had any intention of investing in risky subprime mortgage debt or in any securities derived from or otherwise dependent on it.   Indeed, Plaintiffs – relying upon commonly-held understandings as to the meaning of High Investment Grade Ratings – believed that, by having restricted their cash investments to short- and/or intermediate-term highly liquid securities bearing only High Investment Grade Ratings, they had protected their cash from anything approaching the high risk

of subprime mortgage debt.  As set forth below,  however, the Rating Agencies' profit-motivated and  irresponsible application of High Investm ent  Grade Ratings led   directly to  Plaintiffs' purchase of hundreds of m illions  of dollars of St ructured Product ARS.   Plaintiffs now find themselves the unwitting victims of the subprime mortgage meltdown, stranded with millions of dollars in virtually worthless Structured Product ARS.

### A.    Moody's  and S&P Actively and Kn    owingly  Induced Investor Reliance on Their Ratings of RMBS, CDOs and Structured Product ARS.

23.    The  Rating Agencies were essen tial  players in the m arketing  of RMBS, CDOs and Structured Product ARS.  Base d or dependent as they were upon risky subprim e debt, these esoteric  securities could never have been m  arketed  broadly without ratings from   the Rating Agencies that purported to pr ovide independent, objective, relia ble and unbiased assessm ents of the risk presented by such investm ents.  According to the 2002 SEC st atement of Raymond W. McDaniel ("McDaniel"), the former President and current Chief Executive Officer and Chairman of  Moody's: "[T]he main and proper role of cr    edit  ratings is  to enhance transparency and efficiency in debt cap ital  markets  by reducin g  the information asym metry  between borrow ers and lenders."  [11/21/02 Statem ent of Raymond W . McDaniel Before United States Securities and Exchange Commission, at 2, ("McDaniel SEC Stmt.").]

24.    Indeed, the Rating Agencies have publicly  admitted that these types of securities could not have been proposed, issued or sold  without the Rating Agencies' ratings.  F rank Raiter ("Raiter"), S&P's form er  Managing  Director and Head of    Residential  Mortgage-Backed Securities Ratings, acknowledged in 2008 that:  "B y regulation, institutional investm ent policy, and tradition, the sale o f associated mortgage backed securities generall y required ratings from two of the [Rating Agencies]."  Therefore, "if [the Rating Agencies] had stood up and said we're not going to [rate com plex structured finance tran sactions], then the other players would have

been forced to cut back.  But everyone was ha ving too good a tim e."  According to Raiter, "the rating agencies were the oilers who kept the wheel s of the train greased."  As Richard Gugliada, S&P's former head of CDO ratings, stated, wit hout ratings, the transactions sim ply "can't be done."  [10/22/08 Statem ent of Fra nk L. Raiter  on Credit Rating Agenci es and the Financial Crisis  Before the U.S. House of Represen  tatives  Committee  on Oversight and G  overnment Reform, at 2, Exh. B ("Raiter Stmt."); Transcript of 12/26/08 "Credit and Credibility" Television Program, Exh. C ("Credit and Credibility").]

25.     According  to Ohio's form er  attorney  general  Marc Dann, w ho  investigated the Rating Agencies for mortgage fraud, "[the Ra ting Agencies] made the market.  Nobody would have been able to sell these bonds without the   ratings."  [Quoted in "Overrated," Portfolio.com (Aug. 13, 2007, Exh. D ("Overrated")).]

26.     Even  more  telling are the published conclu  sions of the Financia l Crisis  Inquiry Commission (the "FCIC Report"), a book-length report of the bipart isan Financial Crisis Inquiry Commission  ("FCIC").  The FCIC was establis   hed  by Congress under authority of the Fraud Enforcement  and Recovery Act (P  ublic  Law  111-21),  its m embers  were appointed by both parties, and the Commission was charged with the task of examining and reporting on the causes of  the colla pse  of  major  financial  institutions  that  failed – or would have failed if not for exceptional assistance from the federal government.  The FCIC Report, which is written in plain English, "is intended to provide a historical accounting of what brought our financial system and economy  to a precipice and to help policy m    akers  and the public better   understand how this calamity came to be."  [FCIC Report, at *xi,* Exh. V (excerpts from Report).]

27.     In  an introductory summ ary  of the conc lusions  reached by the FCIC, the FCIC Report states as follows:

**• We conclude the failures of credit rating agencies w ere essential cogs in the wheel of f inancial destruction.** The three credit rating agencies [Moody's, S&P, and Fitch] were key enablers of the financial m eltdown. The m ortgage-related securities at the heart o f the cris is could not have been m arketed and sold without their seal of appr oval. Investors relied on them, often blindly. In som e cases, they were obligated to use th em, or regulatory capital standards were hinged on them . This crisis could not have happened without the rating agencies. Their ratings helped the m arket soar and their downgrades through 2007 and 2008 wreaked havoc across m arkets and firms. In our report, you will read about the breakdowns at Moody's, examined by the Commission as a case study. Fr om 2000 to 2007, Moody's rated nearly 45,000 m ortgage-related securities as triple-A. This compares with six p rivate-sector companies in the United States that carried this coveted rati ng in early 2010. In 2006 alone, Moody's put its triple-A stamp of approval on 30 mortgage-related securities every working day. The results were disastrous: 83% of the mortgage securities rated trip le-A that yea r ultimately were downgraded. You will also read ab out the forces at work behind the breakdowns at Moody's, including the flawed computer models, the pressure from financia l firms that paid for the ratings, the relentless drive for market share, the lack of resources to do the job despite record profits, and the absence of m eaningful public oversight. And you will see that without the active participation of the rating agencies, th e market for mortgage-related securities could not have been what it became.

[FCIC Report at *xxv.*]

28.     As the FCIC Report concluded: "Moody' s … relied on flawed and outdated models to issue erroneous ratings on m ortgage-related securities, failed to perform meaningful due diligence on the assets underlying the securities, *and continued to rely on those models even after it became obvious that the models were wrong*." [FCIC Report, at 126.]

29.     Similar conclusions are contained in a nother congressional report, titled " Wall Street and the Financ ial Crisis: Anatomy of a Financial Collapse," a majority and minority staff report of the United States Senate Perm anent Subcommittee on Investigations, published April 13, 2011 (the "Senate Report"). The goals of th at investigation were to "construct a public

record of the facts in order to deepen the understanding of what happened; identify some of the root causes of the crisis; and provide a factual foundation for the ongoing effort to fortify the country against the recurrence of a similar crisis in the future. [Senate Report, Executive Summary, at 4, Exh. X (excerpts from Senate Report).]

30.     Investors relied upon the ratings of structured finance products more than they did for ratings of other securities, because of the relative opacity of the structured finance markets. As Jerome Fons ("Fons"), a former Moody's Managing Director in charge of Credit Policy, has noted, the "details of the underlying asset pool and often the structure of the transaction are not publicly available for external scrutiny." This lack of publicly available information made "[t]he role of rating agencies . . . particularly important to the structured finance process. Investors rely on agency ratings when making purchase decisions because of the opacity [in the structured finance market]." [Fons, White Paper on Rating Competition and Structured Finance (Jan. 10, 2008), Exh. E ("Fons White Paper").]

31.     Fons explained investor reliance on structured product ratings as follows:

> Market participants relied heavily on the rating agencies when purchasing subprime related assets for at least three reasons. First, subprime RMBS and their offshoots offer little transparency around the composition and characteristics of the underlying loan collateral. Potential investors are not privy to the information that would allow them to understand clearly the quality of the loan pool. Loan-by-loan data, the highest level of detail, is generally not available to investors.       Second, the complexity of the securitization process requires extremely sophisticated systems and technical competence to properly assess risk at the tranche level. Third, rating agencies had a reputation, earned over nearly one century, of being honest arbiters of risk.
>
>                         [10/22/08 Testimony of Jerome S. Fons Before the U.S. House of Representatives Committee on Oversight and Government Reform, Exh. F ("Fons Committee Test.").]

32.     Moody's and S&P actively cultivated investor reliance by portraying their ratings as independent, objective and substantially accurate.  For example, in a statement to the SEC on November 21, 2002, McDaniel, Moody's former President and current Chief Executive Officer, portrayed Moody's as an independent provider of unbiased, trustworthy ratings derived from a rigorous and judicious process:

- Objectivity and independence.  Moody's in ternal policies and procedures have mitigated the latent conflict of interest that is inherent in the rating agency business model.  As such, our rating opinions are the product of analysis that is unbiased and trustworthy.

- Predictive content.  The predictive conten t of our ratings has been consistently mapped and measured.  Moody's and unrelated academics have published studies on the relationship between our ratings and credit defaults.  Research has shown a strong relationship between Moody's ratings  and actual def ault experience.  Put simply, corporate bonds that have receive d higher default from  Moody's default less frequently on average than lower rated bonds.

- Judicious ratings process.  Our ratings     are arrived at th   rough a rigorous and judicious process that tends not to react to transitory conditions in favor of longer-term considerations and ratings stability.

[McDaniel SEC Stmt., at 4.]

33.     S&P has m ade similar  representations.   Deven Sharm a,  President of S&P, testified before Congress on October 22, 2008 that      "[S&P's]  core m ission is to provide the markets  with quality, independe nt  analysis" and "independence   is  a core principle of our business."  [10/22/08 Testim  ony  of Deven Sharm  a Before U.S. House of Representatives Committee on Oversight and Governm ent Reform ("Sharma Committee Test.").]  S&P's former Vice President Vickie A. Tillman ("Tillman") declared in a letter to the editor of the Wall Street Journal that "[o]ur credit ratings  provide objective, im partial opinions on the cred it quality of bonds."  ["How S&P Protects Inte grity of Credit Ratings," Wall  Street Journal (Sept. 17, 2007), Exh. G ("Tillman WSJ").]

34.     In particular, Moody's and S&P induced investor reliance on the ratings of new complex structured securities, such as the RMBS, CDOs, and their offshoot Structured Product ARS, by emphasizing their comparability to the well-familiar ratings of conventional corporate debt.

35.     Moody's made repeated public statements – later revealed to be false – about the comparability of its ratings models for structured finance products and corporate bonds.  For example, Moody's Report on the Code of Professional Conduct (April 12, 2006) proclaimed that "Structured Finance Credit Ratings use the same symbol system and are intended to convey comparable information with respect to the relative risk of expected credit loss."  Likewise, in *Moody's: Rating Symbols and Definitions* (March 2007), Moody's represented the following:

> It is Moody's intention that the expected loss rate associated with a given rating symbol and time horizon be the same across obligations and issuers rated on the Global Scale.  Moody's rating methodologies, rating practices and performance monitoring systems are each designed to ensure a consistency of meaning.
> . . .
>
> Moody's structured finance ratings are engineered to replicate the expected loss content of Moody's Global Scale.

[Exh.                              H.]

Then, in his September 27, 2007 testimony before the U.S. Congress, Michael Kanef, the former head of Moody's Asset-Backed Finance Rating Group responsible for RMBS, testified that:

> Moody's rating accuracy on mortgage-backed securities has been similar to its rating accuracy on other structured finance products, and, over long time horizons, comparable to the accuracy of Moody's corporate bond ratings.
> . . .
> [Moody's ratings] indicate[d] a high degree of consistency between structured finance and corporate ratings.

[9/27/07 Testimony of Michael Kanef Before U.S. House of Representatives Subcommittee on Capital Market, Insurance, and Government Sponsored Enterprises.]

36.     S&P also proclaimed in a special report dated June 13, 2001, that its "approach, in both policy and practice, is intended to provide a *consistent* framework for risk assessment that builds reasonable ratings *consistency* within and across sectors and geographies" (emphasis supplied).   In the same report, S&P defined those "sectors" to include, among others, the "six different sectors of the corporate market, [and] the three major sectors of the structured market (asset-backed, commercial mortgage-backed, and residential mortgage-backed securities)."  S&P Executive Vice President Tillman also reaffirmed S&P's commitment to consistent standards in her September 2007 letter to the editor of the Wall Street Journal,  in which she explained that "we rate [structured] deals based on our criteria – criteria that are publicly available, non-negotiable and *consistently applied* ...." [Tillman WSJ (emphasis added).]

37.     Not only did the Rating Agencies knowingly induce investor reliance on their ratings of RMBS, CDOs and Structured Product ARS, but they did so knowing that such reliance would operate to the investors' detriment.  As expressed in a prophetic internal December 15, 2006 e-mail from Christopher Meyer, an Associate Director in S&P's Global CDO Group: "Rating Agencies continue to create and [sic ] even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters . :o)."  [Quoted in "Rating McGraw-Hill," Fortune Magazine (April 23, 2009), Exh. I.]

38.     The Ratings Agencies' efforts to induce investor reliance worked to perfection. As was the case with Plaintiffs' investment policies, the Defendants' ratings were routinely embedded, or "hard-coded" into financial contracts and policies of banks, pension funds, insurance companies, investment funds and corporate investors, each of which defined risk

tolerance in terms of those ratings.  The Ratings   Agencies were well aware of this   fact.  As Moody's McDaniel explained: "Ratings facilitate [the broad marketability of bonds] . . . because many [large U.S. investors] have prudential inve stment guidelines that rely in part upon ratings as a measure of desired portfolio quality."  To  "promote the objectives of market efficiency and investor protection," ratings were   even incorporated into "various legislative and regulatory frameworks  …."  [2/8/05 Testimony of Ra       ymond  W. McDaniel Before U.S. Senate Subcommittee on Banking, Housing and Urban Affairs.]

**B.**     **The  Rating Agencies Materially   Misrepresented  Their Independence and Objectivity,  While Concealing Their     Conflicts  of I nterest  in Rating Structured Finance Products.**

39.     While Moody's and S&P induced investor reliance by touting their reputations for independence and objectiv ity in evaluating rate d securities, they concealed from   various segments of the investing public – including Plainti ffs – the truth about their conflicts of interest when rating RMBS, CDOs and Structured Product ARS.

40.     In June 2005, Moody's adopted and publishe d a Code of Professional C onduct in which it represented that:

> In  the rating process, Moody's     maintains  independence in its relationship  with Issuers and other   interested  entities. . . . As a matter of policy, and in keeping with its role as an independent and objective publisher of opinions, Moody's retains complete editorial control over the content of its Credit Ratings . . . .

In that Code, Moody's reiterated its "commitment to maintaining the quality and integrity of the rating process" and adopting "policies and controls to ensure that we maintain our independence and properly manage potential conflicts of interest . . . ."  [Id.]

41.    S&P made similar representations about its independence and objectivity. In testimony before Congress on March 20, 2002, Ronald M. Barone, a former Standard & Poor's Managing Director, stated:

> Standard & Poor's is – and has always been – independent of any investment banking firm, bank or similar organization. . . . Standard & Poor's is committed to objective ratings by independent rating committees comprised of analysts with credit experience in their areas.
> . . .
>
> Standard & Poor's credit ratings have gained respect and authority throughout the investment community because they are widely understood to be based on independent, objective and credible analysis.
> . . .
>
> Standard & Poor's Commitment to Objectivity
> [Our] Guidelines and Code stress the overriding importance of objectivity in our ratings process.
> . . .
>
> Indeed, independence, credibility and integrity are the foundations of the Standard & Poor's ratings business and they are what ultimately provide value to the marketplace.
> Our rating opinions are based on an objective and independent process that we consistently disclose and describe to the marketplace.
>
> > [3/20/02 Testimony of Ronald M. Barone Before U.S. Senate Committee on Governmental Affairs.]

42.    In January 2002, S&P published a paper entitled, "Understanding Credit Ratings," in which it represented:

> A Standard & Poor's rating is based on principles of independence, integrity and disclosure – the same standards that underlie market confidence and acceptance of our ratings by investors worldwide. The rating process is open and clear at Standard & Poor's. The process remains consistent across different types of ratings and different markets.

### 1.    The Compensation Scheme for Rating RMBS, CDOs and Structured Product ARS Undermined the Integrity of Defendants' Ratings.

43.    Notwithstanding the Defendants' professions of independence, their ratings process was, in fact, rife with conflicts of interest. For example, the Defendants would not receive any substantial revenue for rating a structured finance product until after they won the business to rate the product. Investment banks would decide which NRSRO to hire based upon the NRSROs' preliminary evaluations of the structured products, for which the NRSRO would be paid only a nominal fee. These preliminary evaluations might consist of a simple approval or disapproval as to whether the proposed capital structure of the deal might justify the desired rating or might predict the "expected loss" associated with the portfolio. If the NRSRO could not reach the desired rating under the proposed structure, negotiation would typically ensue.

44.    Once selected to rate the structured product, the NRSRO would then undertake a purportedly more comprehensive evaluation, and it was only after this phase was completed and the rating published that the NRSRO would receive the most substantial portion of their revenues. Hence, the NRSROs, including Defendants, had incentives to issue favorable evaluations early on to win the coveted business in the first instance, and then to remain pliable throughout the process to ensure a substantial payment at the end.

45.    This pre-evaluation process gave investment banks enormous opportunities for "ratings shopping" – where an underwriter would bring its proposed structured product deal to multiple NRSROs to determine which would impose the least demanding requirements. Since marketing a structured product deal typically required ratings from only two of the three major NRSROs, competitive pressures induced the NRSROs to relax their parameters in order to make their requirements as permissive as possible.

46.     The FCIC Report labeled this system "the CDO machine," and stated "[e]veryone involved in keeping this m achine humming – the CDO m anagers and underwriters who packaged and sold the securities, the rating agenci es that gave most of them sterling ratings, and the guarantors who wrote protecti on against their defaulting – coll ected fees based on the dollar volume of securities sold."  [FCIC Report, at 129.]

47.     As the FCIC summarizes, NRSROs "were co mpensated only for rated deals – in effect, only for the deals for which their ratings    were accepted by the issuer.  So the pressure came from two directions: in-house insistence on increasing market share and direct dem ands from the issuers and investm ent bankers, who pus hed for better ratings w ith fewer conditions." [FCIC Report, at 210.]

48.     The role of the NRSROs in the "CDO machine," the FCIC report continued, "was to provide basic guidelines on the collateral and the structure of the CDOs – that is, the sizes and returns of the various tranches – in close consultation with the underwriters.  For many investors, the triple-A rating made those products appropriate investments."  [FCIC Report, at 131-32.]

49.     The Senate Report states:

> It is not surprising that credit  rating agencies at times gave into pressure from the investment banks and accorded them undue influence in the ra tings process. The ra ting companies were directly dependent upon investment bankers to bring them business and were vulnerable to threats  that the investment bankers would take their business elsewhere if they did not g et the ratings they wanted.  Moody's Chief Credit Officer told the Subcommittee staff that ratings shopping, the practice in which investment banks chose the credit rating agen cy offering the highest rating for a proposed transaction, was commonplace prior to 2008.

[Senate Report, at 287.]

50.     The debasement of standards by the NR SROs significantly impaired the accuracy of the Rating Agencies' credit risk evaluations.    The ratings process rapidly degenerated into a

"race to the bottom" in terms of quality – where, as one former Moody's executive described, "[s]upport levels migrate[d] to the lowest possible values as agencies maneuver[ed] to maintain market shares." [Fons White Paper, at 7.]

51.    Contrary to their denials, the Rating Agencies were willfully complicit in this ratings shopping process. As former Moody's Managing Director Fons testified before Congress on October 22, 2008: "A drive to maintain or expand market share made the rating agencies willing participants in this shopping spree." Succumbing to competitive pressures, Defendants were, in effect, selling their ratings instead of their work. [Fons Committee Test., at 3.]

52.    So eager were the Rating Agencies to never turn down any opportunity to make a profit by rating an investment offering, they agreed to issue their ratings evaluations on impossibly short time frames demanded by the investment banks. As to Moody's, the FCIC found that analysis that previously required six to eight weeks to perform was compressed into three or four days, even as more and more deals were being rated every day:

> Moody's employees told the FCIC that one tactic used by the investment bankers to apply subtle pressure was to submit a deal for a rating within a very tight time frame. [Former Moody's team managing director Eric] Kolchinsky, who oversaw ratings on CDOs, recalled the case of a particular CDO: "What the trouble on this deal was, and this is crucial about the market share, was that the banker gave us hardly any notice and any documents and any time to analyze this deal. … Because bankers knew that we could not say no to a deal, could not walk away from the deal because of a market share, they took advantage of that." For this CDO deal, the bankers allowed only three or four days for review and final judgment. Kolchinsky emailed [another Moody's team managing director] that the transactions had "egregiously pushed our time limits (and analysts)." Before the frothy days of the peak of the housing boom, an agency took six weeks or even two months to rate a CDO. By 2006, Kolchinsky described a very different environment in the CDO group: "Bankers were pushing more aggressively, so that it became from a quiet little group to more of a machine." In 2006, Moody's gave triple-A ratings to an average of more than 30 mortgage securities each and every working day.

[FCIC Report, at 211.]

53.     Mark Froeba, a former Moody's vice president and an attorney who worked in the

Moody's CDO Group from 1997 to 2007, testified to the FCIC that Moody's participation in this

process was knowing and voluntary:

> Until [2000, when it was spun off from   Dun & Bradstreet
> Corp. and becam e a separate publicly traded co  mpany], Moody's
> had  an extrem ely  conservative  analytical culture.  Moody's
> analysts were proud to work for wh at they believed was by far the
> best  of the rating agencies.  … Everyone understood that for any
> new product that was unusual or complex, the Moody's rating was
> the  one to get and that without     it, it would be difficult or even
> impossible to m arket the new produc t.  In short, the Moody's of
> that  time  had the stature (and m   aybe  even the power) to stop
> something like the sub-prime bubble had it arisen then.
>
> Unfortunately, by the time the bubble arrived, Moody's had
> deliberately  abandoned its stature    and  surrendered this power.
> Moody's simply gave up its analyti cal distinctiveness.  How did it
> happen?
>
> Under   the guise of     making   Moody's more business
> friendly, making it m ore responsive to clients – e.g., m aking sure
> that analysts would  return telephone calls  etc., – Moody's senior
> managers  set in m otion  a radica l  change in M oody's  analytical
> culture   that not only changed        the  rating process but also
> profoundly affected Moody's ratings.

>                                   [Written testimony of Mark Froeba to FCIC, June 2,
>                                   2010, Exh. W.]

54.     As  the Senate Report states, "[i]nt    ernal  Moody's and S&P e   mails  further

demonstrate  that senior m  anagement  and rati ngs  personnel  were aware of the deteriorating

mortgage market and increasing credit risk" at the same time they continued to issue investment-

grade ratings to mortgage-backed securities:

> In  June 2005, for example, an   outside  mortgage  broker  who had
> seen  the head of S&   P's  RMBS Group, Susan Barnes, on a
> television  program sent her an em ail  warning about the "seeds of

destruction" in the financial m arkets.  He noted that no one at the time seemed interested in fixing the looming problems:

>I have contacted the OT S, FDIC and others and  my concerns are not addressed.  I have been a mortgage broker for the past 13 years and I have never seen such a lack of attention to loan risk. I am confident  our present hous ing bubble is not from supply  and dem and  of hous ing,  but from   money supply.  In my professiona  l  opinion the biggest perpetrator  is W ashington  Mutual. 1) No incom  e documentation  loans. 2) Option ARMS (negative amortization)  ... 5) 100% financing loans. I have seen instances where WAMU approved buyers for purchase  loans;  where the fully indexed interest only  payments  represented 100% of borrower's gross  monthly  income.  We  need to stop this madness!!!"

Several email chains among S&P employees in the Servicer Evaluation  Group in Structured      Finance  demonstrate a clear awareness  of mortgage market problems.  One from   September 2006, for exam ple, with the subject line "Nightm are Mortgages," contains  an exchange w ith startling frankness and foresight. One S&P employee circulated an article on mortgage problems, stating: "Interesting  Business Week ar  ticle  on Option ARMs, quoting anecdotes  involving som e  of our   favorite servicers." Another responded: "This is frightening.   It wreaks of greed, unregulated brokers,   and 'not so prudent'       lenders."   Another employee commenting on the same article s aid: "I'm surprised the OCC and FDIC doesn't com e  downharder [sic ] on these guys - this is like another banking crisis potentially loom ing!!"  Another email chain that same  month shows that at   least som e  employees understood the  significance of problem  s  within the m ortgage market  nine months before the m ass downgrades began.  O ne S&P employee wrote: "I think [a circu lated article is] telling us  that underwriting fraud;  appraisal fraud and the    general  appetite for new product among originators is res ulting in lo ans being m ade that shou ldn't be made.… [I]f [Eliot] Spitzer [then-New York Attorney G eneral] could prove coercion this could be  a RICO offense!"  A co lleague responded that the head of the S&P Surveillance Group "told m   e that broken down to loan level wha  t she is see ing in losses  is as bad  as high 40's – low 50% I'd love to be able to publish a commentary with this data but maybe too much of a powder keg."

[Senate Report, at 269-70.]

55.     In fact, the Defendants would som etimes sell their proprietary models to th e investment banks, so the banks could them selves manipulate the structure of their deals in an attempt to justify the highest possible rating.    By selling their analytic al tools on the one hand, and advising banks on asset composition and secu    rity structuring on the other, the Rating Agencies were "playing both coach and referee" (Wall Street Journal, *Conflicts and the Credit Crunch*, September 7, 2007) – in direct contraven    tion of the independence, objectivity and integrity that the Rating Agencies so ardently professed in their public statements. [Exh. J.]

56.     Competitive pressures on NRSROs were on    ly heightened by the relative concentration of issuers and banks    in the stru ctured finance space. As com pared with the corporate bond m arket, which comprises thousands    of issuers, the investm ent banks that specialized in creating structured products were few in num ber. Consequently, the loss of one deal could represent the loss of m illions of dollars in revenues to an NRSRO f rom that issuing bank. As Professor John   C. Coffee of Columbia   University explained in his Congressional testimony on September 26, 2007, the NRSROs had been "destabilized" by the "small number" of "large repeat clients" that controlled access to structured finance deals:

> The major change that destabilized rating agencies appears to hav e been the ris e of structu red finance. . .  [T]he rating agen   cy is no longer facing an atom ized market of clients who each com  e to it only intermittently (and thus lack m arket power), but instead large repeat clients who have the ability to take their business elsewhere. Today, structured finance accounts for a m ajor share of som e rating agencies' total revenues;  equally important, these am ounts are paid by a sm all number of i nvestment banks that know how to exploit their leverage . . . .
>
> [9/26/07 Testimony of John C. Coffee, Jr. Before U.S. Senate Banking Committee, Exh. K.]

57.     Pleasing the client thu s became the paramount objective within the Rating Agencies' cultures, supplanting ratings integrity as the overriding goal. As McDaniel conceded

to the company's board of directors in October 2007, Moody's had abandoned its own standards under the influence of banks, issuers, and investors in order to gain market share and reap its share of the subprime mortgage boom.  Indeed, McDaniel stated that Moody's own self-interest had "color(ed)" the firm's purportedly objective ratings, and that its analysts would "drink the kool-aid" in order to keep up the flow of new deals for Moody's to rate.  [Quoted in "Moody's CEO Warned Profit Push Posed Risk to Quality of Ratings," Wall Street Journal (Oct. 23, 2008), Exh. L.]

58.    Gugliada, likewise, told Bloomberg of S&P's involvement in a "market-share war where criteria were relaxed …." ["Race to   Bottom At Moody's, S&P Secured   Subprime's Boom, Bust," Bloomberg.com (Sept. 25, 2008), Exh. M.]  Gugliada said of this relaxation of standards in pursuit of profits:  "I knew it was wrong at the time. … It was either that or skip the business. That wasn't my mandate. My mandate was to find a way. Find the way." [Id.]

59.    In its July 2008 "Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Ratings," the SEC, itself, highlighted the heightened conflict of interest concerns presented by the "issuer-pays" model in the context of mortgage derivative securities.  Specifically, the SEC, which conducted a review of Moody's, S&P and Fitch's noted:

> As the Commission noted in its recent release, some observers
> have indicated that while conflicts of interest due to the "issuer
> pays" model exist with respect to all asset classes that receive
> ratings, the conflicts created from the "issuer pays" model in rating
> structured finance products, particularly RMBS and related-CDOs,
> may be exacerbated for a number of reasons.  First, the arranger is
> often the primary designer of the deal and as such, has more
> flexibility to adjust the deal structure to obtain a desired     credit
> rating as compared to arrangers of non-structured asset classes.  As
> well, arrangers that underwrite RMBS and CDO offerings have
> substantial influence over the choice of rating agencies hired to
> rate the deals.

Second, there is a high concentration in the firm s conducting the underwriting function. Based on data provided by the three rating agencies examined, the Staff reviewed a sample of 642 deals. While 22 different arrangers underwrote subprime RMBS deals, 12 arrangers accounted for 80% of the deals, in both num ber and dollar volume. Similarly, for 368 CDOs of RMBS deals, although 26 different arrangers underwrote the CD Os, 11 arrangers accounted for 92% of the deals and 80% of the dollar volum e. In addition, 12 of the largest 13 RMBS underwriters were also the 12 largest CDO underwriters, furthe r concentrating the underwriting function, as well as the sources of the rating agencies' revenue stream.

> [United States Secu rities and Exchange Commission, "Summary Report of Issues Identified in th e Commission Staff's Examinations of Select Credit Rating Agencies" (July 2008), Exh. N.]

## 2. Despite Representations to the Contrary, Defendants Activ ely Participated in Creating the RM BS, CDOs and Structured Product ARS They Rated.

60.     Despite their repeated public representations about their objectivity and neutrality, the Rating Agencies, in fact, played an active role in structuring complex securities according to a highly subjective, results-oriented appr oach. Indeed, the m ethodology employed by Defendants to rate structured finance securities was anythin g but objective. Far from being passive reviewers, the Rating Agencies were intimately involved in structuring complex financial products – including those unde rlying Structured Product ARS **,** or upon which the ARS were ultimately dependent – precisely to justify a desired rating. Thus, rather than conduct an analysis of objective factors to culm inate in a rating, th e Rating Agencies worked backwards: they started with the ra ting they knew would be requir ed to market the complex securities to investors, and then worked with the investm ent banks to "structure" t hose securities in an attempt to justify the rating.

61.     Moody's former President and Chief Op erating Officer, Brian Clarkson, has conceded that, in creating a structured finance product: "You st art with a rating and build a deal around a rating." [Quot ed in "Overrated".] Ac cording to Moody's, structured finance ratings were an "iterative process, giving feedback"  to underwriters seeking to bring new RMBS and CDOs to market. [Id.]

62.     The extent of the Rating Agencies' im plication in the process – and lack of objectivity – has also been noted by several    commentators.  In Septem ber 2007, Joseph R. Mason, an Associate P rofessor of Finance at Dr exel University and a Senior Fellow at the University of Pennsylvania's W harton School who studied struct ured debt products with the Office of the Comptroller of the Currency, told the United States Congress that:

> [NRSROs] do m ore than opine; th ey play an active ro le in structuring RMBS and CDOs. The y also serve as key sources of information about securitization performance and often enum erate measures that issuers must take to m aintain ratings in troubled securitizations.
>
> > [9/27/07 Testimony of Joseph R. Mason Before U.S. House of Representatives Subcomm ittee on Capital Market, Insurance and Government Sponsored Enterprises, Exh. O ("Mason Test.").

63.     In the words of former SEC Chairman Arthur Levitt, Jr., "as complex structured debt products have increased in popularity, the relationship between rater and issue [sic] became even closer—and the line between independen t rater and paid advisor became blurred." [Levitt, Remarks to Dialogue with the OSC 2006, "Strengthe ning the Gatekeeping: The Im portance of Independence and Accountability to the Capital Markets" (Nov. 27, 2007), Exh. P.]

64.     The process started with the designation by the issuing bank of the target rating it required.  T he rating, in effect, becam e a type of "brand nam e" under which the structured products would be m arketed.  The Ratings Agen cies would then work with the issuers on

supposed "credit enhancem ents" – *e.g.*, subordination, collateral cushions, guarantees, amortization features, etc. – that were designed to justify the re quired rating. E ach of these credit enhancements, however, red uced issuer profit. Accordingly, investm ent banks had a strong interest in awarding their business to th e NRSROs that assigned the lowest "expected loss" designations, because lower expected loss es resulted in higher profits. The Defendants obliged their clients by keeping expected loss projections artificially low in order to keep ratings – and, with them, profits – artificially high.

65.     Unlike bond ratings for corporate issuers, whose financial statements could not be altered in the short term to "score" better rati ngs, structured finance products harbored great flexibility. Consequently, in the words of one former Moody's executive, Paul Stevenson, in the case of structured products, "the rating process became a negotiation." [Quoted in "As Housing Boomed, Moody's Opened Up," Wall Street Journal (April 11, 2008), Exh. Q.]

66.     Defendants materially misrepresented and fa iled to disclos e to investo rs such as Plaintiffs the active role they played in struct uring complex securities, including the Structured Product ARS, and the inherent conf licts of interest that utterly debased the objectivity of their ratings methodologies.

67.     Defendants also materially misrepresented their ability to re main independent of issuers despite the fact that th eir very business model had them competing to obt ain and retain business while the issue rs made clear they were expecting the highest ra tings in exchange for their business:

>             The credit rating agencies     assured Congress and the
> investing public that they coul d "manage" these conflicts, bu t the
> evidence indicates that the driv e for market share and increasing
> revenues, ratings shopping, and inve stment bank pressures have
> undermined the ratings process a nd the quality of the r atings
> themselves. Multip le former Moody's and S&P em ployees told

the Subcommittee that, in the yea rs leading up to the f inancial crisis, gaining market share, in creasing revenues, and pleasing investment bankers bringing business to the firm assumed a higher priority than issuing accurate RMBS and CDO credit ratings.

[Senate Report, at 273.]

C.   **To Improve Their Profits, The Ra ting Agencies Knowingly Rated RMBS, CDOs and Structured Product ARS Us ing Inapplicable and Out-of-Dat e Processes.**

68.   In rating the complex RMBS, CDOs and, ultimately, the Structured Product ARS, the Rating Agencies also applied processes and data they knew to be inaccurate, inapplicable and out-of-date. Thus, while the Rating Agencies led the investing public to believe that a AAA-rated CDO presented the same risk as a AAA-rated corporate bond, the Rating Agencies, in fact, had no basis for providing that comparison. Th e Rating Agencies did all of the foregoing without so infor ming the investing public – incl uding the Plaintiffs – and thereby m isled the public and Plaintiffs into relying upon ratings that had no objective basis.

69.   As the Senate Report concluded:

The conflict of interest problem was not the only reason that Moody's and S&P issued inaccurate RMB S and CDO credit ratings. Another problem was that the credit rating m odels they used were flawed. Over tim e, from 2004 to 2006, S&P and Moody's revised their rating m odels, but never enough to produce accurate forecasts of th e coming wave of mortgage delinquencies and defaults. Key problem s included inadequate performance data for the higher risk m ortgages flooding the m ortgage markets and inadequate correlation factors.

In addition, the com panies failed to provide their ratings personnel with clear, consistent, and comprehensive criteria to evaluate complex structured finance deals. The absence of effective criteria was particularly problematic, because the ratings models did not conclusively dete rmine the ratings for particula r transactions. Instead, modeling results could be altered by the subjective judgment of analysts and their supervisors. This subjective factor, while unavoidabl e due to the com plexity and

27

novelty of the transact ions being rated, re ndered the process vulnerable to improper influence and inflated ratings.

[Senate Report at 288]

70.     The Senate Report, focusing primarily on the conduct of Moody's and S&P, concludes that the Rating Agencies were well aw are of the deficiencies of their ratings long before they starting downgrading structured finance securities in 2007:

> Evidence gathered by the Subcomm ittee shows that the credit rating agencies w ere aware o f problems in the m ortgage market, including an unsustainable rise in housing prices, the high risk nature of the loans being issued, lax lending standards, and rampant mortgage fraud. Instead of using this inform ation to temper their ratings, the firms continued to issue a high volum e of investment grade ratings for mortga ge backed securities. If the credit rating agencies h ad issued ratings that accurately re flected the increasing risk in the RMBS and CDO m arkets and appropriately adjusted existing ratings in those markets, they might have discouraged investors from purchasing high risk RMB S and CDO securities, and slowed the pace of securitizations.

> It was no t in the short term economic interest of either Moody's or S&P, howe ver, to prov ide accurate credit ratin gs for high risk RMBS and CDO securities, because d oing so would have hurt their own revenues. Instead, th e credit rating agencies' profits became increasingly reliant on the fees generated by issuing a large volume of structured finance ratings. In the end, Moody's and S&P provided AAA ratings to tens of thousands of high risk RMBS and CDO securities and then, when those products began to incur losses, issued m ass downgrades that shocked the f inancial markets, hammered the value of th e mortgage related securities, and helped trigger the financial crisis.

[Senate Report at 7.]

71.     The Rating Agencies compromised their rating standards for structured products because doing so was immensely profitable.  By 2008, NRSROs could receive between $750,000 and $1 million per issue of a structured f inance security.  According to Raiter, S&P's f ormer Managing Director and Head of Residential Mortgage-Backed Securities Ratings, during his ten

years with S&P, m ortgage securitization g rew from a $639 billion business to a $3.3 trillion business.  Notably, subprime mortgage "production" alone grew from $35 billion to $807 billion over that time.  [Raiter Stmt., at 2.]  When asked how profitable CDOs were for S&P, Gugliada answered, "[v]ery profitable . . . [a] typical[] fee would be som ething like a quarter of a million dollars per deal," and, "in the busiest m onths, we were doing as m any as 20, 25 per m onth." From 2002 to 2007, revenues from  these transactions put S&P in the top ten of the S&P 500. [Credit and Credibility.]

72.     Moody's bottom line fared similarly well from the expansion of mortgage-backed securitizations.  The FCIC  Report noted that Moody's rate d 220 deals in 2004, 363 deals in 2005, 749 in 2006, and  717 in 2007.  The v alue of those d eals rose from $90 billion in 2004 to $326 billion in 2007.  The reported revenues of M     oody's Investors Service fro m structured products grew from $199 million in 2000, or 33 pe rcent of overall corp orate revenues, to $887 million in 2006, or 44 percen t of overall reve nue.  Between 2000 and 2006, the corporation's revenues grew from $602 million to $2 billion, and its profit margin climbed from 26 percent to 37 percent.  [FCIC Report at 149.]

73.     By the time Moody's became a public company in 2000, rating structured finance products had becom e its top source of reve  nue.  Initially,  "Moody's could receive between $200,000 and $250,000 to rate a $350 m     illion mortgage pool, for exam ple, while rating a municipal bond of a similar size might have generated just $50,000 in fees."  ["Debt Watchdogs: Tames or Caught Napping? "  New York Ti mes (Dec. 7, 2008), Exh. R.]  Between 2000 and 2006, Moody's profits rose 375% and its share pr  ice quintupled.  Moody's structured finance group grew to accoun t for approximately 53% of Moody's revenue by the first quarter of 2007, up from 28% in 1998.  "By 2006, the firm    had m ore revenue from  structured finance alone –

$881 million – than its entire revenue had been in 2001." ["As Housing Boom ed, Moody's Opened Up," Wall Street Journal (April 11, 2008), Exh. Q.] From 2002 to 2007, revenues from these transactions made Moody's the third-most profitable company in the S&P 500-stock index – higher than Microsoft and Google. Misrepresenting the independence, objectivity and integrity of their ratings process proved a lucrative way of doing business for Defendants. [See, e.g., id.]

74.     The Senate Report found that "[t]he dr ive for m arket share was sim ilarly emphasized at S&P." It states, citing a prep ared statement of Fran k Raiter, S &P's former Managing Director and Head of Res idential Mortgage-Backed Securities Ratings, that, by 2004, the structured finance department at S&P was a major source of revenue and profit for the parent company, McGraw-Hill. [Senate Report, at 276.]

75.     The Senate Report further states, for example:

> Numerous internal emails illustrate not only S&P's drive to maintain or increase market share, but also how that pressure negatively impacted the ratings process, placing revenue concerns ahead of ratings quality. For example, in a 2004 em ail, S&P management discussed the possibili ty of changing its CDO ratings criteria in response to an "ongoing threat of losing deals":

> > "We are meeting with your group this week **to discuss a djusting criteria fo r rating CDOs of real estate assets this w eek because of the ongoing threat of losing deals**."

> On another occasion, in response to a 2005 email stating that S&P's ratings model needed to be adjus ted to account for the higher risks associated with subpr ime loans, a director in RMBS research, Frank Parisi, wrote th at S&P could have released a different ratings m odel, LEVELS 6.0, months ago "if we didn't have to m assage the sub-prim e and Alt -A numbers to preserve market share." This same director wrote in an email a month later: "Screwing with cr iteria to 'get the deal' is putting the entire S&P franchise at risk – it's a bad idea."

> > [Senate Report, at 276-77 (noting that em phasis was in the original e-mail).]

76.     In furtherance of the profit objective, the voice of dissent was routinely quashed at Moody's and S&P by reassigning scrupulous analysts and supervisors to other divisions.  As the Wall Street Journal reported, Moody's analysts deemed too "fussy" were reassigned, because "[a]nalysts who raised doubts about a deal could hurt revenues for the rating firm and investment bank."  ["At Request of Bond Issuers or Bankers, Credit-Rating Firms Switch Analysts," Wall Street Journal (May 23, 2008), Exh. S.] Thus, analysts who demonstrated the very objectivity and independence that the Rating Agencies touted as their hallmarks were routinely kept down.

77.     As a number of Moody's insiders stated to the FCIC, this new attitude came directly from the top: Brian Clarkson, the company's President and Chief Operating Officer. [See generally FCIC Report at 206-12 ("Moody's: "It Was All About Revenue").]

78.     In an interview with the FCIC staff, Scott McCleskey, a former chief compliance officer at Moody's, provided an example of this change of corporate culture.  As McCleskey related, he and Clarkson were dining with the board of directors after the company had announced strong earnings, particularly in the business of rating mortgage-backed securities and CDOs.  "So Brian Clarkson comes up to me, in front of everybody at the table, including board members, and says literally, 'How much revenue did Compliance bring in this quarter?  Nothing. Nothing.' … For him to say that in front of the board, that's just so telling of how he felt that he was bulletproof.  … For him, it was all about revenue."  [FCIC Report, at 208.]

79.     The Ratings Agencies not only generated enormous revenue from rating RMBS, CDOs and Structured Product ARS, but the Rating Agencies also maintained their profits by refusing to incur the costs necessary to rate those securities properly.  Specifically, both Moody's and S&P refused – primarily, if not solely, for profit reasons – to implement new models for rating RMBS, CDOs and Structured Product ARS.

80.     Prior to the advent of com plex structured securities like RMBSs and CDOs, the Rating Agencies rated trad itional debt securities like corpo rate bonds.  The Rating Agencies generally employed mathem atical "models" to a ssess the future perfor mance of these debt securities.  These m odels were mathematical representations of economic and other factors that were likely to impact an issuer's ability to make such payments, and included such metrics as the issuer's revenues, costs, or curr ency fluctuations in the m arkets in which the issuer conducts its business.  By inputtin g into thos e models data ref lecting various a ssumptions, the Rating Agencies were able to project the issuer's revenues and, accordingly, its ab ility to satisfy its obligations on debts as those de bts came due. The quality of the analyst's projections was determined by the metrics in the model and the data input into those metrics.

81.     In stark contrast, RMBS and CDOs were         issued by specially created trusts holding pools of new   mortgages and other asse ts, none of which had any prior history.  Accordingly, in rating R MBS, CDOs and Struct ured Product ARS, the Rating Agencies did not have access to the type of hist orical issuer data upon which they had trad itionally relied to provide a rating.

82.     The Rating Agencies k new full well th at these traditional models wer e grossly inadequate for rating RMBS, CDOs and Structur ed Product ARS, but the Rating Agencies used those traditional m odels anyway. Indeed,    both Defendants had created new models and processes that would allow them to measure the performance of RMBS and CDOs over tim e so the Defendants could reassess the applicability of their ratings. As both Moody's and S&P have admitted, however, each decided not to em ploy these new models and processes, including the periodic reviews, because: i) doing so would cut into their profits; and ii) they were only paid to rate the securities once – at the time of issuance.

83.     As an example, the FDIC Report states that, for years, Moody's knew it was rating subprime mortgage-backed securities using a 1996 model that was developed for general RMBS and thus unsuitable for subprime deals, and "only in the fall of 2006, when the housing market had already peaked, did it develop its model for rating subprime deals." [FCIC Report, at 120.]

84.     Even then, Moody's knew its new subprime model was not sufficiently accounting for the deteriorating quality of subprime loans being securitized. Fons described this problem to the FCIC: "I sat on this high-level Structured Credit committee, which you'd think would be dealing with such issues [of declining mortgage-underwriting standards], and never once was it raised to this group or put on our agenda that the decline in quality that was going into pools, the impact possibly on ratings, other things. … We talked about everything but, you know, the elephant sitting on the table." [FCIC Report, at 121.]

### 1.     S&P Rated Structured Products Even Though It Knew It Had No Workable Model For Doing So.

85.     In a written statement to the U.S. House of Representatives on October 22, 2008, Raiter, S&P's former Managing Director and Head of Residential Mortgage-Backed Securities Ratings, explained that, beginning in the mid-1990s, S&P developed better, statistically-based models for estimating default risk on individual loans and pools. As Raiter confirmed, "[i]t was critical to maintain the best models as they were the linchpin of the rating process" and "[e]ach version of the model was better than its predecessor in determining default probabilities." [Raiter Stmt., at 5.]

86.     With the vast expansion of the housing market beginning in 2001, S&P then developed its most comprehensive model for analyzing complex structured debt products to date, one that would "cover[] the full spectrum of new mortgage products, particularly in the Alt-A

and fixed/floating payment type catego ries" – those categories that ultim ately wrecked th e financial markets. In Raiter's words, the model was "by far the best yet developed." [Id.]

87. Shockingly, however, S&P's state-of-the-art model "was not implemented due to budgetary constraints." S&P in stead continued to employ a model that would not account for new types of mortgages and their risks, because the company quite simply did not want to spend the money. Raiter stated bluntly that S&P's management failed to im plement the new m odel because "it was expens ive to build or acqu ire the growing data bases, perform the neces sary statistical analysis, complete the [information technology] code modifications and im plement and distribute new versions of the model," a nd, "[b]y 2001, the focus at S&P was profits for the parent company, McGraw-Hill – it was not on incurring additional expense." [Id. at 5-6.]

88. Raiter also advised Congress that, in his opinion, had S&P implemented the more refined methods for assessing default risk, the seve rity of the current market crisis m ight have been mitigated: "An unf ortunate consequence of continuing to use out-dated ve rsions of the rating model was the failure to capture changes in performance of the new non-prime products." [Id. at 6.]

89. The Senate Report found th at although S&P did purchas e data on performance of new loans between 2002 and 2006, which would ha ve aided in im proving its RMBS m odel, it did not devote sufficient resources to analyzing the data in order to make use of it. S&P claimed to the Senate Subcommittee:

> that it m ade "concerted efforts to analyze" this data, "both by employing external consultants an d dedicating resources within Standard & Poor's to analyze the data for criteria development."
>
> Contrary to S&P's claim , the form er head of the S&P RMBS Ratings Group, Frank Raite r, who worked at S&P until 2005, told the Subcommittee that management did not provide him with sufficient resources to analyze the data and develop im proved

criteria for the RMBS model. Mr.  Raiter told the Subcommittee
that he personally inform ed S&P's senior m anagement about the
need to update S&P's model with better loan data several years
before the crisis.  Mr. Raiter also testified that the "analysts at S&P
had developed better methods for determ ining default which did
capture some of the variations   among products that were to
become evident at the advent of the crisis," but those methods
were not incorporated into the RMBS model before he left in 2005.
Mr. Raiter said that "[i]t is m y opinion that had these m odels been
implemented we woul d have had an earlier warning about the
performance of m any of the new products that subsequently lead
[sic] to such substantial losses."

[Senate Report, at 291.]

90.     Furthermore, the Senate Report concl uded from the evidence presented that

pressure from issuers on both Moody's and S  &P "impacted the ratin gs process, enabling the

banks to ob tain more favorable treatment than they otherwise would have received." [Senate

Report, at 278.] This favorable treatm ent at both Moody's and S   &P included knowingly

refraining from using better, m ore conservative rating models even when better models were

available. [Id. at 278-80.]

91.     The favorable treatm ent also includ ed succumbing to pressure from investm ent

banks to continue gran ting "exceptions" from ratings standard s in order to give higher ratings

than would be justified even under the model that was used:

Documents obtained by the Subcommittee ind icate that
investment bankers who com plained about rating m ethodologies,
criteria, or decisions were often able to obtain exceptions or other
favorable treatment.  In many instances, the decisions m ade by the
credit rating agencies appeared to cross over from the healthy give
and take involved in com plex analysis to concessions m ade to
prevent the loss of business. W hile the former facilitates efficient
transactions, the second distorts the market and hurts investors.

*        * *

An exception m ade one tim e often turned into further
exceptions down the road. In     August 2006, for exam ple, an

investment banker from Morgan Stanley tried to leverage past exceptions into a new one, couching his request in the context of prior deals:

> "When you went from [m odel] 2.4 to 3.0, there was a period of tim e where you would rate on either model. I am asking for a sim ilar 'dual option' window for a s hort period. I do not think this is unreasonable."

> A frustrated S&P manager resisted, saying: "You want this to be a commodity relationship and this is EX ACTLY what you get." But even in the midst of his defense, the same S&P manager reminded the banker how often he had granted exceptions in other transactions: "How many times have I accommodated you on tigh t deals? Neer, Hill, Yoo , Garzia, Nager, May, Mitev a, Benson, Erdman all think I am helpful, no?"

> [Senate Report, at 280-81.]

92.     The Senate Report refers to S&P's rati ngs for a specific offering in 2007 of a CDO "Delphinus CDO 2007-1" as a "striking example" of a CDO whose alm ost immediate downgrading belied the falsely high rating given to it when it was issued in 2007. The Report states: "Moody's gave AAA ratings to seven of its tranches and S&P to six tranches in July and August 2007, respectively, but began downgrading its securities by the end of the year, and by the end of 2008, had fully downgraded its AAA rated securities to junk status." [Sen ate Report, at 267.] O n September 26, 2011, McGraw-Hill, S&P's parent company, filed a Form 8-K disclosing that the SEC had sent it a "W ells Notice" stating that the SEC Staff is consider ing recommending that th e Commission institute a ci vil injunctive action against S &P alleging violations of federal securities laws with respect to S&P's ratings for a specific offering

### 2.     Moody's Rated Structured Finance Products Even Though it Knew it Had No Workable Model for Doing So.

93.     Like S&P, Moody's, at all relevant tim es, also knew that it did not have a ratings model that could provide a meaningful analysis of RMBS, CDOs and Structured Product ARS.

94.     Moody's rated RMBS and CDOs by using  a model that had been created to analyze simple corporate bonds.  In an April 3, 2007 press release, Moody's conceded that these models were out of date, becau se they had b een created in 2002 and lacked key information necessary to properly assess the attendant risk s.  According to Moody's, "[s]ince then, the mortgage market has evolved considerably, with  the introduction of ma ny new products and an expansion of risks associated with them. . . ."  [Quoted in Mason Test., at 8.]

95.     Moreover, Moody's knew that applying it  s outdated and unsuitable corporate bond models to complex structured products was pr oducing ratings that were wildly m isleading. According to Moody's own analysis, for exa mple, corporate bonds that Moody's had rated Baa (its lowest investment grade ra ting) had had an average 2.2% defa ult rate in the period prior to 2005.  In contrast, CDOs to which Moody's had ascribed the same Baa grade had default rates of 24%.  At no tim e did Moody's disclose to invest  ors such as Plaintiffs that, for    example, a structured finance product, such as the Structured  Product ARS, could be ten times riskier than a corporate bond bearing the same Moody's rating.

96.     As the FCIC Report identified, a key difficulty in rating CDOs was the estimation of the "default correlation" be tween the secu rities in a po rtfolio – th e likelihood of m ultiple securities contained in a CDO de faulting at the same time.  Citing an F DIC staff interview with Gary Witt, who was one of Moody's managing directors for the company's CDO unit from 2000 to 2005, the FCIC Re port observed that "Moody' s didn't have a good m odel on which to estimate correlations between m ortgage-backed securities – so  they 'made them up.' [W itt] recalled, 'They went to the analy st in each of the groups and they said , 'Well, you know, how related do you think these types of [mortgage-backed securities] are?' " [FCIC Report, at 147.]

97.     Quoting Witt's testimony to the Commissi on, the FCIC Re port stated that "W itt felt strongly that Moody's needed  to update its CDO rating m  odel to explicitly  address the increasing concentration of risky mortgage-related securities in the collateral underlying CDOs." [FCIC Report, at 147.]  That ne ver happened, and, at best, any im  provements that were m ade were watered down and delayed, as the FCIC Report relates at pages 147-48:

- In 2004, W itt developed a rating  methodology that incorporated correlation into the model, but the m ethodology he devised was not applied to CDO r  atings for another year.

- Witt's superiors approved his proposed research initiative in early 2005 to "look through" a few CDO deals at the leve     l of the underlying m  ortgage-backed securities and to check the accuracy     of Moody's correlation assum ptions, but contractual issues prevented th e  purchase of software necessar y to conduct this analysis.

- In June 2005, Moody's updated its approach     for estim ating default correlation, but it based the new m odel on trends from the previous 20 years – a period when housing   prices were rising, m     ortgage   delinquencies were very low, and nontraditional mortgage products occupied a small niche.

- Even then, Moody's modified this model with a series of ad hoc adjustments that resulted in higher ratings than the model otherwise would have produced.

98.     The other NRSROs followed the same flawed approach that Moody's used in its 2005 model.  [FCIC Report, at 148 (citing S&P and Fitch reports).]

99.     Despite the com pany's ballooning revenue s and increased workload  associated with the boom in structure finance, Moody's kept tight control on  staff size and ex penses.  As a result, Moody's insiders knew they sim ply had not been given the resources to perfor m proper analysis of deals they were rating:

> [T]he increase in the CDO group's workload and revenue was not paralleled by a staffing increa se.  "We were under-resourced, you know, we were always playing    catch-up," Witt said.  Moody's "penny-pinching" and "stingy" m anagement was reluctant to pay up for expe rienced employees.  "The problem of recruiting and retaining good staff was insolub le. Investment banks often hired

away our best people.  As far as I can rem ember, we were never
allocated  funds to m ake counter offers," Witt said. "We had
almost no ability to do m eaningful research."  Eric Kolchinsky, a
former  team m anaging director  at Moody's, told the FCIC that
from 2004 to 2006, the increase in the num ber of deals rated was
"huge … but our person nel did not go up accordingly."  By  2006,
Kolchinsky  recalled, "My role as a team         leader was cris  is
management.  Each deal was a cris is."  When personnel worked to
create a new methodology, Witt said, "We had to kind  of do it in
our spare time."

[FCIC Report, at 149.]

100.    In  an interview with F  CIC staff, Je rome Fons, the form er  Moody's Managing

Director in charge of Credit Policy,  stated: "The main problem was … that th e  firm became so

focused,  particularly the structured area, on re   venues, on m arket  share, and the ambitions of

Brian Clarkson, that they willi ngly looked the other way, traded  the firm's reputation for short-

term profits."  [FCIC Report, at 207.]  The FCIC Report continued:

Richard  Michalek, a form  er  Moody's vice president and
senior credit officer, testified to   the FCIC, "The threat of losing
business to a com petitor, even if not realized, absolutely tilted the
balance away from an independent arbiter of risk towards a captive
facilitator  of  risk trans fer."  W itt  agreed. W hen  asked if  the
investment banks frequently threat ened to withdraw their business
if they didn't get the ir desired r ating, Witt replied, "Oh God, are
you kidding? All the tim  e. I m ean, that's routine. I m ean, they
would threaten you all of the tim  e. …  It's like, 'W ell, next time,
we're just going to go with Fitch and S&P.' "  Clarkson affirm   ed
that "it wouldn't surprise m e to hear people say that" about issuer
pressure on Moody's employees.

Former  managing director F ons  suggested that Moody's
was complaisant when it should have been principled: "[Moody's]
knew that they were being bullied  into caving in to bank pressure
from the investm ent banks and or iginators  of these things. …
Moody's allow[ed] itself to be     bullied. And, you know, they
willingly played the game. …  They could have stood up and said,
'I'm sorry, this is no t – we're not going to sign off on this. W e're
going to protect investors. W e're going to stop – you know, we're
going to try to protect our reputation. We're not going to rate these
CDOs, we're not going to rate these subprime RMBS.' "

[FCIC Report, at 210.]

101.    Despite  knowing that it did not have        an  appropriate m odel  for  analyzing structured finance products, and that the m odels it was us ing were producing wildly misleading ratings, Moody's nevertheless became the largest rater of RMBS, CDOs and Structured Product ARS.  By 2006, Moody's rated nine     out  of e very ten dollars of   mortgage-related  structured finance products.  In 2007, Moody's rated about 94% of the $190 billion in mortgage-related and other structured finance CDOs issued, the second busiest year ever.

102.    As the FCIC concluded, Moody's "conti nued issuing ratings on m ortgage-related securities, using its outdated analytical m odels, rather than m aking the necessary adjustm ents. The  business m odel  under which firm  s  issuing s ecurities  paid for th  eir  ratings seriously undermined the quality and integrity of those ratings; the rating agencies placed market share and profit considerations above the quality and integrity of their ratings."  [FCIC Report, at 212.]

### 3.    The  Rating Agencies ' Failure to    Evaluate the Default Risk of Underlying  Subprime Mortgages Re  ndered  Their Ratings of The Subject Securities Completely Baseless.

103.    Any  credible m odel  for assessing the   risk  of RMBS, CDOs and Structured Product ARS had to include the likely default ra  te of the subprim e mortgages and other assets ultimately underlying those structured products.

104.    Because  the Ratings Agencies elected – for profit reasons     – not to implem  ent models that would m easure those default rates, it was f oreordained that the Ratings Agencies' ratings  of RMBS, CDOs and St   ructured  Product ARS would be     meaningless.  The Ratings Agencies,  however, falsely propped up the reliabi    lity of their ratings   of  RMBS, CDOs and, ultimately,  Structured  Product ARS by publicly        misrepresenting  that th  ey  analyzed the underlying loan data.

a.  **Moody's Repeatedly Misrepresented That It Conducted Meaningful Analysis of Original Loan Data in Rating Structured Securities.**

105.  Moody's made repeated public statements – later revealed to be false – indicating that it routinely evaluated orig inal loan data as part of its rating m ethodology for structured finance products.

106.  For example, a Moody's report dated April 1, 2003 that described its model for analyzing mortgage-backed secur ities contained a chap ter entitled, "Originator and Servicer Practices and Loan Programs Continue to be Captured." In that report, Moody's stated:

> Moody's continues to rely on both quantitative m eans as well as qualitative reviews to assess orig inator and servicer qu ality and their impact on pool perform ance. These assessm ents form an integral part of Moody's Mo rtgage Metrics credit support calculations.
>
> Moody's considers numerous factors when determining the quality and performance of the originator and services, including:
>
> - Past performance of an originator's loans;
> - Underwriting guidelines for the m ortgage loans and adherence to them;
> - Loan marketing practices;
> - Credit checks made on borrowers;
> - Appraisal standards;
> - Experience in origination of mortgages. . . .
>
> [Moody's Investors Service, "M oody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools," April 1, 2003, Exh. T.]

107.  In 2007, Moody's made similar representations:

> In addition to reported loan characteristics, qualitative elem ents of the origination and servicin g processes influence pool performance. Moody's considers a num ber of these elem ents, including mortgage loan unde rwriting quality, underwriting guidelines, appraisal standards and the quality assurance processes. Underwriting guidelines and exception practices in the sub-prime market can vary substa ntially across originators, as can service r

41

quality, with a significant impact on loan quality and performance. . . . Moody's view of the ove       rall quality of origination, and servicing practices, as well as originators' historical performance is applied to assess the pool loss estimates.

[Moody's Investors Service, *Closed-End Seconds:  Recent Performance and Update to Methodology*, April 2, 2007.]

108.    These  representations were m aterially  false  and m isleading.  As Mc Daniel,  the Chairman and Chief Executive Officer of Moody's parent corporation, admitted in his testimony to  Congress on October 22, 2008:  "[W]e do not rece       ive  or review  individual  loan files." [10/22/08  Testimony  of Raym ond  W.  McDaniel  Before  U.S. House of Representatives Committee on Oversight and Government Reform.]

**b.    S&P    Repeatedly    Misrepresented    That It Conducted Meaningful    Analysis of Original Loan Data in Rating Structured Securities.**

109.    S&P also made repeated public statements – later revealed to be false – indicating that  it routinely evaluated orig  inal  loan data as   part of its rating m  ethodology for structured finance products.

110.    S&P's Tillman  testified before Congre ss  on September 26, 2007 that "[t]he first step  in our analysis is evalua  ting  the overall creditwor thiness  of a pool of  mortgage  loans by conducting loan level analysis ….  S &P also reviews the practices, polices [sic] and procedures of the originators and servicers.   …  For an originator, the topics  we review include, but are not limited  to:  loan production pr   actices;  loan underwriting; and quality control practices and findings."  [9/26/07 Testimony of Vickie A. Tillman Before U.S. Senate Committee on Banking, Housing and Urban Affairs.]  Chris Atkins, an  S&P spokesman, was later  quoted in an October 23, 2008 New York Times article as  representing that "[i]t has long been the practice of S&P to

review loan level data for new RMBS securitie s."  ["Credit Rating Ag ency Heads Grilled By Lawmakers," N.Y. Times (Oct. 23, 2008), Exh. U.]

111.    These representations were materially false and misleading.  Raiter, S&P's former Managing Director and Head of  Residential Mortgage B acked Securities Ratings, admitted to Congress that S&P's loan evalua  tion practices were, in fact, non-  existent.  He stated that, although the issue was robustly de  bated, "[t]he Managing Director  of the surveillance area for RMBS did not believe loan level data was nece    ssary and that had the effect of quashing all requests for funds to build in-house data bases" to evaluate such data.  [Raiter Stmt., at 6.]

**D.    Upon Defendants' Misrepresenta tions and Omissions, Plaintiffs A uthorized Their Broker to Purch ase ARS Based Upon Their High  Investment Grad e Ratings.**

112.    In establishing its investm ent policy and investm ent limits for Lehm an, their investment advisor, each of ASI and SEI      relied upon, among other things, the professed objectivity and integrity of the Ratings Agencies      and th e comparability of their stru ctured products ratings to rating s of conventional corporate debt.  St ated simply, ASI and SEI believed that Structured Product ARS rated AAA bore the same low risk as corporate debt rated AAA.

113.    To ensure safety of their cash, Plainti     ffs limited their investments to those carrying High Investm ent Grade Ratings from M oody's, S&P and/or Fitch IBCA.  Plaintiffs were led to believe that they had m inimal, if any, credit risk by restricting their investm ents to only those securities that were rated at the very  top of the Moody's and S& P scales, as indicated by the following chart:

| | **Moody's** | **S&P** | | |
|---|---|---|---|---|
| Highest | Aaa<br>Aa | AAA<br><br>AA | } | At least 80% of Plaintiffs' portfolios were required to possess Aa/AA ratings or higher. |
| | A | A | } | Up to 20% of Plaintiffs' portfolios were allowed to possess A2/A ratings. |
| | Baa | BBB | } | |
| | Ba | BB | | |
| | B | B | | Not eligible for inclusion in Plaintiffs' portfolios. |
| | Caa | CCC | | |
| | Ca | CC | | |
| Lowest | C | SD/D | | |

114.   Starting in 2004, SEI had discussions with Lehman regarding investment of SEI's cash on SEI's behalf. SEI advised Lehm an that SEI was not willin g to trad e security and liquidity for higher returns, and, as a result,      SEI would only grant Lehm an discretionary authority to invest in a m anner consistent with SEI's existing conserva tive risk profile, whose risk tolerance required High Investment Grade Ratings from the Defendants.

115.   On or about January 28, 2005, SEI and Lehm an then entered into a Cash Management Brokerage Agree ment and Li mited Discretionary Authorization (the "SEI Cash Account Agreement"), pursuant to which SEI gave Lehman limited discretion to invest cash that SEI would place in a d iscretionary account with Lehman (the "SEI Cash Account"). Lehm an agreed that all purchases of securities for SEI w ould be consistent with SEI's conservative risk profile as codified in written investing guidelines (the "SEI Gu idelines"). The SEI Guidelines included as "Approved Securities"    debt obligations of the U.S. Treasury, corporate debt obligations, certificates of deposit, time deposits, money market funds, and ARS.

116.   SEI agreed to add ARS to its Approved    Securities list because SEI reasonably believed that, so long as those ARS carried the High Investment Grade Ratings from Defendants

required by SEI's conservative risk profile, the   ARS would not subject SEI to any greater risk than other investments carrying the same ratings.  Stated otherwise, SEI reasonably believed that the ratings Defendants applied to ARS indicated a level of credit quality cons istent with that of any other debt security to which the Rating Agencies had applied the same rating.

117.    On or about May 24, 2006, ASI also entere d into a Cash Managem ent Brokerage Agreement  and Lim ited  Discretionary Authoriza tion  with Lehm an  (the "ASI Cash Account Agreement"), which was supposed to govern the operation of ASI's own discretionary brokerage account  with Lehm an  (the "ASI Cash Account    ").  As with SEI,     the ASI Cash Account Agreement also incorpo rated  written investing gui delines (the "ASI Guidelines") derived from and  consistent with th e SEI Guidelines.  At Lehm  an's  recommendation,  the ASI Guidelines included U.S. Treasury bills, co rporate bonds, commercial paper, and ARS.  ASI agreed to ad d ARS to its Approved Securities for the same reason that SEI did so.

118.    In short, Plaintiffs authorized Lehman to purchase ARS for th eir accounts only to the  extent  ARS m et  Plaintiffs'  Investment  Guidelines.  In gra nting  that  autho rity,  Plaintiffs reasonably  believed  that Defendants' ratings   of  ARS accurately reflected each Defendant's independent conclusions relative  to its published standards.  Pl aintiffs  relied upon the Rating Agencies' public representations that they were assigning ratings objectively in accordance with their  published criteria and standa  rds.  Plaintiffs reasonably be  lieved  that the Defendants' assignment of a High Investm ent Grade Rating m eant that the secur ity conformed to the Rating Agencies' risk standards for assigning that rating and was less risky than securities th at received lower ratings.

E.    **Defendants' Misrepresentations and Omissions Caused Plaintiffs Harm.**

119.    In reliance upon the Defendant s' promises to deliver unbiased, objective ratings predicated upon rigorous analysis, Plaintiffs au thorized Lehman to purchase for their accoun ts ARS that Defendants had rated "A" or higher.  Based upon the Rating Agencies' representations, Plaintiffs justifiably and reasonably believed that that the ra tings on those ARS represented a level of creditworthiness consistent with ot her debt products to which the Defendants had assigned identical ratings.

120.    Throughout the time that Plaintiffs had authorized Lehman to purchase such ARS:

    a.    Plaintiffs reasonably relied upon the Defendants' public representations of their independence, objectivity, consistency and substantial accuracy;

    b.    Plaintiffs did not have any understa nding, belief, or suspicion that the Rating Agencies were not independent or that the Ratings Agencies had a financial interest in assigning High Investment Grade Ratings to ARS;

    c.    Plaintiffs did not have any understa nding, belief, or suspicion that the Rating Agencies' ratings models were flawed or inadequate with respect to the ratin gs ultimately applied to Structured Product ARS, or that the Ratings Agencies had declined to employ models and/or knowingly lowered their standards that would produce more meaningful and reliable results for Structured Product ARS;

    d.    Plaintiffs did not have any understa nding, belief, or suspicion that the Rating Agencies were not m onitoring the relevant risks relating to the Structured Product ARS they had rated and were not updating or correcting their previously issued ratings; and

e.    Plaintiffs were part of the limited class of investors Defendants intended and knew would be relying on their ratings of Structured Product ARS.

121.    Based upon Plaintiffs' authorization, Lehman purchased for each of ASI and SEI hundreds of millions of dollars worth of Structured Product ARS that bore High Investment Grade Ratings.

122.    In or about January 2008, just before it became apparent in February 2008 that the ARS did not possess the credit quality falsely represented by Defendants, Plaintiffs held the ARS identified in the spreadsheets set forth below, and also attached as Exhibit A, which are expressly adopted and incorporated herein:

## SEI AUCTION RATE HOLDINGS IN LEHMAN ACCOUNT JANUARY 2008

| SECURITY/ISSUER | CUSIP | COST | SETTLE DATE | MOODY'S SETTLE DATE | S&P SETTLE DATE | MOODY'S JAN. 26, 2008 | S&P JAN. 26, 2008 |
|---|---|---|---|---|---|---|---|
| Double Oak Cap Secs 2007 – III (Protective Life) | 25857eaa8 | 4,900,000 | 7/23/07 | Aaa | AAA | Aaa | AAA |
| Potomac Tr Cap Vi 2004 | 73771naa1 | 1,300,000 | 5/26/06 | Aaa | AAA | Aaa | AAA |
| Potomac Tr Cap Vi 2004 | 73771naa1 | 1,100,000 | 4/27/07 | Aaa | AAA | Aaa | AAA |
| River Lake Ins. Co II Surplus Nt Ser C (INC 2004-3) | 76827rac5 | 1,100,000 | 8/11/06 | Aaa | AAA | Aaa | AAA |
| River Lake Ins. Co II Surplus Nt Ser C (INC 2004-3) | 76827rac5 | 2,800,000 | 12/26/06 | Aaa | AAA | Aaa | AAA |
| Grand Central Cap Tr III (FGIC) | 38528c205 | 1,200,000 | 8/24/06 | Aa2 | AA | Aa2 | AA |
| Grand Central Cap Tr III (FGIC) | 38528c205 | 800,000 | 2/8/07 | Aa2 | AA | Aa2 | AA |
| Grand Central Cap Tr Money Market (FGIC) | 38528a209 | 700,000 | 6/15/06 | Aa2 | AA | Aa2 | AA |
| North Castle Mmp IV (MBIA) | 658316203 | 1,000,000 | 5/30/06 | Aa2 | AA | Aa3 | AA- |
| North Castle Mmp IV (MBIA) | 658316203 | 200,000 | 2/6/07 | Aa2 | AA | Aa3 | AA- |
| North Castle Mmp I (MBIA) | 658317102 | 2,300,000 | 12/18/06 | Aa2 | AA | Aa3 | AA- |
| Sutton Cap Tr I (FSA) | 869435206 | 1,100,000 | 1/25/06 | Aa2 | AA | Aa2 | AA |
| Sutton Cap Tr II Money Market (FSA) | 86943v209 | 3,100,000 | 10/11/06 | Aa2 | | Aa2 | AA |
| Blue Water Trust I (RAM Re Ins) | 09608r305 | 1,400,000 | 8/8/05 | A2 | A+ | A2 | A+ |
| Blue Water Trust I (RAM Re Ins) | 09608r305 | 1,800,000 | 2/21/06 | A2 | A+ | A2 | A+ |
| Blue Water Trust I (RAM Re Ins) | 09608r305 | 1,200,000 | 4/27/06 | A2 | A+ | A2 | A+ |
| Dutch Harbor Fin SubTrust II (AMBAC) | 26702h207 | 4,000,000 | 2/2/07 | Aa2 | AA | Aa2 | AA |
| Athilon Cap Corp Sub Deferrable Int. NT. Ser. B | 047468ab9 | 3,100,000 | 8/28/06 | Aa2 | AA | Aa2 | AA |
| Athilon Cap Corp Sub Deferrable Int. NT. Ser. B | 047468ab9 | 1,300,000 | 11/29/06 | Aa2 | AA | Aa2 | AA |
| Lehman Bros. Custodial Rep Primus Fin. Ser. B (Primus) | 52519g802 | 1,300,000 | 2/10/05 | | | A2 | A |

| SECURITY/ISSUER | CUSIP | COST | SETTLE DATE | MOODY'S SETTLE DATE | S&P SETTLE DATE | MOODY'S JAN. 26, 2008 | S&P JAN. 26, 2008 |
|---|---|---|---|---|---|---|---|
| Lehman Bros. Custodial Rep Primus Fin. Ser. B (Primus) | 52519g802 | 1,400,000 | 3/31/05 | | | A2 | A |
| Primus Final Prods Sub Nt Ser B (05) | 74163paf9 | 2,300,000 | 12/19/05 | Aa2 | | Aa2 | AA |

### ASI AUCTION RATE HOLDINGS IN LEHMAN ACCOUNT JANUARY 2008

| SECURITY/ISSUER | CUSIP | COST | SETTLE DATE | MOODY'S SETTLE DATE | S&P SETTLE DATE | MOODY'S JAN. 26, 2008 | S&P JAN. 26, 2008 |
|---|---|---|---|---|---|---|---|
| Grand Central Cap Tr III (FGIC) | 38528c205 | 1,000,000 | 10/19/06 | Aa2 | AA | Aa2 | AA |
| Grand Central Cap Tr III (FGIC) | 38528c205 | 1,000,000 | 3/8/07 | Aa2 | AA | Aa2 | AA |
| Grand Central Cap Tr Money Market (FGIC) | 38528a209 | 1,500,000 | 6/15/06 | Aa2 | AA | Aa2 | AA |
| North Castle Mmp I (MBIA) | 658317102 | 1,600,000 | 10/23/06 | Aa2 | AA | Aa3 | AA- |
| North Castle Mmp I (MBIA) | 658317102 | 1,000,000 | 3/12/07 | Aa2 | AA | Aa3 | AA- |
| Sutton Cap Tr I (FSA) | 869435206 | 1,200,000 | 11/29/06 | Aa2 | AA | Aa2 | AA |
| Blue Water Trust I (RAM Re Ins) | 09608r305 | 3,000,000 | 1/22/07 | A2 | A+ | A2 | A+ |
| Athilon Cap Corp Sub Deferrable Int. NT. Ser. B | 047468ab9 | 900,000 | 8/16/06 | Aa2 | AA | Aa2 | AA |
| Athilon Cap Corp Sub Deferrable Int. NT. Ser. B | 047468ab9 | 2,000,000 | 10/23/06 | Aa2 | AA | Aa2 | AA |
| Athilon Cap Corp Sub Deferrable Int. NT. Ser. B | 047468ab9 | 500,000 | 10/30/06 | Aa2 | AA | Aa2 | AA |
| Lehman Bros. Custodial Rep Primus Fin. Ser. B (Primus) | 52519g802 | 2,000,000 | 5/24/06 | A2 | A | A2 | A |
| Double Oak Cap Secs | 25857caa2 | 3,000,000 | 7/23/07 | Aaa | AAA | Aaa | AAA |
| North Castle V Money Mkt Pfd | 658320205 | 1,000,000 | 5/9/07 | Aa2 | AA | Aa3 | AA- |
| North Castle Mmp | 658321203 | 1,400,000 | 6/19/06 | Aa2 | AA | Aa3 | AA- |
| Primus Finl Prods Lsc Sub Nt | 74163pae2 | 900,000 | 3/9/07 | Aa2 | AA | Aa2 | AA |
| Sutton Cap Tr lv Money Mkt Committed Pfd | 86943x205 | 1,500,000 | 2/21/07 | Aa2 | AA | Aa2 | AA |
| Lehman Bros Custodial Rep Primus Fins Ser A | 52519g208 | 500,000 | 6/28/06 | A2 | A | A2 | A |

| SECURITY/ISSUER | CUSIP | COST | SETTLE DATE | MOODY'S SETTLE DATE | S&P SETTLE DATE | MOODY'S JAN. 26, 2008 | S&P JAN. 26, 2008 |
|---|---|---|---|---|---|---|---|
| Lehman Bros Custodial Rep Primus Fins Ser A | 52519g208 | 800,000 | 7/26/06 | A2 | A | A2 | A |
| Anchorage Fin Sub Trust | 033299207 | 400,000 | 10/18/06 | Aa2 | AA | Aa2 | AA |
| Market Street Custodial Trust | 570601209 | 1,600,000 | 6/29/07 | NR | A | NR | A |
| Insurance Note Capital | 45804eaa0 | 600,000 | 7/31/07 | Aaa | AAA | Aaa | AAA |
| Insurance Note Capital | 45804xaa8 | 2,900,000 | 7/11/07 | Aaa | AAA | Aaa | AAA |
| Insurance Note Capital | 45804qaa3 | 1,000,000 | 5/17/07 | Aaa | AAA | Aaa | AAA |

123.    These specific ARS consisten tly received high investment-grade ratings from Defendants, as reflected in the spreadsheet, from the settle date through at least as late as January 2008.

124.    As a result of Defenda nts' misrepresentations, which initia lly led to P laintiffs' purchases of these ARS, Plaintiffs have been f orced to continue holding, in som e form, these impaired and, in some instances, unmarketable investments.

125.    As noted, each of the Structured Product ARS purchased by Plaintiffs were given High Investment Grade Ratings by Defendants.   Defendants, who upon infor mation and belief were paid significant sum s by the issuers of and/or  other entities with a direc t interest in the securities they rated (and the sale thereof), issu ed such ratings not of  their own accord for th e purpose of dissemination to the public generally, but specifically for use in marketing and selling the securities to a limited class of investors, including Plaintiffs.

126.    But, as has now been revealed, Defendants'  ratings of these securities  were not objective and indepen dent, and they did not accu    rately reflect the creditworthiness of the Structured Product ARS purchased by Plaintif  fs. The Ratings Agencies never reviewed the default risk of the Structured   Product ARS sold to Plaintiffs. Instead, upon inform    ation and belief, the Agencies simply transferred to the ARS the ratings that they had applied to the issuing

entities, themselves—typically specially created trusts or companies with no credit histories of their own—and/or other entities whose ratings we re knowingly and improperly inf lated due to their dependence on the underlying and improperly rated subprime securities.

127.   Because the issuers and /or other related en tities could use the m oney Plaintiffs paid for the ARS to pay losses on RMBS and CDOs, the rating applied to the issuer and/or other entities—and, in tu rn, to the  ARS—would  necessarily be deri ved  from or dependent on the ratings applied to the RMBS and CDOs.  Accord  ingly, the High Investm ent Grade Ratings the Agencies applied to the Structured P roduct ARS purchased by Plaintiffs suffered from the sam e egregious and knowing failings  as the rating s applied to the RMBS and CDOs, discussed    in detail  above, and were equally flawed and       over  inflated.  Defendants knew this, but they nonetheless issued the High Investment Grade Ratings for the Structured Product ARS purchased by Plaintiffs.

128.   Because these Structu red  Product ARS pur chased  by Plaintiffs were based or otherwise dependent upon extrem ely risky subpri me mortgage-related derivatives, they never warranted the High Investm ent Grade Ratings the Defendants gave them, and Defendants knew it.

129.   Beginning in or around 2007, the house of cards that the Rating Agencies helped to build based on subprim e and ot her high-risk mortgages began to  collapse.  Hold ers of such mortgages  began to default at increasing rates,       and those increasing defaults reverberated throughout the RMBS, CDOs and Structured Product ARS tied to or dependent upon those loans. Billions of dollars worth of structured securities have defaulted and, in many cases, have become worthless.

130.     It has now become clear that Defendants misled Plaintiffs – and other risk averse investors – into purchasing the risky Structured Product ARS by assigning to those ARS grossly inflated and unjustified ratings. Plaintiffs and other investors were unwittingly duped into holding highly risky investments that far exceeded their risk tolerance parameters.

131.     After the subprime mortgage crisis revealed the true risks of those Structured Product ARS, including those ARS purchased by Plaintiffs, the ARS became illiquid and substantially devalued, and Plaintiffs have been left holding millions of dollars in impaired and, in some instances, unmarketable Structured Product ARS. The losses sustained by Plaintiffs were a foreseeable consequence of the Defendants' misrepresentations and omissions.

132.     Had Plaintiffs known the facts set forth herein, Plaintiffs would not have permitted Lehman to purchase the Structured Product ARS for their accounts, and would not have suffered the harm they did.

## COUNT I

### (Fraud)

133.     Plaintiffs reallege and incorporate the foregoing paragraphs as if fully rewritten herein.

134.     With the intent of inducing Plaintiffs to purchase Structured Product ARS and to continue holding Structured Product ARS, Defendants knowingly and/or recklessly made false representations of fact.

135.     Defendants, with knowledge of or reckless disregard for the truth, disseminated the false statements specified above, which were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

136.     Defendants' aforementioned misrepresentations and omissions are material factors that reasonable investors, including Plaintiffs, would have considered important in making an investment decision.

137.     Plaintiffs justifiably and reasonably relied upon Defendants' false representations as to the credit quality of the Structured Product ARS in purchasing and holding tens of millions of dollars worth of Structured Product ARS.

138.     Had Plaintiffs known the truth about Structured Product ARS and Defendants' rating of them, Plaintiffs would not have purchased and held such ARS.

139.     Plaintiffs purchased the Structured Product ARS between the time the misrepresentations were made and the time the true credit risks of investing in such securities were revealed.

140.     By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT II

### (Violations of Section 10(b) of the
### Exchange Act and Rule 10b-5 Promulgated Thereunder)

141.     Plaintiffs reallege and incorporate the foregoing paragraphs as if fully rewritten herein.

142.     Defendants intentionally and/or recklessly: (a) employed a device, scheme and artifice to defraud Plaintiffs with respect to the sale of the Structured Product ARS; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business that operated as a fraud and deceit upon Plaintiffs in connection with the sale and purchase of Plaintiffs' ARS, in violation of Section

10(b), 15 U.S.C. § 78i(b), of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

143.    Plaintiffs justifiably and reasonably relied upon Defendants' false representations as to the credit quality of the Structured Product ARS in purchasing and holding tens of millions of dollars worth of Structured Product ARS.

144.    Had Plaintiffs known the truth about Structured Product ARS and Defendants' rating of them, Plaintiffs would not have purchased and held such ARS.

145.    Defendants' misrepresentations, misleading statements and omissions were not "forward looking" statements because they were statements of current or historical fact.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint.

146.    Alternatively,  to the extent  that  the statutory  safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because:  (i) such statements, made intentionally by Defendants, were material; (ii) at the time each of those forward-looking statements was made, Defendants had actual knowledge that the particular forward-looking statement was false or misleading; and/or (iii) such statements were  not identified by Defendants as "forward-looking" and lacked  meaningful  cautionary language identifying important factors that could cause actual results to  differ materially from those in the purportedly forward-looking statements.

147.    Defendants' materially misleading statements and omissions were reflected in the primary offering and subsequent market price of the Structured Product ARS.

148.    Plaintiffs purchased the Structured Product  ARS in reasonable and justifiable reliance upon Defendants' false representations as  to the credit quality of the Structured Product

ARS in purchasing and holding tens of millions of dollars worth of Structured Product ARS; the market price, which incorporated Defendants' ratings; and the integrity of the ARS market itself, on which the Structured Product ARS could not ha ve traded absent Defendants' fraudulent and misleading statements and omissions.

149.    Plaintiffs commenced this action within two years of February 2008, when they first became aware that the Structu red Product ARS might not have th e credit quality falsely represented by Defendants, and w ithin five years of the date they purchased, through Lehm an, the relevant ARS.

150.    By reason of the foregoing, Plaintiffs have be en damaged in an am ount to be determined at trial.

### COUNT III

**(Violation Of Ohio's Blue Sky Laws)**

151.    Plaintiffs reallege and inco rporate the foregoing paragrap hs as if fully rewritten herein.

152.    The Structured Product ARS Plaintiffs, who are based in Ohio, now own were offered for sale pur suant to of fering materials that contained false statements, omitted to s tate material facts necessary in or der to m ake the statem ents made not m isleading, and contained unfounded and unjustified ratings.

153.    Specifically, the offering materials falsely represented that the Structured Product ARS Plaintiffs purchased had a credit quality consistent with Defendants' criteria for High Investment Grade Ratings.

154.    In fact, those Structured Product ARS did not have a credit quality consistent with Defendants' criteria for High Inves tment Grade Ratings, because, as Defendants well kn ew,

those ARS were in fact related to and/or otherwise dependent on and subject to the credit risks of highly risky subprime mortgage debt.

155.    Defendants participated in and aided in   the sale of the Structured Product ARS purchased by Plaintiffs, including by falsely representing that those ARS were of a credit quality consistent with Defendants' High Investment Grade Ratings, and Defendants did so in violation of Sections 1707.41, 1707.43 and 1707.44 of the Ohio Securities Act.

156.    Plaintiffs   justifiably and reasonab     ly   relied upon the Defendants' false representations of credit qual ity in purchasing and holding,   through Lehman, the Structured Product ARS.  Had Plaintiffs known the truth about   the credit quality of the Structured Product ARS represented by Defendants, Plaintiffs would not have purchased those ARS.

157.    By reason of the foregoing, Plaintiffs have be    en damaged in an am ount to be determined at trial.

## COUNT IV

### (Negligent Misrepresentation)

158.    Plaintiffs reallege and inco rporate the foregoing paragrap hs as if fully rewritten herein.

159.    Plaintiffs were part of a select and    limited class of qualified investors to whom Defendants intended their ratings to be ultimately supplied as part of the offering materials.

160.    Defendants issued ratings of Structured     Product ARS to provide guidance to investors such as Plaintiffs in making investment decisions, and Defendants knew that their ratings would be relied upon by Plaintiffs and other members of this class of investors.

161.    Plaintiffs had a reasonable expectation th at Defendants were independent, that Defendants' methods were valid and objective, and that Defenda nts' ratings of Structure d Product ARS accurately reflected the credit quality of such instruments.

162.    Defendants knew or should have known that their representations about Structured Product ARS were false and misleading.

163.    Defendants made their m aterial misrepresentations and om issions of fact negligently and carelessly.

164.    But for the Def endants' material misrepresentations and om issions of fact, the Structured Product ARS would have been unmarketable.

165.    Plaintiffs reasonably relied to thei r detriment upon Defendants' negligent misrepresentations and omissions by purchasing and holding tens of millions of dollars worth of Structured Product ARS that are now illiquid and devalued.

166.    As a direct and proxim ate consequence of Defendants' negligent misrepresentations, Plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT V

### (Declaratory Relief)

167.    Plaintiffs reallege and inco rporate the foregoing paragrap hs as if fully rewritten herein.

168.    Defendants have repe atedly asserted that th e First Am endment to th e United States Constitution bars any claim s against them for fraud and/or neglig ent misrepresentation on the basis of their ratings.

169.    Specifically, Defendants have repeatedly asserted two, primary First A mendment arguments: (a) that they, as pu rported members of the "fin ancial press," can be h eld liable for

misstatements only upon proof of "actual m     alice"—a  standard applicable in certain cases involving  public-figure pl aintiffs;  and (b) that their rating    s  constitute "opinion," which they contend is non-actionable under the First Amendment.

170.    Defendants' First Amendment arguments, however, represent a m isapplication of First Amendment jurisprudence and/or are contra ry to substantial precedent which holds, am ong other things, that:

(a)    the  First  Amendment  is not a defense to frau    d  and/or securities frau  d claims [see Illinois ex rel. Madigan v. Telemarketing Associates, Inc., 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud.")];

(b)    even in the defamation context, the "actual malice" test for *liability* applies only  where the Plaintiff is    a "pub lic  figure," even  if the defendant is a journalist, and that, absent a public figur e plaintiff, the  mere  fact that the matter  is o ne  of  "public conce rn"  is insuf ficient  to invo ke  the "ac tual malice" test for liability  [see Gertz  v. Robert Welch, Inc., 418 U.S. 323, 343-45,  347-49 (1974) (refusing to a     pply  actual m alice  standard to private-figure plaintiffs, even wher e underlying speech invo lved a matter of public concern)];

(c)    that  rating agency defendants do not      act as "financial journalists   " in providing  issuer-paid ratings to be used    in the m arketing  of  the issue r's securities to a targeted  group of investors, nor do ratings issued in such circumstances constitute matters of "public concern"; and

(d)    even  purported  "opinions"  are actionab le,  consistent  with th e  First Amendment,  where th ey  contain  "provably  false" and /or  objectively

verifiable statements; or where th e party offering the opinion does not believe it or it is without basis in fact [see Milkovich v. Lorain Journal, 497 U.S. 1, 19-23 (1990)].

171.    As set forth herein, Plaintiffs have allege d that Defendants' fact-based ratings of the Structured Product ARS purchased by Plainti ffs were:  (a) based on knowingly and provably false and/or deficient evaluations and/or criteria employed by Defendants; and (b) generated for use and paid for by the issuers thereof in a ttempting to s ell the Structured Product ARS to a limited class of investors, including Plaintiffs—which are privately-held companies.

172.    Given the obvious conflict between Defe         ndants' First Am endment-based assertions and the app licable precedent, in light of Plain     tiffs' actual allegations, a r eal, substantial, and immediate controversy is presented regarding the rights, duties and liabilities of the parties.  Declar atory relief from this Court will r esolve this controversy and lim it the uncertainties.

173.    Plaintiffs therefore request a declaratory judgment from this Court, pursuant to Rule 57 of the Federal Rules of Ci vil Procedure, that will resolve the issue of the application of the First Am endment to Plain tiffs' claims in th is case.  Specifically,    Plaintiffs request a declaration, in light of the applicable precedent, that:

(a)    the First Amendment has no applic ation to Plaintiffs' fraud and/or federal and state-law securities fraud claims;

(b)    that the "ac tual malice" test f or liability that is applied in public -figure _defamation_ cases involving speech regarding matters of "public con cern" has no application to this case because (i) this test is not applicable outside

of the public figure defamation context, and (ii) it otherwise has no application to the privately-held corporate plaintiffs in this case;

(c)    that, in generating and providing issuer-paid ratings of securities for the purpose of marketing such securities to a targeted group of investors, Defendants do not act as financial publishers, and their ratings do not constitute matters of "public concern"; and

(d)    that Defendants' ratings at issue in this case do not constitute protected "opinion" because such ratings are based on objectively verifiable information, Defendants did not truly believe the accuracy of the ratings and/or such ratings lacked a basis in fact.

**WHEREFORE**, Plaintiffs demand judgment:

(a)    awarding Plaintiffs compensatory damages in amounts to be determined at trial, in excess of $75,000, together with interest, attorneys' fees, costs and disbursements; and

(b)    awarding Plaintiffs punitive and exemplary damages in amounts to be determined at trial; and

(c)    a declaratory judgment as set forth in Count V, above; and

(d)    such other and further relief as is just and proper.

Respectfully submitted,

ZEIGER, TIGGES & LITTLE LLP

By:    _____
Marion H. Little, Jr.   (0042679)
Christopher J. Hogan (0079829)
3500 Huntington Center
41 South High Street
Columbus, Ohio  43215
(614) 365-9900
(Fax) (614) 365-7900

little@litohio.com
hogan@litohio.com

BRACEWELL & GIULIANI LLP

Andrew K. Rafalaf  (4566535)
1251 Avenue of the Americas
New York, New York 10020
(212) 508-6100 (t)
(212) 508-6101 (f)
andrew.rafalaf@bgllp.com

JAMES E. ARNOLD & ASSOCIATES,
LPA

James E. Arnold (0037712)
Scott J. Stitt (0073943)
115 W. Main Street, Suite 400
Columbus, Ohio 43215
(614) 460-1600 (t)
(614) 469-1066 (t)
jarnold@arnlaw.com

Attorneys for Plaintiffs

## Jury Demand

Plaintiffs demand a trial by jury, in the maximum number provided by law, as to all claims and issues properly triable to a jury.

_____
Marion H. Little, Jr.   (0042679)

885-001:317128