UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN SIGNATURE, INC. and SEI,
INC.,

                Plaintiffs,

    - against -

MOODY'S INVESTORS SERVICES, INC.,
THE MCGRAW-HILL COMPANIES, INC.,
d/b/a Standard & Poor's Rating Services, and
STANDARD & POOR'S FINANCIAL
SERVICES, LLC,

                Defendants.

**MEMORANDUM
OPINION & ORDER**

10 Civ. 5095 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        This case centers on allegations that certain credit rating agencies assigned false

and misleadingly high ratings to auction rate securities. Plaintiffs American Signature, Inc. and

SEI, Inc. bring this action against The McGraw-Hill Companies, Inc. and Standard & Poor's

Financial Services, LLC[1] (together "S&P"), and Moody's Investors Service, Inc.[2] ("Moody's")

(collectively the "Rating Agencies" or "Defendants") pursuant to Section 10(b) of the Securities

and Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act") and Rule 10b-5, 17 C.F.R.

§ 240.10b-5. (FAC (Dkt. No. 76)) Plaintiffs also assert claims for common law fraud, negligent

---

[1]  Standard & Poor's Financial Services, LLC is a wholly-owned subsidiary of The McGraw-Hill
Companies, Inc. (First Amended and Supplemented Complaint ("FAC") (Dkt. No. 76) ¶ 13;
Def. Br. (Dkt. No. 25-2) at 21 n.1 ("Since January 1, 2009, S&P Ratings Services has been a
business unit of Standard & Poor's Financial Services LLC, a wholly-owned subsidiary of
McGraw-Hill.") Additionally, all references to page numbers in this Order are as reflected in this
District's Electronic Case Filing System.
[2]  Plaintiffs sued "Moody's Investors Services, Inc." (see Cmplt. (Dkt. No. 3)), but the
company's actual name is "Moody's Investors Service, Inc." (See Def. Br. (Dkt. No. 25-2) at
21).

misrepresentation, violation of Ohio's Blue Sky Laws, and seek declaratory relief pursuant to the First Amendment. (Id.)

Defendants have moved to dismiss the FAC pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (See Def. Br. (Dkt. No. 25-2); Supp. Def. Br. (Dkt. No. 79)) Defendants argue, inter alia, that: (1) Plaintiffs lack standing to bring their claims; (2) Plaintiffs' fraud claims are insufficiently pled; (3) Plaintiffs' non-fraud claims are preempted by federal law; (4) Plaintiffs' negligent misrepresentation claim fails under both New York and Ohio law; (5) Plaintiffs' Ohio Blue Sky Law claims are not adequately pled; and (6) the First Amendment bars Plaintiffs' Ohio Blue Sky Law and negligent misrepresentation claims. (Id.)

For the reasons set forth below, Defendants' motion to dismiss will be granted.

## **BACKGROUND**

### I.     **FACTS**[3]

Plaintiffs are retail businesses "maintain[ing] substantial amounts of their assets in cash or other highly-liquid investments[.]"[4] (FASC (Dkt. No. 76) ¶ 16) Moody's and Standard & Poor's Rating Service are nationally recognized statistical rating organizations.[5] (Id. ¶¶ 4, 11-14)

Plaintiffs employed a "conservative investment policy" (id. ¶ 17), and to "protect their cash" (id. ¶ 16) they intended to "permit investment of their cash in only safe and liquid

---

[3]  The following facts are drawn from the FAC and are presumed true for purposes of resolving Defendants' motion to dismiss. See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

[4]  Plaintiff American Signature is an Ohio corporation, and Plaintiff SEI is a Nevada corporation. (FAC (Dkt. No. 76) ¶¶ 9-10) Plaintiffs' principal places of business are in Columbus, Ohio. (Id.)

[5]  Moody's and The McGraw Hill Companies are incorporated in Delaware, with their principal places of business in New York. (Id. ¶¶ 11-12) Standard & Poor's Financial Services, LLC is a Delaware limited liability company, with its principal place of business in New York. (Id. ¶13)

'cash equivalent' securities." (Id. ¶ 4)  Accordingly, they "limited their investments to those

carrying high ratings from . . . Moody's, S&P, and/or Fitch IBCA." (Id. ¶ 17)  They also "relied

explicitly upon Defendants' rating schemes," and the "representations that their ratings were the

product of current, unbiased, objective analyses and reflected . . . independent and good faith

conclusions as to the creditworthiness of the rated securities." (Id. ¶ 4)

        Consistent with their investment strategy, between February 2005 and July 2007,

Plaintiffs instructed "their former investment advisor, Lehman Brothers, Inc.," to only purchase

securities on their behalf "that carried high 'investment grade' ratings from one or more of the

major" rating organizations, including Defendants.[6] (Id. ; see also id. Ex. A)  Plaintiffs allege,

however, that Defendants assigned "over inflated and utterly baseless" ratings to **certain**

"auction rate securities," "as well as the underlying ratings from which they were derived."[7] (Id.

¶ 2)  "In fact, the [Defendants] fraudulently concealed the truth that certain [auction rate

securities] . . . were undeserving of the misleadingly high ratings . . . assigned to them because

those ratings did not reflect any review of the [auction rate securities] but, rather, were . . .

derived from the Rating Agencies' own ratings on subprime mortgage-related derivatives and/or

---

[6] Plaintiffs' allege that "[i]n reliance" on Defendants' "unjustified investment grade ratings[,] . . . Lehman purchased on Plaintiffs' behalf hundreds of millions of dollars worth of those [auction rate securities]." (Id. ¶ 8)

[7] According to the FAC, subprime mortgages are "loans at higher interest rates made to borrowers with riskier credit histories." (Id. ¶ 18)  "Subprime mortgages were packaged together and securitized as complex structure debt securities, such as residential mortgage-back securities and collateralized debt obligations." (Id. ¶ 19)  "While [residential mortgage-backed securities] and [collateralized debt obligation] securities were typically long-term securities purchased by investors seeking higher yields, the damage caused by these risky and volatile securities was spread to conservative short term investors . . . through the creation of Structure Product [auction rate securities] . . . marketed to investors . . . as safe, 'cash equivalent' investments on the basis that they were highly rated and highly liquid, because they could be sold at auctions held as frequently as every seven days." (Id. ¶ 20)  See also Anschutz Corp. v. Merrill Lynch & Co., 690 F. 3d 98, 102 (2d Cir. 2012) (providing a more comprehensive discussion of auction rate securities).

entities whose ratings were knowingly and improperly inflated due to their dependence on the underlying and improperly rated subprime securities." (Id.)

Plaintiffs claim that Defendants' ratings were "inflated" and "baseless" because the Rating Agencies

    (1)    competed to deliver to the issuers of the underlying subprime derivatives highly and unjustifiably favorable ratings in order to convince the issuers to retain them;

    (2)    participated in structuring those very securities that they were supposed to be rating objectively; and

    (3)    used ratings methodologies that they knew to be outdated, inappropriate and inapplicable.

(Id. ¶ 2)

Plaintiffs allege that "Moody's and S&P knew, but concealed from Plaintiffs" that the ratings "assigned to the complex [auction rate securities] . . . had no basis in fact because the ratings the Agencies applied to the subprime mortgage-related securities upon which the [auction rate securities] ratings were ultimately derived and/or dependent were utterly meaningless." (Id. ¶ 5) Rather than forming "independent" and "objective" opinions and methodologies, as was "represented," "Moody's and S&P concealed . . . [their] strong incentives from their compensation structure to deliver highly favorable investment grade ratings." (Id. ¶ 6) In other words, Defendants "were under strong competitive and financial pressures to deliver favorable evaluations of the [auction rate securities] to win the issuer's business and capture lucrative fees." (Id.)

Due to Plaintiffs' "reliance upon the unjustified investment grade ratings" (id. ¶ 8), and "Defendants' fraud . . . [in] assign[ing] egregiously misleading high . . . ratings to [auction rate securities], . . . Plaintiffs became the owners of now worthless [auction rate securities] and have suffered tens of millions of dollars in losses." (Id. ¶ 3; see also id. ¶ 8

("Now that the true risks of those securities have been revealed by the exploding subprime mortgage crisis, Plaintiffs are holding millions of dollars worth of securities that are essentially worthless."))

## II.   PROCEDURAL HISTORY

On August 31, 2009, Plaintiffs filed the Complaint in Ohio state court asserting claims for fraud, violation of § 10(b) of the Exchange Act and Rule 10b-5, violation of Ohio's Blue Sky Laws, and negligent misrepresentation.  (Notice of Removal, Ex. A. (Cmplt.) (Dkt. No. 2-2))  On October 6, 2009, the case was removed to the United States District Court for the Southern District of Ohio.  (Id.; see also Cmplt. (Dkt. No. 3))

On December 4, 2009, Plaintiffs filed an Amended Complaint.  (Am. Cmplt. (Dkt. No. 20))  The Amended Complaint adds a claim seeking a declaration that the First Amendment to the United States Constitution does not bar Plaintiffs' claims.  (Id. at 43-44)

On January 11, 2010, Defendants moved to dismiss the Amended Complaint.[8] (Def. Br. (Dkt. No. 25-2))  That same day, The McGraw-Hill Companies and Moody's moved to stay discovery (Dkt. No. 24),[9] and The McGraw-Hill Companies and Standard & Poor's Financial Services moved to change venue (Dkt. No. 26).[10]

On January 28, 2010, the Southern District of Ohio granted the motion to stay all discovery but for that informing venue, noting that the "stay will remain in effect until disposition of the pending motion to dismiss or until otherwise lifted by order of this Court."

---

[8]  On March 5, 2010 – in response to Plaintiffs' brief opposing the motion to dismiss (Pltf. Opp. (Dkt. No. 38)) – Defendants filed a joint reply in support of their motion to dismiss.  (Def. Reply (Dkt. No. 40))
[9]  On January 15, 2010, Standard & Poor's Financial Services joined the instant motion.  (Dkt. No. 31)
[10]  On January 14, 2010, Moody's joined the instant motion.  (Dkt. No. 30)

(Dkt. No. 34 at 3)  On July 2, 2010, before the pending motion to dismiss was resolved, this case was transferred from the Southern District of Ohio to this District.  (Dkt. No. 41)

On October 7, 2011, pursuant to Federal Rule of Civil Procedure 15(d), Plaintiffs moved for leave to supplement the Amended Complaint.  (Dkt. No. 67)  On September 27, 2012, this Court granted that motion and instructed Plaintiffs to file a supplemented FAC conforming with the order.  The Court also notified Defendants that no responsive pleading was necessary, as the pending motion to dismiss would be deemed directed to the supplemented FAC.  (See Dkt. No. 74)

The Court also directed the parties to submit supplemental briefing addressing the law applicable in this District (see id. at 9 ("The briefing on Defendants' motion to dismiss cites to [out of circuit case law] that [is] of little use to this Court.")) and the new allegations contained in the supplemented FAC.  (Id.)

The supplemented FAC was filed on October 3, 2012 (Dkt. No. 76), and a supplemental opposition brief was filed on October 15, 2012.  (Supp. Opp. (Dkt. No. 78))  On October 29, 2012, Defendants filed a supplemental brief in support of their motion to dismiss. (Def. Supp. Br. (Dkt. No. 79))

## DISCUSSION

### I.   MOTION TO DISMISS STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss[,] . . .  the court is to accept as true all facts alleged in the

complaint," <u>Kassner v. 2nd Ave. Delicatessen, Inc.</u>, 496 F.3d 229, 237 (2d Cir. 2007), and must

"draw all reasonable inferences in favor of the plaintiff." <u>Id.</u>

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of

'further factual enhancement,'" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 557), and

does not provide factual allegations sufficient "to give the defendant fair notice of what the claim

is and the grounds upon which it rests." <u>Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.</u>,

507 F.3d 117, 121 (2d Cir. 2007) (citing <u>Twombly</u>, 550 U.S. at 555). "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice [to

establish entitlement to relief]." <u>Iqbal</u>, 556 U.S. at 678.

Additionally, "[i]n considering a motion to dismiss for failure to state a claim

pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint,

documents attached to the complaint as exhibits, and documents incorporated by reference in the

complaint." <u>DiFolco v. MSNBC Cable L.L.C.</u>, 622 F.3d 104, 111 (2d Cir. 2010). Moreover,

"[w]here a document is not incorporated by reference, the court may never[the]less consider it

where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document

'integral' to the complaint." <u>Id.</u> (quoting <u>Mangiafico v. Blumenthal</u>, 471 F.3d 391, 398 (2d Cir.

2006)). A court may also consider "legally required public disclosure documents filed with the

SEC[.]" <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007).

## II.   <u>STANDING</u>

Defendants contend that Plaintiffs lack standing to assert their claims, arguing that

Plaintiffs (1) cannot "demonstrate that their asserted 'losses' can be fairly traceable to the Rating

Agencies' alleged conduct"; and (2) "have not adequately alleged that they have suffered any

actual or imminent 'injury in fact.'" (<u>See</u> Def. Br. (Dkt. No. 25-2) at 28-30)

To adequately allege standing, a plaintiff must plead facts demonstrating that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (citing Lujan v. Defs. Of Wildlife, 504 U.S. 555, 560 (1992)). Here, Plaintiffs' alleged "injury" is the harm they suffered from purchasing incorrectly rated and currently illiquid securities. The injury alleged by Plaintiffs is "'real', and not 'abstract.'" Id. at 340 (quoting Webster's Third New International Dictionary 472 (1971)). Moreover, the standard for determining "standing at the pleading stage is lenient," Baur v. Veneman, 352 F.3d 625, 637 (2d Cir. 2003), and while Defendants dispute the causal link between Plaintiffs' alleged injury and Defendants' alleged actions, the standard for determining standing is not the same as that applicable for determining loss causation. Compare Baur, 352 F.3d at 637, with In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d 367, 388 (S.D.N.Y. 2012). This Court concludes that Plaintiffs – who acquired the allegedly improperly rated and now valueless securities – have adequately pled standing. See In re Bear Sterns Mortg. Pass-Through Certs. Litig., 851 F. Supp. 2d 746, 776-77 (S.D.N.Y. 2012) (finding that standing was adequately pled where "at least one named Plaintiff purchased securities" from the offerings that contained "alleged misrepresentations and omissions," and where the securities' decline in value was traceable to the alleged misrepresentations and omissions); NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 158 (2d Cir. 2012) ("[Plaintiff] has Article III standing to sue defendant[] [underwriters] in its own right because it plausibly alleged (1) a diminution in the value of [certain mortgage backed securities] (2) as a result of defendants' inclusion of misleading statements in . . . registration statements and associated prospectuses that is (3) redressable through rights of action for damages.").

8

## III.   FEDERAL AND COMMON LAW FRAUD CLAIMS

Defendants contend that Plaintiffs' fraud-based claims should be dismissed because: (1) credit ratings are opinions, and Plaintiffs have not met the standard for pleading a claim based on an opinion; (2) Plaintiffs cannot establish reasonable reliance or loss causation as a matter of law; and (3) Plaintiffs have not pled scienter with particularity. (See generally Def. Br. (Dkt. No. 25-2), Def. Supp. Br. (Dkt. No. 79))

### A.   Legal Standards

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must "allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Commc'ns, 493 F.3d at 105 (citing Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)); see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co., 75 F.3d 801, 808 (2d Cir. 1996) ("To state a cause of action under section 10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury."). "A failure on any one of these elements necessitates dismissal." In re Merrill Lynch Auction Rate Secs. Litig., 851 F. Supp. 2d at 524; see also Lentell, 396 F.3d at 172 (declining to address "alternative bases for dismissal because, assuming away any other pleading defects, the district court correctly found that plaintiffs failed to plead that [the] . . . misstatements and omissions caused their investment losses").

Moreover, "[a] complaint alleging securities fraud pursuant to Section 10(b) of the Securities Exchange Act is subject to two heightened pleading standards." In re Gen. Elec.

<u>Co. Sec. Litig.</u>, 857 F. Supp. 2d 367, 383 (S.D.N.Y. 2012).  A plaintiff must satisfy Federal Rule of Civil Procedure 9(b), which requires that the complaint "'state with particularity the circumstances constituting fraud,'" and must also meet the pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b).  <u>Id.</u> (quoting Fed. R. Civ. P. 9(b))

The heightened pleading requirement under Rule 9(b) "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." <u>ATSI Commc'ns</u>, 493 F.3d at 99 (citing <u>Rombach v. Chang</u>, 355 F.3d 164, 171 (2d Cir. 2004)).  Pursuant to Rule 9(b), a securities fraud complaint based on misstatements must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" <u>Rombach</u>, 355 F.3d at 170 (quoting <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1175 (2d Cir. 1993)).

The PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2)(A); <u>see</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 313 (2007) ("The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, <u>i.e.</u>, the defendant's intention 'to deceive, manipulate, or defraud.'" (quoting <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 194 & n.12 (1976))).  "To qualify as 'strong' within the intendment of [the PSLRA] . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." <u>Tellabs</u>, 551 U.S. at 314; <u>see also</u> <u>id.</u> ("[T]o determine whether a complaint's scienter allegations can survive threshold

inspection for sufficiency, a court governed by [the PSLRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

As to Plaintiffs' common law fraud claims, the pleading requirements under New York and Ohio law are essentially the same:  plaintiff must plead (1) a misrepresentation or omission of material fact, (2) that is false, (3) that is known to be false by the defendant, (4) that is relied upon by the plaintiff, and (5) which causes injury.  Compare Ambac Assurance Corp. v. Countrywide Home Loans, Inc., 31 N.Y. 3d 569, 578-79 (2018) ("The required elements of a common-law fraud claim are a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury" (citation and quotation marks omitted)) with Lucarell v. Nationwide Mut. Ins. Co., 97 N.E.3d 458, 472 (Ohio 2018) (stating the elements of a fraud claim as "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." (citation omitted)); see also Long Island Lighting Co. v. Gen. Elec. Co., 712 F. Supp. 292, 302 (E.D.N.Y. 1989) ("[T]he elements of a fraud cause of action [under Ohio law] . . . are identical to the elements required to be proven under New York law.").

11

**B.**     **Analysis**

Here, Defendants contend that credit ratings are predictive opinions and, as such, Plaintiffs' fraud-based claims must be dismissed for failure to plausibly allege an actionable misrepresentation of an opinion.  (See, e.g., Def. Br. (Dkt. No. 25-2) at 32; Def. Supp. Br. (Dkt. No. 79) at 9)  According to Defendants, the FAC does not allege facts from which it is plausible to infer that the Rating Agencies did not believe their rating opinions at the time they were issued.  (See, e.g., Def. Supp. Br. (Dkt. No. 79) at 9)  Plaintiffs instead rely on "hindsight criticisms of the Rating Agencies regarding their ratings on [residential mortgage-backed securities] and [collateralized debt obligations]."  (Id. at 9)  According to Defendants, Plaintiffs' "hindsight criticisms" do not demonstrate that Defendants "disbelieved any of their ratings at the time they were issued."  (Id. at 10)

As an initial matter, credit ratings promulgated by rating agencies are "opinion[s] [about] the creditworthiness of a particular security."  In re Lehman Bros. Mortgage-Backed Secs. Lit., 650 F.3d 167, 183 (2d Cir. 2011); see also Compuware Corp. v. Moody's Invs. Servs., Inc., 499 F.3d 520, 529 (6th Cir. 2007) ("A . . . credit rating is a predictive opinion, dependent on a subjective and discretionary weighing of complex factors."); Tolin v. Standard & Poor's Fin. Sers., LLC, 950 F. Supp. 2d 714, 722 (S.D.N.Y. 2013) ("courts in this circuit – and around the country – have consistently held that credit ratings are statements of opinion" (citing In re Bear Stearns Mortgage Pass-Through Certificates Litig., 851 F. Supp. 2d at 770; In re Merrill Lynch Auction Rate Sec. Litig., 2011 WL 536437, at *12 (S.D.N.Y. Feb. 9, 2011), aff'd sub nom Anschutz Corp. v. Merrill Lynch & Co., 680 F.3d 98 (2d Cir. 2012); Compuware Corp., 499 F.3d at 529)).

"As such, for a credit rating to be actionable, a plaintiff must allege that the holder of the opinion reflected in the rating did not believe the opinion at the time that it was made." Tolin, 950 F. Supp. 2d at 722.  In other words, rating agencies "may only be liable for fraud if the ratings both misstated the opinions or beliefs held by the [r]ating [a]gencies and were false or misleading with respect to the underlying subject matter they address."  Abu Dhabi Com. Bank v. Morgan Stanley & Co., 888 F. Supp. 2d 431, 456 (S.D.N.Y. 2012) (emphasis in original); see also id. at 454-56 (citing Fait v. Regions Fin. Corp., 655 F.3d 105 (2d Cir. 2011) and noting that in City of Omaha, Neb. Civilian Emps. Ret. Sys. v. CBS Corp., 679 F.3d 64, 67-68 (2d Cir. 2012), the Second Circuit applied Fait's reasoning to actions under Section 10(b)).  This same standard likewise applies to claims brought under the PSLRA, New York law, and Ohio law. See Tolin, 950 F. Supp. 2d at 722 (explaining that the standard is the same under New York law and the PSLRA, because the "elements of common law fraud under New York law are substantially identical to those governing Section 10(b)" (citation and quotation marks omitted)); Lucarell , 97 N.E.3d at 472 (listing the elements of common law fraud under Ohio law); see also Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC, 700 F.3d 829, 842 (6th Cir. 2012) ("Under Ohio law, an actionable misrepresentation generally must relate to an existing or pre-existing fact which is susceptible of knowledge. . . . A statement is actionable only when an affirmative false statement has been made. . . . New York law imposes a similar requirement" (citation, quotation marks, and alteration omitted)).

Here, the FAC asserts that Defendants engaged in "egregious fraud in convincing Plaintiffs . . . to rely . . . upon the Rating Agencies' ratings of the creditworthiness of securities – ratings that the Agencies falsely represented were objective, independent, and derived from valid methodologies."  (FAC (Dkt. 76) ¶ 1)  According to Plaintiffs, the FAC "alleges facts

demonstrating that Defendants could not have plausibly believed that the ratings opinions they were giving were accurate or had any reasonable factual basis." (Pltf. Supp. Opp. (Dkt. 78) at 19) As discussed below, however, the Court concludes that the FAC pleads "generic," conclusory statements regarding the alleged fraud committed by the Rating Agencies and does not adequately allege "disbelief" by the Rating Agencies at the time the ratings were assigned. See Tolin, 950 F. Supp. 2d at 722.

1. **The FAC's Allegations**

In attempting to plead facts demonstrating that Defendants did not believe that the rating opinions they offered were accurate and had a reasonable factual basis, the FAC relies on both general and more targeted factual allegations.

As to the generalized allegations, the FAC states that "the Rating Agencies fraudulently concealed the truth that certain complex derivative [auction rate securities] were undeserving of the misleadingly high ratings . . . assigned to them because [they] . . . were . . . derived from the Rating Agencies' own ratings on subprime mortgage-related derivatives and/or entities whose ratings were knowingly and improperly inflated due to their dependence on the underlying and improperly rated subprime securities." (FAC (Dkt. No. 76) ¶ 2) Although buzzwords such as "fraud" and "knowledge" are used, this sort of unsupported "generic statement" "fails by a wide margin to allege" that the Rating Agencies "did not believe the ratings when [they] made them." Tolin, 950 F. Supp. 2d at 722. Similarly, accusations that the "Rating Agencies cast aside the objectivity that had been the hallmark of their business" (FAC (Dkt. No. 76) ¶ 21) does not speak to Defendants' alleged disbelief in their ratings, let alone with particularity. Tolin, 950 F. Supp. 2d at 722.

The FAC also alleges a generalized profit motive for the Rating Agencies' alleged misconduct.  For example, according to Plaintiffs, the Rating Agencies "refused to implement . . . new [statistical] methodologies because doing so would have cut into profits."  (FAC (Dkt. No. 76) ¶ 5)  The Rating Agencies instead relied on "preexisting, outdated and inapplicable methodologies for rating much less complex, ordinary corporate bonds, . . . relaxed their standards," (id.) and had "strong incentives from their compensation structure to deliver highly favorable investment grade ratings" (id. ¶ 6), resulting in the "inflat[ion]" of "preliminary and final ratings . . . assigned to complex new securities and, ultimately, to the [auction rate securities]." (Id. ¶ 7)  But these allegations – centered on profit motive and conflicts of interest discussed in more detail below – "at most explain why [the Rating Agencies], in theory, had a generalized motive to issue skewed non-objective ratings," Tolin, 950 F. Supp. 2d at 722, and do not demonstrate that the Rating Agencies' did not believe their ratings at the time they were issued.  Id. (citing Plumbers' Union Loc. No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 775-76 (1st Cir. 2011)); see also Plumbers' Union, 632 F.3d at 775-76 ("[T]he complaint also alleges that the ratings agencies produced high ratings aimed at keeping business, . . . [b]ut, tellingly, the complaint stops short of alleging expressly that the leadership of S & P or Moody's believed that their companies' ratings were false. . . . That a high rating may be mistaken, a rater negligent in the model employed or the rating company interested in securing more business may be true, but it does not make the report of the rating false or misleading.").

The Court considers below the FAC's more targeted allegations, in which Plaintiffs assert that the Rating Agencies (1) knowingly induced investor reliance; (2) materially misrepresented their independence and objectivity (i.e., concealed conflicts of interest); and (3)

used inapplicable and out-of-date processes to rate securities in order to improve the Rating Agencies' profits.

### a.   Knowingly Induced Investor Reliance

Plaintiffs contend that the Rating Agencies played an integral role in the "marketing of [residential mortgage-backed securities], [collateralized debt obligations], and Structured Product [auction rate securities]." (FAC (Dkt. No. 76) ¶ 23) In support of this allegation, the FAC includes quotes from various Ratings Agency personnel and government actors. For example, the FAC includes a 2008 statement from S&P's former Managing Director and Head of Residential Mortgage-Backed Securities Ratings Frank Reiter that "'the rating agencies were the oilers who kept the wheels of the train greased.'" (Id. ¶ 24 (citation omitted)) And the FAC cites the Financial Crisis Inquiry Commission ("FCIC") Report's finding that "'the failures of credit rating agencies were essential cogs in the wheel of financial destruction. The three credit rating agencies [Moody's, S&P, and Fitch] were key enablers of the financial meltdown.'" (Id. ¶ 27 (citation omitted)) While these portions of the FAC clearly point to poor performance by the rating agencies generally, and while the FCIC concluded that Moody's early-2000 rating practices were "disastrous" (id. (citation omitted)), none of the statements cited in the FAC suggest that Defendants did not believe in their ratings at the time they were issued. Tolin, 950 F. Supp. 2d at 722.

Plaintiffs also cite the FCIC Report's conclusion that "Moody's . . . relied on flawed and outdated models to issue erroneous ratings on mortgage-related securities, failed to perform meaningful due diligence on the assets underlying the securities, and continued to rely on those models even after it became obvious that the models were wrong." (Id. ¶ 28 (citation omitted) (emphasis omitted); see also id. ¶ 35) But "a disagreement, informed by hindsight, with

16

the [credit rating] opinions stated . . . is not enough to sustain" a claim based on an opinion.  In re Merrill Lynch, 2011 WL 536437, at *12-13; see also Tsereteli v. Residential Asset Securitization Tr. 2006-A8, 692 F. Supp. 2d 387, 395 (S.D.N.Y. 2010) (Finding allegations that rating agencies "used out-of-date models, did not verify the loan information provided to them, and have since downgraded [certain certificate] ratings" "insufficient to support an inference that the [r]atings [a]gencies did not actually believe that the ratings they had assigned were supported by the factors they said they had considered.  At best, they support an inference that some people believed or now believe that a different set of models, based on a different set of assumptions, might have resulted in a different rating.").

   In re Lehman Brothers Securities and ERISA Litigation, 684 F. Supp. 2d 485 (S.D.N.Y. 2010) is instructive here.  In that case, plaintiffs alleged that Moody's and S&P had "used out-of-date models"; cited articles and Congressional testimony demonstrating "that Moody's and S&P had not updated the models"; and asserted that an S&P employee had "admitted" that certain data used was "much less of a guide to future performance."  In re Lehman Bros., 684 F. Supp. 2d at 495, aff'd sub nom. In re Lehman Bros. Mortg.-Backed Sec. Litig., 650 F.3d 167 (2d Cir. 2011).  The district court dismissed plaintiffs' claims against Moody's and S&P, and the Second Circuit affirmed, finding that such allegations were

> insufficient to support an inference that the ratings agencies did not actually hold the opinion about the sufficiency of the credit enhancements to justify each rating at the time each rating was issued.  At best, they support an inference that some employees believed that the ratings agencies could have used methods that better would have informed their opinions.  Consequently, the claims based on [those] statements fail.

Id.; see also Plumbers' Union, 632 F.3d at 775 ("The complaint includes acknowledgments from S & P and Moody's executives conceding, in hindsight, that the models and data that the rating agencies were using were deficient.  But the ratings were

not false or misleading because rating agencies should have been using better methods and data.  Defendants are not liable under the securities laws when their opinions, or those they reported, were honestly held when formed but simply turn out later to be inaccurate; nor are they liable only because they could have formed 'better' opinions.").

This analysis applies with equal force here.  The post-hoc critiques in reports, testimony, and articles that Plaintiffs point to do not demonstrate actual contemporaneous disbelief by Defendants in their proffered ratings.  The critiques of the methodologies employed by the Rating Agencies at best "support an inference that some employees believed [better alternatives were available]."  In re Lehman Bros., 684 F. Supp. 2d at 495.  But such proof does not demonstrate, let alone with particularity, that Defendants knew the methodologies were yielding inaccurate ratings at the time.[11]  Id.

---

[11] The cases Plaintiffs cite in support of their "disbelief" arguments are not on point.  In Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 651 F. Supp. 2d 155 (S.D.N.Y. 2009), for example, plaintiffs brought a "class action to recover losses stemming from the liquidation of notes issued by a structured investment vehicle ("SIV")."  Id. at 163.  Moody's and S&P had rated the notes at issue and were named defendants.  Id. at 163-64.  The Abu Dhabi plaintiffs alleged, however, that Moody's and S&P "worked directly with Morgan Stanley to structure the Rated Notes in such a way that they could qualify for the Rating Agencies' highest ratings," and had helped "to determine how much equity was required at each level of the SIV in order to support the Senior Notes' 'top ratings' and the Capital Notes' 'investment grade' ratings."  Id. at 166.  The Abu Dhabi plaintiffs further alleged that the rating agencies were involved in ongoing monitoring of the SIV portfolio and provided continued advice regarding, for instance, "which types of assets the [] SIV could acquire."  Id. at 166-67.  Given these allegations, the Abu Dhabi court concluded that "plaintiffs have sufficiently pled that the Rating Agencies did not genuinely or reasonably believe that the ratings they assigned to the Rated Notes were accurate and had a basis in fact," and as such had made "actionable misstatements."  Id. at 176; see also id. at 178 (describing the rating agencies' particularized knowledge of the incorrect ratings assigned).  Here, the FAC does not contain comparable allegations.

Goldman v. Belden, 754 F. 2d 1059 (2d Cir. 1985), is likewise not on point.  In that case, the Second Circuit reversed a district court decision dismissing claims against Sykes Datatronics – "a company that designed, manufactured, and marketed microcomputer systems" –  and three of its officers, finding that the complaint had alleged and "detailed" the defendants' knowledge of "infirmit[ies]" and "flaws" in the company's business model, and had "alleged that defendants'

Similarly, alleged reliance on models known to be "flawed and outdated" (FAC (Dkt. No. 76) ¶ 28) – models used for mortgage-related securities, and not used per se for auction rate securities – does not demonstrate, let alone with particularity, that a rating was disbelieved when issued.  Tolin, 950 F. Supp. 2d at 722.

   Plaintiffs also contend that the Rating Agencies "cultivat[ed] investor reliance by portraying their ratings as independent, objective and substantially accurate" (FAC (Dkt. No. 76) ¶ 32; see also id. ¶ 33), and allege that the Rating Agencies knew "such reliance would operate to the investors' detriment."  (Id. ¶ 37)  But this allegation is likewise premised on Defendants' alleged awareness that their ratings were flawed (see, e.g., id. ¶¶ 35-38) and – as discussed above – Plaintiffs' support for this assertion is insufficient.  As to this point, Plaintiffs cite an internal 2006 email transmitted by an Associate Director in S&P's Global CDO Group:  "'Rating Agencies continue to create an[] even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters."  (Id. ¶ 37 (citation omitted); see also id. ¶ 54)  But this quote does not demonstrate that Defendants disbelieved their ratings at the time they were issued.  It instead speaks to a generalized awareness of issues with the collateralized debt obligations market.  See Tolin, 950 F. Supp. 2d at 722; In re Merrill Lynch, 2011 WL 536437, at * 12.

---

knowledge of the industry and of [Sykes' products] must have caused them to have some reservations about the ability of the Company to fulfill [the defendants' very positive] predictions [as to the probable success of one of the Company's products]."  Goldman, 754 F. 2d at 1068-69; see also Fogarazzo v. Lehman Bros., 341 F. Supp. 2d 274, 280-81 (S.D.N.Y. 2004) (noting that "explicit promises were allegedly made:  one Lehman pitch promised that the analyst 'will lead a powerful marketing campaign' for the company, presumably through positive reports.  The inevitable result of the close relationship between banking and research, coupled with the tremendous pressure on analysts to help investment bankers acquire business, was the issuance of research reports that were exaggerated or outright fabricated").  Goldman and Fogarazzo are not factually analogous to the instant case.

######## b.   <u>Concealed Conflicts of Interest</u>

Plaintiffs contend that Defendants concealed "their conflicts of interests when rating [residential mortgage-backed securities, collateralized debt obligations] and Structured Product [auction rate securities]" (FAC (Dkt. No. 76) ¶ 39) and that these alleged conflicts of interests compromised Defendants' claimed independence and objectivity in the security rating process.  (<u>Id.</u> ¶¶ 39-42)  According to Plaintiffs, (1) the compensation scheme for rating securities undermined the integrity of Defendants' ratings; and (2) Defendants participated in creating the securities they rated despite representations to the contrary.  (<u>Id.</u> ¶¶ 43-67)

As to the compensation scheme, Plaintiffs contend that Defendants had an incentive to provide high ratings to securities to win business from investment banks (<u>id.</u> ¶¶ 43-44), and that these "competitive pressures induced the [Rating Agencies] to relax their parameters."  (<u>Id.</u> ¶ 45)  In support of this allegation, Plaintiffs cite to the FCIC Report – which concluded that the Rating Agencies were "pressure[d]" to issue "better ratings" (<u>id.</u> ¶ 47 (citation omitted)) – and to an April 13, 2011 report of the United States Senate's Permanent Subcommittee on Investigations concerning the causes of the 2008 financial crisis (the "Senate Report") concluding that "credit rating agencies at times gave into pressure from the investment banks and accorded them undue influence."  (<u>Id.</u> ¶¶ 29, 49 (citation omitted); <u>id.</u>, Ex. X (Dkt. No. 76-8))  But this alleged "debasement of standards" by the Rating Agencies (<u>id.</u> ¶ 50) does not demonstrate that the Rating Agencies did not believe in their ratings at the time they were issued. <u>See</u>, <u>e.g.</u>, <u>In re Merrill Lynch</u>, 2011 WL 536437, at *12 ("[T]he fact that the Rating Agencies may have given higher – but not untruthful – ratings to retain business does not render the opinions of the Rating Agencies actionable."); <u>see also</u> <u>Plumbers' Union</u>, 632 F.3d at 776 ("In addition to claiming that the ratings were faulty, the complaint also alleges that the ratings agencies produced high ratings aimed at keeping business, and it quotes individuals at the rating

20

companies to support that proposition and to suggest that some inside the company thought that ratings were skewed.  But, tellingly, the complaint stops short of alleging expressly that the leadership of S & P or Moody's believed that their companies' ratings were false or were unsupported by models that generally captured the quality of the securities being rated.").

In sum, the testimony and statements that Plaintiffs cite in support of their claim that the Rating Agencies suffered from conflicts of interest (FAC (Dkt. No. 76) at ¶ 51, see also id. ¶¶ 52-53) – which suggest sloppiness, lack of discipline, "lack of attention" (id. ¶ 54 (citation omitted)), and "abandon[ment] of [] standards" (id. ¶ 57) – are not sufficient to demonstrate that the Rating Agencies did not believe in their ratings at the time they were issued.  See In re Merrill Lynch, 2011 WL 536437, at * 12.  Similarly, Plaintiffs' allegation that Defendants' "paramount objective" was to "pleas[e] . . . clients" in the "concentrat[ed]" environment of "issuers and banks" does not show disbelief in the ratings themselves.  (Id. ¶¶ 56-57)

Plaintiffs's strongest evidence of such disbelief is found in internal correspondence between Rating Agencies personnel.  For example, the Senate Report states that emails among S&P employees "'demonstrate[d] a clear awareness of mortgage market problems'" (id. ¶ 54 (citation omitted)):

> [A]t least some employees understood the significance of problems within the mortgage market nine months before the mass downgrades began.  One S&P employee wrote:  "I think [an article then in circulation is] telling us that underwriting fraud; appraisal fraud and the general appetite for new product among originators is resulting in loans being made that shouldn't be made. . . . [I]f [Eliot] Spitzer [then-New York Attorney General] could prove coercion this could be a RICO offense!"  A colleague responded that the head of the S&P Surveillance Group "told me that broken down to loan level what she is seeing in losses is as bad as high 40's – low 50% I'd love to be able to publish a commentary with this data but maybe too much of a powder keg."

(Id. (citation omitted))

Plaintiffs also cite the following:  (1) a statement of Richard Gugliada, S&P's former head of collaterized debt obligation ratings, that he "'knew it was wrong at the time [to relax standards in pursuit of profits and that]. . . [i]t was either that or skip the business" (id. ¶ 58); (2) a July 2008 SEC report entitled "Summary Report of Issues Identified in The Commission Staff's Examinations of Select Credit Ratings," which states that "the conflicts created by the 'issuer pays' model in rating structured finance products, particularly RMBS and related-CDOs may be exacerbated" because "arranger[s]" of such deals have greater flexibility to "adjust the deal structure to obtain a desired credit rating" and because of the "high concentration in [underwriting] firms" (id. ¶ 59 (citation omitted)); and (3) the Senate Report, which states that "[m]ultiple former Moody's and S&P employees told the Subcommittee that, in the years leading up to the financial crisis, gaining market share, increasing revenues, and pleasing investment bankers bringing business to the firm assumed a higher priority than issuing accurate [residential mortgage-backed securities and collateralized debt obligation] credit ratings."  (Id. ¶ 67 (citation omitted))

This evidence does not constitute a particularized allegation of disbelief in an issued rating, however.  These statements indicate a generalized awareness on the part of Rating Agencies personnel that (1) there were serious problems in the mortgage market; (2) relaxing standards is "wrong"; (3) conflicts of interest inherent in the "issuer pays" model were heightened in the market for auction rate securities; and (4) business concerns were being prioritized over accuracy in ratings in some instances.  But none of these statements constitutes proof of a contemporaneous disbelief in an assigned auction rate security rating.  Accordingly, these statements are not sufficient to state a claim.  Tolin, 950 F. Supp. 2d at 722.

Plaintiffs allegations that Defendants "played an active role in structuring complex securities" (id. ¶ 60) are likewise not sufficient to state a claim.  According to Plaintiffs, the "Rating Agencies worked backwards:  they started with the rating they knew would be required to market complex securities to investors, and then worked with the investment banks to 'structure' those securities."  (Id. ¶¶ 60-62)  But generalized allegations that Rating Agencies "started with the rating" and structured "deal[s] around a rating" (id. ¶ 61 (quotation marks and citation omitted)) do not demonstrate that any particular rating was wrong.  In re Merrill Lynch, 2011 WL 536437, at * 12 ("[T]he fact that the Rating Agencies may have given higher – but not untruthful – ratings to retain business does not render the opinions of the Rating Agencies actionable."); In re IndyMac Mortgage-Back Secs. Litig., 718 F. Supp. 2d 495, 511-12 (discussing contention that "the ratings process was 'unreliable and highly compromised' because the rating agencies had conflicts of interest and did not verify the loan data provided to them"; concluding that such "allegations are insufficient," in part because "there was no duty to disclose the ratings agencies conflicts of interest, as the information was known widely" (citation omitted)).

Similarly, the alleged "blurring" between "rater and issue[r]" (id. ¶ 63 (quotation marks and citation omitted)) does not constitute a plausible allegation that a rating was disbelieved.  See In re Lehman Bros., 684 F. Supp. 2d at 491-92 (discussing allegations of "rating shopping," in which Lehman Bros. allegedly "paid the ratings agencies for their ratings"; concluding that such allegations fail to state a claim, in part because "the risk that the ratings agencies operated under a conflict of interest because they were paid by the issuers had been known publicly for years"); see also Plumbers' & Pipefitters' Loc. No. 562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance Corp. I, 2012 WL 601448, at *15 (E.D.N.Y. Feb. 23, 2012) (in

discussing conflicts of interest, noting that "[t]he Securities Act of 1933 . . . does not require offerings to disclose information that is already public"); In re Moody's Corp. Sec. Litig., 2013 WL 4516788, at *1 (S.D.N.Y. Aug. 23, 2013) ("Moody's publicly available Professional Code of Conduct, which was adopted in June of 2005, sets forth its policies and procedures about managing the conflicts of interest inherent in this 'issuer pays' model."); United States v. McGraw-Hill Companies, Inc., 2014 WL 1647385, at *1 (C.D. Cal. Apr. 15, 2014) ("As of June 2007, [nationally recognized statistical rating organization] status was based, in part, on S&P's submission of its 'Code of Conduct' to address questions about the management of 'conflicts of interest.'"); New Jersey Carpenters Health Fund v. Residential Capital, LLC, 2010 WL 1257528, at *7 (S.D.N.Y. Mar. 31, 2010) ("Conflicts of interest between rating agencies and underwriters due to the pay structure was known, considered, and published in SEC reports from at least 2003 . . . . There were also a number of trade journal and other press articles that discussed rating agency payment by investment banks. . . . A reasonable investor would be expected to know that the rating agencies were paid by the investment banks that hired them, and that they had a hand in determining the structure of securitizations." (citation and quotation marks omitted)).

And while Plaintiffs cite a statement from a former Moody's executive that "'the ratings process became a negotiation'" (id. ¶ 65 (citation omitted)), that statement does not demonstrate that the ratings in general were inaccurate, fraudulent, wrong, or disbelieved, much less that any particular rating was inaccurate, fraudulent, wrong, or disbelieved. Compare, e.g., Negotiation, Black's Law Dictionary (11th ed. 2019) ("A consensual bargaining process in which the parties attempt to reach agreement on a disputed or potentially disputed matter") with Disbelief, https://www.meriam-webster.com/disbelief (last visited Oct. 9, 2023) ("the act of disbelieving; mental rejection of something as untrue"). Assuming that the Rating Agencies

negotiated with investment banks regarding appropriate ratings, this circumstance does not demonstrate that the ratings that were later issued were inaccurate, fraudulent, wrong, or disbelieved, much less that any particular rating was inaccurate, fraudulent, wrong, or disbelieved.

In sum, Plaintiffs have not plausibly alleged that the ratings issued by Defendants were disbelieved when made.  See Tolin, 950 F. Supp. 2d at 722.

### c.      Use of Outdated Processes to Rate Securities

Plaintiffs also complain that the Rating Agencies knowingly "applied processes and data they knew to be inaccurate, inapplicable and out-of-date" in rating securities.  (FAC (Dkt. No. 76) ¶ 68)  Defendants' use of "flawed" credit rating models produced "inaccurate ratings," and ratings that were "vulnerable to improper influence and inflated ratings."  (See, e.g., id. ¶ 69 (quotation marks and citation omitted))  In making these assertions, Plaintiffs cite the Senate Report, which found that

> the credit rating agencies were aware of problems in the mortgage market . . .
> [and] [i]nstead of using this information to temper their ratings, the firms
> continued to issue a high volume of investment grade ratings for mortgage backed
> securities.  If the credit rating agencies had issued ratings that accurately reflected
> the increasing risk in the RMBS and CDO markets and appropriately adjusted
> existing ratings in those markets, they might have discouraged investors from
> purchasing high risk RMBS and CDO securities, and slowed the pace of
> securitizations.
>
> It was not in the short term economic interest of either Moody's or S&P, however,
> to provide accurate credit ratings for high risk RMBS and CDO securities,
> because doing so would have hurt their own revenues. . . .

(Id. ¶ 70 (citation omitted)

These allegations, like those addressed above, constitute a generalized accusation of profit motive and knowledge of mortgage-market problems.  These allegations are not

sufficient to allege disbelief.  <u>Tolin</u>, 950 F. Supp. 2d at 722; <u>In re Merrill Lynch</u>, 2011 WL

536437, at *12.

           Plaintiffs' other allegations regarding the models used by Rating Agencies are

likewise conclusory and generalized.  For example, Plaintiffs contend that Defendants "refused –

primarily, if not solely, for profit reasons – to implement new models for rating [residential

mortgage-backed securities, collateralized debt obligations] and Structured Product [auction rate

securities." (<u>Id.</u> ¶ 79; <u>see</u> <u>also</u>, <u>e.g.</u>, <u>id.</u> ¶¶ 82-102) (alleging that Defendants' "knew" that their

models were "inadequate," outdated, "unsuitable," and "not sufficient[] [to] account[] for the

deteriorating quality of subprime loans being securitized," with reference to the Senate Report

and FCIC Report)  These generalized and conclusory allegations are not sufficient to show that

Defendants disbelieved the ratings at the time they were made.  See <u>Plumbers' Union</u>, 632 F.3d

762, 775 (1st Cir. 2011) ("The complaint includes acknowledgments from S&P and Moody's

executives conceding, in hindsight, that the models and data that the rating agencies were using

were deficient.  But the ratings were not false or misleading because rating agencies should have

been using better methods and data.  Defendants are not liable under the securities laws when

their opinions, or those they reported, were honestly held when formed but simply turn out later

to be inaccurate; nor are they liable only because they could have formed "better" opinions.").

And Defendants' profit motive and interest in currying favor with investment banks (<u>see</u>, <u>e.g.</u>, <u>id.</u>

¶¶ 71-77, 91, 100, 104) does not amount to the knowing promulgation of inaccurate ratings.  See

<u>Tolin</u>, 950 F. Supp. 2d at 722; <u>In re Merrill Lynch</u>, 2011 WL 536437, at * 12.

*     *     *     *

           Because the FAC does not plausibly allege that Defendants "did not believe" the

ratings at the time they were issued, Plaintiffs have not alleged actionable misstatements.  <u>Tolin</u>,

26

950 F. Supp. 2d at 722.  Accordingly, Plaintiffs' fraud-based claims will be dismissed for failure to state a claim.[12]

## IV.    NEGLIGENT MISREPRESENTATION CLAIM

Defendants contend that Plaintiffs' negligent misrepresentation claim is governed by New York law, and that Plaintiffs have failed to state a claim under New York law.  (Def. Supp. Br. (Dkt. No. 79) at 20-21)

Plaintiffs contend that their negligent misrepresentation claim is governed by Ohio law, and that they have stated a claim under Ohio law.  (Pltf. Supp. Opp. (Dkt. No. 78) at 33, 36)

### A.    Applicable New York and Ohio Law

Under New York law,

> to state a claim for negligent misrepresentation[,] . . . the plaintiff must allege that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 114 (2d Cir. 2012) (citation and quotation marks omitted)  The "duty element" is "strictly limit[ed] . . . to situations involving actual privity of contract between the parties or a relationship so close as to approach that of privity."  Id. (citation and quotation marks omitted).

Under Ohio law, "[d]etermining whether a duty of care exists . . . is not as straightforward [as the determination under New York law].

---

[12]  Because the FAC's fraud-based claims do not allege an actionable misrepresentation, this Court need not address Defendants' arguments regarding scienter, loss causation, reliance, the statute of limitations, or First Amendment protections for opinions.  (See Def. Br. (Dkt. No. 25-2) at 39, 43, 46, 49).

Ohio cases generally agree[, however,] that speakers do not owe a duty of care to the "extensive, faceless, and indeterminable investing public-at-large." Federated Mgmt., 738 N.E.2d at 856. "[L]iability may be imposed for negligent misrepresentation only if the disseminator of the information intends to supply it to a specific person or to a limited group of people." Amann v. Clear Channel Commc'ns, Inc., 165 Ohio App.3d 291, 846 N.E.2d 95, 100 (2006); see also Picker Int'l, Inc. v. Mayo Found., 6 F. Supp. 2d 685, 689 (N.D.Ohio 1998) ("A core requirement [of negligent misrepresentation claims] is a special relationship under which the defendant supplied information to the plaintiff for the latter's guidance in its business transactions."). For instance, accountants owe a duty of care not merely to their clients, but to any "third party [that] is a member of a limited class whose reliance on the accountant's representation is specifically foreseen." Haddon View Inv. Co. v. Coopers & Lybrand, 70 Ohio St.2d 154, 436 N.E.2d 212, 215 (1982) (finding limited partners were owed a duty of care by an accounting firm their general partner hired to perform accounting work); see also Picker, 6 F. Supp. 2d at 689 ("Usually the defendant is a professional . . . who is in the business of rendering opinions to others for their use in guiding their business, and the plaintiff is a member of a limited class.").

Ohio Police & Fire Pension Fund, 700 F.3d at 840-41 (emphasis in original).

Accordingly, to successfully plead a negligent misrepresentation claim under Ohio law, a plaintiff must proffer facts showing "'a special relationship under which the defendant supplied information to the plaintiff for the latter's guidance in its business transactions.'" Id. (quoting Picker, 6 F.Supp.2d at 689). This "'special relationship'" is "'a core requirement,'" and while plaintiff need not show privity, typically "'the plaintiff is a member of a limited class.'" Id. (quoting Picker, 6 F. Supp. 2d at 689) (emphasis in Picker). "In practice, the [Ohio] rule appears to work in much the same way that New York's rule of privity or 'near-privity' works." Id. at 841.

B.    **Analysis**

Here, as in Anschutz, Plaintiffs have not alleged a "relationship or contact" with the Rating Agencies that satisfies the "duty" standard necessary to state a claim for negligent misrepresentation under New York law. Anschutz, 690 F.3d at 114-15. Indeed, Plaintiffs concede this point. (See Pltf. Supp. Opp. (Dkt. No. 78) at 10 ("[W]e concede that if New York law applies to Plaintiffs' negligent misrepresentation claims, the claims fail under the 'duty'

element because the pleading here, like the one in Anschutz, contains no allegations of direct

contact between Plaintiffs and the Rating Agencies.")

Plaintiffs argue, however, that Ohio law governs their negligent misrepresentation

claim, and that their allegations are sufficient under Ohio law.  (Id. at 33)  Plaintiffs' negligent

misrepresentation claim fails under Ohio law as well, however, because Plaintiffs are not

members of a "limited class" to whom the Rating Agencies were disseminating information.

Ohio Police & Fire Pension Fund, 700 F. 3d at 841 (quoting Picker, 6 F. Supp. 2d at 689)

(emphasis in Picker).

In Ohio Police & Fire Pension Fund, the Sixth Circuit noted that, as in Anschutz,

plaintiffs had made "no allegations of contacts" with the defendant rating agencies that

demonstrated a special relationship approaching that of privity under New York law.  Id. at 840.

The court then addressed whether a "duty of care exist[ed] under Ohio law."  Id.

The court found that although plaintiffs claimed to be a part of a "limited class,"

the complaint revealed the opposite.  Id. at 841.  "Of the 308" securities purchased by the

plaintiffs, "254 of them were publicly available securities any investor could have acquired."  Id.

The court concluded that "[t]his is precisely the sort of claim for representations made to the

'faceless' investing public that Ohio courts reject."  Id.  The court further concluded that

plaintiffs' allegations were "not salvaged by the Agencies' alleged role in structuring funds, the

creation of 'pre-sale' reports containing ratings that were used by arrangers to market [the

securities], or the contingent relationship between providing a desired rating and receiving rating

fees."  Id.

Here too, the securities purchased by Plaintiffs were "disseminated to the entire

world."  (Pltf. Supp. Opp. (Dkt. No. 78) at 36)  Indeed, according to the FAC, the securities at

issue were "marketed widely" and "broadly" (FAC (Dkt. No. 76) ¶¶ 21, 23), including "to investors such as Plaintiffs" (id. ¶ 20), who are "retail businesses." (Id. ¶ 16)  Although Plaintiffs argue that they are "among a 'limited group of persons for whose benefit and guidance the defendant[s] intend[ed] to supply the information'" (Pltf. Supp. Opp. (Dkt. No. 78) at 36-37 (quoting Delman v. City of Cleveland Heights, 41 Ohio St. 3d 1, 4 (1989))), this argument is belied by the FAC, which pleads that Plaintiffs are retail business that purchased securities that were "marketed widely" and "broadly." (FAC (Dkt. No. 76) ¶¶ 16, 21, 23)

As in Ohio Police & Fire Pension Fund, Plaintiffs have not pled facts demonstrating that they were part of a "limited class" of investors.  Accordingly, they cannot establish the duty of care necessary to sustain a negligent misrepresentation claim under Ohio law.  Ohio Police & Fire Pension Fund, 700 F.3d at 840-42.

Because Plaintiffs' negligent misrepresentation claim is insufficient under both New York and Ohio law, it will be dismissed.[13]

## V.    OHIO BLUE SKY LAW CLAIM

Defendants contend that Plaintiffs' Ohio Blue Sky Law claim fails for multiple reasons, including that (1) New York law governs Plaintiffs' claims; (2) the pleading defects discussed above in connection with Plaintiffs' fraud-based claims and negligent misrepresentation claim are also fatal to Plaintiffs' Ohio Blue Sky Law claim; (3) Plaintiffs have not pled the requisite nexus with Ohio; and (4) Defendants' "conduct does not fall within the ambit of Ohio's Blue Sky laws."  (Def. Supp. Br. (Dkt. No. 79) at 26)

---

[13]  This Court does not reach Defendants' alternative arguments regarding preemption, the statute of limitations, and the First Amendment.  (See Def. Br. (Dkt. No. 25-2) at 53, 63, 75-76, 82).

A.      **Legal Standard**

"Section 1707.41(A) of the Ohio Revised Code . . . . creates 'an express private

civil cause of action for the use of false sales materials.'"   Ohio Police & Fire Pension Fund, 700

F.3d at 835 (citation omitted).   Section 1707.41, "Civil liability of seller for fraud," reads, in

part, as follows:

> In addition to the other liabilities imposed by law, any person that, by a written or
> printed circular, prospectus, or advertisement, offers any security for sale,
> or receives the profits accruing from such sale, is liable, to any person that purchased
> the security relying on the circular, prospectus, or advertisement, for the loss or
> damage sustained by the relying person by reason of the falsity of any material
> statement contained therein or for the omission of material facts, unless the
> offeror or person that receives the profits establishes that the offeror or person had
> no knowledge of the publication prior to the transaction complained of, or had just
> and reasonable grounds to believe the statement to be true or the omitted facts to
> be not material.

Ohio Rev. Code § 1707.41(A)

Section 1707.43, "Remedies of purchaser in unlawful sale," provides, in part, that

> every sale or contract for sale made in violation of Chapter 1707. of the Revised
> Code, is voidable at the election of the purchaser.  The person making such sale or
> contract for sale, and every person that has participated in or aided the seller in
> any way in making such sale or contract for sale, are jointly and severally liable to
> the purchaser . . .

Id. § 1707.43(A)

B.      **Discussion**

The FAC alleges that Defendants "violat[ed] Sections 1707.41, 1707.43 and

1707.44 of the Ohio Securities Act" by "participat[ing] in and aid[ing] in the sale of the

Structured Product [auction rate securities] purchased by Plaintiffs, including by falsely

representing that those [auction rate securities] were of a credit quality consistent with

Defendants' High Investment Grade Ratings."  (FAC (Dkt. No. 76) ¶ 155)

31

"Ohio's blue sky law prohibits sellers of securities from using material misrepresentations or omissions of material fact in printed materials that are reasonably relied on by purchasers." Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs., LLC, 813 F. Supp. 2d 871, 876-77 (S.D. Ohio 2011) (citing O.R.C. § 1707.41). Here, it is undisputed that Defendants did not sell the auction rate securities at issue. Plaintiffs instead allege that "Defendants participated in and aided in the sale" of the securities Plaintiffs purchased (FAC (Dkt. No. 76) ¶ 155), and "receive[d] the profits accruing from such sale." Ohio Rev. Code. § 1707.41(A).

Plaintiffs' allegations and the allegations in Ohio Police & Fire Pension Fund are similar. In that case, the district court "held that [the defendant rating agencies] did not [receive profits accruing from the sale of the securities in question] because the [a]gencies were paid for 'work performed in preparation for a securities offering' and their fees were 'not contingent upon an actual sale.'" Ohio Police & Fire Pension Fund, 700 F.3d at 835 (quoting Ohio Police & Fire Pension Fund, 813 F. Supp. 2d at 878).

Here, the FAC alleges that Defendants earned "profits" from investment banks and issuers for the ratings they issued. (See, e.g., FAC (Dkt. No. 76) ¶ 7) Other than alleging that Lehman Bros. purchased the auction rate securities on Plaintiffs' behalf (id. ¶ 8), however, the FAC does not discuss Plaintiffs' purchase of securities. There are no allegations suggesting that Defendants received profits as a result of Lehman's purchase of the auction rate securities. Moreover, to the extent that the FAC alleges that Defendants had a profit motive for their alleged misconduct, and received money as a result of their rating activities (see, e.g., id. ¶¶ 24, 52, 71, 79), there is no allegation that any money Defendants received was contingent on the sale of a security. See Ohio Police & Fire Pension, 700 F.3d at 835-36 ("The Funds argue that the [rating

agencies] 'receive[d] the profits' from the sale of [mortgage backed securities] merely because they were paid out of the 'proceeds' or "net proceeds' of [mortgage backed securities] sales.  But this argument confuses the source of payment with the manner in which the amount of payment is determined."); Ohio Police & Fire Pension Fund, 813 F. Supp. 2d at 878 ("because the language of [Ohio Rev. Code § 1707.41(A)] plainly requires that the profits accrue from the sale of securities, not from work performed in preparation for a securities offering, if the fee is not contingent upon an actual sale[, § 1707.41(A) cannot be applied to a non-seller]")

As in Ohio Police & Fire Pension Fund, this Court concludes that "§ 1707.41 . . . clearly does not apply to the situation at hand." Ohio Police & Fire Pension Fund, 813 F. Supp. 2d at 878.  That investment banks paid Defendants for their rating services does not demonstrate that the Rating Agencies received "profit" from the investment banks' sale of securities to Lehman Bros., Plaintiffs' agent.

Moreover, Section 1707.43, applies only to "[t]he person making [a] sale[,] . . . and every person that has participated in or aided the seller in any way in making such sale or contract for sale," that is in "violation of Chapter 1707."  Ohio Rev. Code § 1707.43(A).  As discussed above, Defendants were not "sellers," and the FAC contains no allegations regarding violations of Ohio law by sellers.  Cf. Ohio Police & Fire Pension, 700 F.3d 829 at 838-39 (noting that plaintiffs, in an attempt to "salvage their recission remedy . . . claim that two different predicate violations can be reasonably inferred from the complaint:  violations of section 1707.41(A) by the arrangers in issuing the securities the Funds purchased, and violations of section 1707.44(B) by the Agencies themselves").  The FAC does not allege any predicate violations by a seller, and therefore Plaintiffs' reliance on Section 1707.43 is misplaced.

In their supplemented briefing, however, Plaintiffs state that they are relying on Subsections 1707.44(B)(4) and 1707.44(J), and that their claims survive under these provisions. (Pltf. Supp. Opp. (Dkt. No. 78) at 39-40)  Subsection 1707.44(B)(4) states:

> No person shall knowingly make or cause to be made any false representation concerning a material and relevant fact, in any oral statement or in any prospectus, circular, description, application, or written statement, for any of the following purposes . . . selling any securities in this state.

Ohio Rev. Code § 1707.44(B)(4).  Subsection 1707.44(J) states:

> No person, with purpose to deceive, shall make, issue, publish, or cause to be made, issued, or published any statement or advertisement as to the value of securities, or as to alleged facts affecting the value of securities, or as to the financial condition of any issuer of securities, when the person knows that the statement or advertisement is false in any material respect."

Id. § 1707.44(J).

As to Subsection 1707.44(B)(4), however, the FAC does not allege that Defendants "knowingly" made false representations to sell securities in Ohio.  To the extent that the FAC broadly alleges that "Moody's and S&P regularly conduct business in Ohio" (FAC (Dkt. No. 76) ¶ 15), this allegation is not sufficient to plausibly state a claim.  And as to Subsection 1707.44(J), as discussed at length above, the FAC does not adequately allege that Defendants disbelieved the ratings they issued at the time they were issued.

For all these reasons, Plaintiffs' Ohio's Blue Sky Law claim will be dismissed for failure to state a claim.[14]

---

[14]  The Court does not reach Defendants' remaining arguments for dismissal of Plaintiffs' Ohio Blue Sky Law claim.  (See, e.g., Def. Br. (Dkt. No 25-2) at 53, 77-80)

## **CONCLUSION**

For the reasons stated above, Defendants' motion to dismiss Plaintiffs' First

Amended and Supplemented Complaint is granted.

Dated: New York, New York
October 12, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge